# OREGON *v.* MITCHELL, ATTORNEY GENERAL

No. 43, Orig.   Argued October 19, 1970—Decided December 21, 1970*

---

·*Together with No. 44, Orig., *Texas* v. *Mitchell, Attorney General,* No. 46, Orig., *United States* v. *Arizona,* and No. 47, Orig., *United States* v. *Idaho,* also on bills of complaint.

· BLACK, J., delivered an opinion announcing the judgments of the Court and expressing his own view of the cases. DOUGLAS, J., filed a separate opinion, *post*, p. 135. HARLAN, J., filed an opinion concurring in part and dissenting in part, *post*, p. 152. BRENNAN, WHITE, and MARSHALL, JJ., filed an opinion dissenting from the judgments in part and concurring in the judgments in part, *post*, p. 229. STEWART, J., filed an opinion concurring in part and dissenting in part, in which BURGER, C. J., and BLACKMUN, J., joined, *post*, p. 281.

*Lee Johnson,* Attorney General of Oregon, argued the cause for plaintiff in No. 43, Orig. With him on the briefs were *Diarmuid F. O'Scannlain,* Deputy Attorney General, *Jacob B. Tanzer,* Solicitor General, and *Al J. Laue* and *Thomas H. Denney,* Assistant Attorneys General. *Charles Alan Wright* argued the cause for plaintiff in No. 44, Orig. With him on the brief were *Crawford C. Martin,* Attorney General of Texas, *Nola White,* First Assistant Attorney General, *Alfred Walker,* Executive Assistant Attorney General, and *J. C. Davis, W. O. Shultz II,* and *John Reeves,* Assistant Attorneys General.

*Solicitor General Griswold* argued the cause for defendant in Nos. 43, Orig., and 44, Orig., and for the United States in Nos. 46, Orig., and 47, Orig. With him on the briefs were *Attorney General Mitchell, pro se, Assistant Attorney General Leonard, Peter L. Strauss,* and *Samuel Huntington.* ·

*Gary K. Nelson,* Attorney General of Arizona, and *John M. McGowan II,* Special Assistant Attorney General, argued the cause and filed a brief for defendant in No. 46, Orig. *Robert M. Robson,* Attorney General of Idaho, argued the cause for defendant in No. 47, Orig. With him on the brief was *Richard H. Greener,* Assistant Attorney General.

Brief of *amicus curiae* in all cases was filed by *A. F. Summer,* Attorney General, *Delos Burks,* First Assistant Attorney General, *William A. Allain,* Assistant Attorney General, and *Charles B. Henley* for the State of Mississippi. Briefs of *amici curiae* in Nos. 43, Orig., 46, Orig., and 47, Orig., were filed by *Melvin L. Wulf* for the American Civil Liberties Union, and by *John R. Cosgrove* for Citizens for Lowering the Voting Age et al.. Brief of *amicus curiae* in Nos. 43, Orig., and 46, Orig., was filed by *William A. Dobrovir, Joseph L. Rauh, Jr., David Rubin, Stephen I. Schlossberg, John A. Fillion, Nathaniel R. Jones, Clarence Mitchell,* and *J. Francis Pohlhaus* for the Youth Franchise Coalition et al. Briefs of *amici curiae* in No. 43, Orig., were filed by *Joseph A. Califano, Jr.,* and *Clifford L. Alexander* for the Democratic National Committee, and by *Messrs. Jones, Mitchell,* and *Pohlhaus* for the Department of Armed Services and Veterans Affairs of the National Association for the Advancement of Colored People. Brief of *amicus curiae* for the State of Indiana in support of plaintiff in No. 44, Orig., was filed by *Theodore L. Sendak,* Attorney General, *Richard C. Johnson,* Chief Deputy Attorney General, and *William F. Thompson,* Assistant Attorney General, joined by the Attorneys General for their respective States, as follows: *Joe Purcell* of Arkansas, *Robert M. Robson* of Idaho, *Jack P. F. Gremillion* of Louisiana, *Clarence A. H. Meyer* of Nebraska, *Warren B. Rudman* of New Hampshire, *Robert Morgan* of North Carolina, *Helgi Johanneson* of North Dakota, *Paul W. Brown* of Ohio, *Gordon Mydland* of South Dakota, *Vernon B. Romney* of Utah, *Slade Gorton* of Washington, *Chauncey H. Browning, Jr.,* of West Virginia, and *James E. Barrett* of Wyoming. Brief of *amicus curiae* in No. 47, Orig., was filed by *Andrew P. Miller,* Attorney General, and *Anthony F. Troy* and *Walter A. McFarlane,* Assistant Attorneys General, for the Commonwealth of Virginia.

MR. JUSTICE BLACK, announcing the judgments of the Court in an opinion expressing his own view of the cases.

In these suits certain States resist compliance with the Voting Rights Act Amendments of 1970, Pub. L. 91–285, 84 Stat. 314, because they believe that the Act takes away from them powers reserved to the States by the Constitution to control their own elections.[1] By its terms the Act does three things. First: It lowers the minimum age of voters in both state and federal elections from 21 to 18. Second: Based upon a finding by Congress that literacy tests have been used to discriminate against voters on account of their color, the Act enforces the Fourteenth and Fifteenth Amendments by barring the use of such tests in all elections, state and national, for a five-year period. Third: The Act forbids States from disqualifying voters in national elections for presidential and vice-presidential electors because they have not met state residency requirements.

For the reasons set out in Part I of this opinion, I believe Congress can fix the age of voters in national elections, such as congressional, senatorial, vice-presidential

---

[1] In Nos. 43, Orig., and 44, Orig., Oregon and Texas, respectively, invoke the original jurisdiction of this Court to sue the United States Attorney General seeking an injunction against the enforcement of Title III (18-year-old vote) of the Act. In No. 46, Orig., the United States invokes our original jurisdiction seeking to enjoin Arizona from enforcing its laws to the extent that they conflict with the Act, and directing the officials of Arizona to comply with the provisions of Title II (nationwide literacy test ban), § 201, 84 Stat. 315, and Title III (18-year-old vote), §§ 301, 302, 84 Stat. 318, of the Act. In No. 47, Orig., the United States invokes our original jurisdiction seeking to enjoin Idaho from enforcing its laws to the extent that they conflict with Title II (abolition of residency requirements in presidential and vice-presidential elections), § 202, 84 Stat. 316, and Title III (18-year-old vote) of the Act. No question has been raised concerning the standing of the parties or the jurisdiction of this Court.

and presidential elections, but cannot set the voting age in state and local elections. For reasons expressed in separate opinions, my Brothers DOUGLAS, BRENNAN, WHITE, and MARSHALL join me in concluding that Congress can enfranchise 18-year-old citizens in national elections, but dissent from the judgment that Congress cannot extend the franchise to 18-year-old citizens in state and local elections. For reasons expressed in separate opinions, my Brothers THE CHIEF JUSTICE, HARLAN, STEWART, and BLACKMUN join me in concluding that Congress cannot interfere with the age for voters set by the States for state and local elections. They, however, dissent from the judgment that Congress can control voter qualifications in federal elections. In summary, it is the judgment of the Court that the 18-year-old vote provisions of the Voting Rights Act Amendments of 1970 are constitutional and enforceable insofar as they pertain to federal elections and unconstitutional and unenforceable insofar as they pertain to state and local elections.

For the reasons set out in Part II of this opinion, I believe that Congress, in the exercise of its power to enforce the Fourteenth and Fifteenth Amendments, can prohibit the use of literacy tests or other devices used to discriminate against voters on account of their race in both state and federal elections. For reasons expressed in separate opinions, all of my Brethren join me in this judgment. Therefore the literacy-test provisions of the Act are upheld.

For the reasons set out in Part III of this opinion, I believe Congress can set residency requirements and provide for absentee balloting in elections for presidential and vice-presidential electors. For reasons expressed in separate opinions, my Brothers THE CHIEF JUSTICE, DOUGLAS, BRENNAN, STEWART, WHITE, MARSHALL, and BLACKMUN concur in this judgment. My Brother

HARLAN, for the reasons stated in his separate opinion, considers that the residency provisions of the statute are unconstitutional. Therefore the residency and absentee balloting. provisions of the Act are upheld.

*Let judgments be entered accordingly.*

## I

The Framers of our Constitution provided in Art. I, § 2, that members of the House of Representatives should be elected by the people and that the voters for Representatives should have "the Qualifications requisite for Electors of the most numerous Branch of the State Legislature." Senators were originally to be elected by the state legislatures, but under the Seventeenth Amendment Senators are also elected by the people, and voters for Senators have the same qualifications as voters for Representatives. In the very beginning the responsibility of the States for setting the qualifications of voters in congressional elections was made subject to the power of Congress to make or alter such regulations if it deemed it advisable to do so.[2] This was done in Art. I, § 4, of the Constitution which provides:

"The Times, Places and Manner of holding Elections for Senators and Representatives, shall be

---

[2] Article I, § 4, was a compromise between those delegates to the Constitutional Convention who wanted the States to have final authority over the election of all state and federal officers and those who wanted Congress to make laws governing national elections, 2 J. Story, Commentaries on the Constitution of the United States 280–292 (1st ed. 1833). The contemporary interpretation of this compromise reveals that those who favored national authority over national elections prevailed. Six States included in their resolutions of ratification the recommendation that a constitutional amendment be adopted to curtail the power of the Federal Government to regulate national elections. Such an amendment was never adopted.

A majority of the delegates to the Massachusetts ratifying con-

prescribed in each State by the Legislature thereof; *but the Congress may at any time by Law make or alter such Regulations,* except as to the Places of chusing Senators." (Emphasis supplied.)

Moreover, the power of Congress to make election regulations in national elections is augmented by the Necessary and Proper Clause. See *McCulloch* v. *Maryland,* 4 Wheat. 316 (1819). In *United States* v. *Classic,* 313 U. S. 299 (1941), where the Court upheld congressional power to regulate party primaries, Mr. Justice Stone speaking

---

vention must have assumed that Art. I, § 4, gave very broad powers to Congress. Otherwise that convention would not have recommended an amendment providing:

"That Congress do not exercise the powers vested in them by the 4th section of the 1st article, but in cases where a state shall neglect or refuse to make the regulations therein mentioned, or shall make regulations subversive of the rights of the people to a free and equal representation in Congress, agreeably to the Constitution." 2 J. Elliot's Debates on the Federal Constitution 177 (1876).

· The speech of Mr. Cabot, one delegate to the Massachusetts convention, who argued that Art. I, § 4, was "to be as highly prized as any in the Constitution," expressed a view of the breadth of that section which must have been shared by most of his colleagues:

"[I]f the state legislatures are suffered to regulate conclusively the elections of the democratic branch, they may . . . finally annihilate that control of the general government, which the people ought always to have . . . ." *Id.,* at 26.

And Cabot was supported by Mr. Parsons, who added:

"They might make an unequal and partial division of the states into districts for the election of representatives, or they might even disqualify one third of the electors. Without these powers in Congress, the people can have no remedy; but the 4th section provides a remedy, a controlling power in a legislature, composed of senators and representatives of twelve states, without the influence of our commotions and factions, who will hear impartially, and preserve and restore to the people their equal and sacred rights of election." *Id.,* at 27.

for the Court construed the interrelation of these clauses of the Constitution, stating:

"While, in a loose sense, the right to vote for representatives in Congress is sometimes spoken of as a right derived from the states . . . this statement is true only in the sense that the states are authorized by the Constitution, to legislate on the subject as provided by § 2 of Art. I, to the extent that Congress has not restricted state action by the exercise of its powers to regulate elections under § 4 and its more general power under Article I, § 8, clause 18 of the Constitution 'to make all laws which shall be necessary and proper for carrying into execution the foregoing powers.'" 313 U. S., at 315.

See also *Ex parte Siebold,* 100 U. S. 371 (1880); *Ex parte Yarbrough,* 110 U. S. 651 (1884); *Swafford* v. *Templeton,* 185 U. S. 487 (1902); *Wiley* v. *Sinkler,* 179 U. S. 58 (1900).

The breadth of power granted to Congress to make or alter election regulations in national elections, including the qualifications of voters, is demonstrated by the fact that the Framers of the Constitution and the state legislatures which ratified it intended to grant to Congress the power to lay out or alter the boundaries of the congressional districts. In the ratifying conventions speakers "argued that the power given Congress in Art. I, § 4, was meant to be used to vindicate the people's right to equality of representation in the House," *Wesberry* v. *Sanders,* 376 U. S. 1, 16 (1964), and that Congress would "'most probably . . . lay the state off into districts.'" And in *Colegrove* v. *Green,* 328 U. S. 549 (1946), no Justice of this Court doubted Congress' power to rearrange the congressional districts according to population; the fight in that case revolved about the judicial power to compel redistricting.

Surely no voter *qualification* was more important to the Framers than the *geographical qualification* embodied in the concept of congressional districts. The Framers expected Congress to use this power to eradicate "rotten boroughs,"[3] and Congress has in fact used its power to prevent States from electing all Congressmen at large.[4] There can be no doubt that the power to alter congressional district lines is vastly more significant in its effect than the power to permit 18-year-old citizens to go to the polls and vote in all federal elections.

Any doubt about the powers of Congress to regulate congressional elections, including the age and other qualifications of the voters, should be dispelled by the opinion of this Court in *Smiley* v. *Holm,* 285 U. S. 355 (1932). There, Chief Justice Hughes writing for a unanimous Court discussed the scope of congressional power under § 4 at some length. He said:

> "The subject matter is the 'times, places and manner of holding elections for Senators and Representatives.' It cannot be doubted that these comprehensive words embrace authority to provide a complete code for congressional elections, not only as to times and places, but in relation to notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of election returns; in short, to enact the numerous requirements as to procedure and safeguards which experience shows are necessary in order to enforce the fundamental right involved. . . .
>
> "This view is confirmed by the second clause of Article I, section 4, which provides that 'the Con-

---

[3] See *Wesberry* v. *Sanders,* 376 U. S. 1, 14–16 (1964).

[4] See, *e. g.,* Act of Aug. 8, 1911, 37 Stat. 13.

gress may at any time by law make or alter such regulations,' with the single exception stated. The phrase 'such regulations' plainly refers to regulations of the same general character that the legislature of the State is authorized to prescribe with respect to congressional elections. In exercising this power, the Congress may supplement these state regulations or may substitute its own. . . . It 'has a general supervisory power over the whole subject.' " *Id.*, at 366–367.

In short, the Constitution allotted to the States the power to make laws regarding national elections, but provided that if Congress became dissatisfied with the state laws, Congress could alter them.[5] A newly created national government could hardly have been expected to survive without the ultimate power to rule itself and to fill its offices under its own laws. The Voting Rights Act Amendments of 1970 now before this Court

[5] My Brother STEWART has cited the debates of the Constitutional Convention to show that Ellsworth, Mason, Madison, and Franklin successfully opposed granting Congress the power to regulate federal elections, including the qualifications of voters, in the original Constitution. I read the history of our Constitution differently. Mr. Madison, for example, explained Art. I, § 4, to the Virginia ratifying convention as follows:

"[I]t was thought that the regulation of time, place, and manner, of electing the representatives, should be uniform throughout the continent. Some States might regulate the elections on the principles of equality, and others might regulate them otherwise. This diversity would be obviously unjust. . . . Should the people of any state by any means be deprived of the right of suffrage, it was judged proper that it should be remedied by the general government." 3 J. Elliot's Debates on the Federal Constitution 367 (1876).

And Mr. Mason, who was supposedly successful in opposing a broad grant of power to Congress to regulate federal elections, still found it necessary to support an unsuccessful Virginia proposal to curb the power of Congress under Art. I, § 4. *Id.*, at 403.

124

evidence dissatisfaction of Congress with the voting age set by many of the States for national elections. I would hold, as have a long line of decisions in this Court, that Congress has ultimate supervisory power over congressional elections.[6] Similarly, it is the prerogative of Congress to oversee the conduct of presidential and vice-presidential elections and to set the qualifications for voters for electors for those offices. It cannot be seriously contended that Congress has less power over the conduct of presidential elections than it has over congressional elections.[7]

On the other hand, the Constitution was also intended to preserve to the States the power that even the Colonies had to establish and maintain their own separate and independent governments, except insofar as the Constitution itself commands otherwise. My Brother HARLAN has persuasively demonstrated that the Framers of the Constitution intended the States to keep for themselves,

---

[6] See, *e. g., Ex parte Siebold,* 100 U. S. 371 (1880); *Ex parte Yarbrough,* 110 U. S. 651 (1884); *United States* v. *Mosley,* 238 U. S. 383 (1915); *United States* v. *Classic,* 313 U. S. 299 (1941).

[7] With reference to the selection of the President and Vice President, Art. II, § 1, provides: "Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress . . . ." But this Court in *Burroughs* v. *United States,* 290 U. S. 534 (1934), upheld the power of Congress to regulate certain aspects of elections for presidential and vice-presidential electors, specifically rejecting a construction of Art. II, § 1, that would have curtailed the power of Congress to regulate such elections. Finally, and most important, inherent in the very concept of a supreme national government with national officers is a residual power in Congress to insure that those officers represent their national constituency as responsively as possible. This power arises from the nature of our constitutional system of government and from the Necessary and Proper Clause.

as provided in the Tenth Amendment,[8] the power to regulate elections. My major disagreement with my Brother HARLAN is that, while I agree as to the States' power to regulate the elections of their own officials, I believe, contrary to his view, that Congress has the final authority over federal elections. No function is more essential to the separate and independent existence of the States and their governments than the power to determine within the limits of the Constitution the qualifications of their own voters for state, county, and municipal offices and the nature of their own machinery for filling local public offices. *Pope* v. *Williams,* 193 U. S. 621 (1904); *Minor* v. *Happersett,* 21 Wall. 162 (1875). Moreover, Art. I, § 2,[9] is a clear indication that the Framers intended the States to determine the qualifications of their own voters for state offices, because those qualifications were adopted for federal offices unless Congress directs otherwise under Art. I, § 4. It is a plain fact of history that the Framers never imagined that the national Congress would set the qualifications for voters in every election from President to local constable or village alderman. It is obvious that the whole Constitution reserves to the States the power to set voter qualifications in state and local elections, except to the limited extent that the people through constitutional amendments have specifically narrowed the powers of the States. Amendments Fourteen, Fifteen, Nineteen, and Twenty-four, each of which has assumed that the States had general supervisory power

---

[8] "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U. S. Const., Amdt. X.

[9] "The House of Representatives shall be composed of Members chosen every second Year by the People of the several States, and the Electors in each State shall have the Qualifications requisite for Electors of the most numerous Branch of the State Legislature."

over state elections, are examples of express limitations on the power of the States to govern themselves. And the Equal Protection Clause of the Fourteenth Amendment was never intended to destroy the States' power to govern themselves, making the Nineteenth and Twenty-fourth Amendments superfluous. My Brother BRENNAN's opinion, if carried to its logical conclusion, would, under the guise of insuring equal protection, blot out all state power, leaving the 50 States as little more than impotent figureheads. In interpreting what the Fourteenth Amendment means, the Equal Protection Clause should not be stretched to nullify the States' powers over elections which they had before the Constitution was adopted and which they have retained throughout our history.

Of course, the original design of the Founding Fathers was altered by the Civil War Amendments and various other amendments to the Constitution. The Thirteenth, Fourteenth, Fifteenth, and Nineteenth Amendments have expressly authorized Congress to "enforce" the limited prohibitions of those amendments by "appropriate legislation." The Solicitor General contends in these cases that Congress can set the age qualifications for voters in state elections under its power to enforce the Equal Protection Clause of the Fourteenth Amendment.

Above all else, the framers of the Civil War Amendments intended to deny to the States the power to discriminate against persons on account of their race. *Loving* v. *Virginia,* 388 U. S. 1 (1967); *Gomillion* v. *Lightfoot,* 364 U. S. 339 (1960); *Brown* v. *Board of Education,* 347 U. S. 483 (1954); *Slaughter-House Cases,* 16 Wall. 36, 71–72 (1873). While this Court has recognized that the Equal Protection Clause of the Fourteenth Amendment in some instances protects against discrim-

inations other than those on account of race,[10] see *Reynolds* v. *Sims,* 377 U. S. 533 (1964); *Hadley* v. *Junior College District,* 397 U. S. 50 (1970); see also *Kotch* v. *Board of River Port Pilots,* 330 U. S. 552 (1947), and cases cited therein, it cannot be successfully argued that the Fourteenth Amendment was intended to strip the States of their power, carefully preserved in the original Constitution, to govern themselves. The Fourteenth Amendment was surely not intended to make every discrimination between groups of people a constitutional denial of equal protection. Nor was the Enforcement Clause of the Fourteenth Amendment intended to permit Congress to prohibit every discrimination between groups of people. On the other hand, the Civil War Amendments were unquestionably designed to condemn and forbid every distinction, however trifling, on account of race.

To fulfill their goal of ending racial discrimination and to prevent direct or indirect state legislative encroachment on the rights guaranteed by the amendments, the Framers gave Congress power to enforce each of the Civil War Amendments. These enforcement powers are broad. In *Jones* v. *Alfred H. Mayer Co.,* 392 U. S. 409, 439 (1968), the Court held that § 2 of the Thirteenth

---

[10] My Brother BRENNAN relies upon *Carrington* v. *Rash,* 380 U. S. 89 (1965); *Cipriano* v. *City of Houma,* 395 U. S. 701 (1969); and *Evans* v. *Cornman,* 398 U. S. 419 (1970). These typical equal protection cases in which I joined are not relevant or material to our decision in the cases before us. The establishment of voter age qualifications is a matter of legislative judgment which cannot be properly decided under the Equal Protection Clause. The crucial question here is not who is denied equal protection, but, rather, which political body, state or federal, is empowered to fix the minimum age of voters. The Framers intended the States to make the voting age decision in all elections with the provision that Congress could override state judgments concerning the qualifications of voters in federal elections.

128

Amendment "clothed 'Congress with power to pass *all laws necessary and proper for abolishing all badges. and incidents of slavery in the United States.'*" In construing § 5 of the Fourteenth Amendment, the Court has stated:

> "It is not said the *judicial power* of the general government shall extend to enforcing the prohibitions and to protecting the rights and immunities guaranteed. It is not said that branch of the government shall be authorized to declare void any action of a State in violation of the prohibitions. *It is the power of Congress which has been enlarged.*" *Ex parte Virginia,* 100 U. S. 339, 345 (1880): (Emphasis added in part.)

And in *South Carolina* v. *Katzenbach,* 383 U. S. 301 (1966) (BLACK, J., dissenting on other grounds), the Court upheld the literacy test ban of the Voting Rights Act of 1965, 79 Stat. 437, under Congress' Fifteenth Amendment enforcement power.

As broad as the congressional enforcement power is, it is not unlimited. Specifically, there are at least three limitations upon Congress' power to enforce the guarantees of the Civil War Amendments. First, Congress may not by legislation repeal other provisions of the Constitution. Second, the power granted to Congress was not intended to strip the States of their power to govern themselves or to convert our national government of enumerated powers into a central government of unrestrained authority over every inch of the whole Nation. Third, Congress may only "enforce" the provisions of the amendments and may do so only by "appropriate legislation." Congress has no power under the enforcement sections to undercut the amendments' guarantees of personal equality and freedom from discrimination, see *Katzenbach* v. *Morgan,* 384 U. S. 641, 651 n.

10 (1966), or to undermine those protections of the Bill of Rights which we have held the Fourteenth Amendment made applicable to the States.[11]

Of course, we have upheld congressional legislation under the Enforcement Clauses in some cases where Congress has interfered with state regulation of the local electoral process. In *Katzenbach* v. *Morgan, supra,* the Court upheld a statute which outlawed New York's requirement of literacy in English as a prerequisite to voting as this requirement was applied to Puerto Ricans with certain educational qualifications. The New York statute overridden by Congress applied to all elections. And in *South Carolina* v. *Katzenbach, supra* (BLACK, J., dissenting on other grounds), the Court upheld the literacy test ban of the Voting Rights Act of 1965. That Act proscribed the use of the literacy test in all elections in certain areas. But division of power between state and national governments, like every provision of the Constitution, was expressly qualified by the Civil War Amendments' ban on racial discrimination. Where Congress attempts to remedy racial discrimination under its enforcement powers, its authority is enhanced by the avowed intention of the framers of the Thirteenth, Fourteenth, and Fifteenth Amendments. Cf. *Harper* v. *Virginia Board of Elections,* 383 U. S. 663, 670 (1966) (BLACK, J., dissenting).

---

[11] See: the First Amendment, *e. g., Gitlow* v. *New York,* 268 U. S. 652 (1925); *Cantwell* v. *Connecticut,* 310 U. S. 296 (1940); *Edwards* v. *South Carolina,* 372 U. S. 229 (1963); the Fourth Amendment, *Mapp* v. *Ohio,* 367 U. S. 643 (1961); the Fifth Amendment, *Chicago, B. & Q. R. Co.* v. *Chicago,* 166 U. S. 226 (1897); *Malloy* v. *Hogan,* 378 U. S. 1 (1964); *Benton* v. *Maryland,* 395 U. S. 784 (1969); the Sixth Amendment, *Gideon* v. *Wainwright,* 372 U. S. 335 (1963); *Pointer* v. *Texas,* 380 U. S. 400 (1965); *Klopfer* v. *North Carolina,* 386 U. S. 213 (1967); *Duncan* v. *Louisiana,* 391 U. S. 145 (1968); and the Eighth Amendment, *Robinson* v. *California,* 370 U. S. 660 (1962).

In enacting the 18-year-old vote provisions of the Act now before the Court, Congress made no legislative findings that the 21-year-old vote requirement was used by the States to disenfranchise voters on account of race. I seriously doubt that such a finding, if made, could be supported by substantial evidence. Since Congress has attempted to invade an area preserved to the States by the Constitution without a foundation for enforcing the Civil War Amendments' ban on racial discrimination, I would hold that Congress has exceeded its powers in attempting to lower the voting age in state and local elections. On the other hand, where Congress legislates in a domain not exclusively reserved by the Constitution to the States, its enforcement power need not be tied so closely to the goal of eliminating discrimination on account of race.

To invalidate part of the Voting Rights Act Amendments of 1970, however, does not mean that the entire Act must fall or that the constitutional part of the 18-year-old vote provision cannot be given effect. In passing the Voting Rights Act Amendments of 1970, Congress recognized that the limits of its power under the Enforcement Clauses were largely undetermined, and therefore included a broad severability provision:

> "If any provision of this Act or the application of any provision thereof to any person or circumstance is judicially determined to be invalid, the remainder of this Act or the application of such provision to other persons or circumstances shall not be affected by such determination." 84 Stat. 318.

In this case, it is the judgment of the Court that Title III, lowering the voting age to 18, is invalid as applied to voters in state and local elections. It is also the judgment of the Court that Title III is valid with respect to national elections. We would fail to follow the

express will of Congress in interpreting its own statute if we refused to sever these two distinct aspects of Title III. Moreover, it is a longstanding canon of statutory construction that legislative enactments are to be enforced to the extent that they are not inconsistent with the Constitution, particularly where the valid portion of the statute does not depend upon the invalid part. See, *e. g., Watson* v. *Buck,* 313 U. S. 387 (1941); *Marsh* v. *Buck,* 313 U. S. 406 (1941). Here, of course, the enforcement of the 18-year-old vote in national elections is in no way dependent upon its enforcement in state and local elections.

## II

In Title I of the Voting Rights Act Amendments of 1970 Congress extended the provisions of the Voting Rights Act of 1965 which ban the use of literacy tests in certain States upon the finding of certain conditions by the United States Attorney General. The Court upheld the provisions of the 1965 Act over my partial dissent in *South Carolina* v. *Katzenbach, supra,* and *Gaston County* v. *United States,* 395 U. S. 285 (1969). The constitutionality of Title I is not raised by any of the parties to these suits.[12]

In Title II of the Amendments Congress prohibited until August 6, 1975, the use of any test or device resembling a literacy test in any national, state, or local election

---

[12] Yuma County, Arizona, is presently subject to the literacy-test ban of the Voting Rights Act of 1965 pursuant to a determination of the Attorney General under § 4 (a) of the 1965 Act. I do not understand Arizona to contest the application of the 1965 Act or its extension to that county. Arizona "does not question" Congress' authority to enforce the Fourteenth and Fifteenth Amendments "when Congress possesses a 'special legislative competence'"; and cites *South Carolina* v. *Katzenbach,* 383 U. S. 301 (1966), and *Katzenbach* v. *Morgan,* 384 U. S. 641 (1966), with approval. Answer and Brief for Arizona, No. 46, Orig., O. T. 1970.

in any area of the United States where such test is not already proscribed by the Voting Rights Act of 1965. The State of Arizona maintains that Title II cannot be enforced to the extent that it is inconsistent with Arizona's literacy test requirement, Ariz. Rev. Stat. Ann. §§ 16–101.A.4, 16–101.A.5 (1956). I would hold that the literacy test ban of the 1970 Amendments is constitutional under the Enforcement Clause of the Fifteenth Amendment and that it supersedes Arizona's conflicting statutes under the Supremacy Clause of the Federal Constitution.

In enacting the literacy test ban of Title II Congress had before it a long history of the discriminatory use of literacy tests to disfranchise voters on account of their race. Congress could have found that as late as the summer of 1968, the percentage registration of nonwhite voters in seven Southern States was substantially below the percentage registration of white voters.[13] Moreover, Congress had before it striking evidence to show that the provisions of the 1965 Act had had in the span of four years a remarkable impact on minority group voter registration.[14] Congress also had evidence to show that voter registration in areas with large Spanish-American populations was consistently below the state and national averages. In Arizona, for example, only two counties out of eight with Spanish surname populations in excess of 15% showed a voter registration equal to the state-wide average.[15] Arizona also has a serious problem of deficient voter registration among Indians. Congres-

---

[13] Hearings on H. R. 4249, H. R. 5538, and Similar Proposals before Subcommittee No. 5 of the House Committee on the Judiciary, 91st Cong., 1st Sess., Ser. 3, p. 14 (1969).

[14] Id., at 93.

[15] Hearings on S. 818, S. 2456, S. 2507, and Title IV of S. 2029 before the Subcommittee on Constitutional Rights of the Senate Committee on the Judiciary, 91st Cong., 1st and 2d Sess., 406 (1969–1970).

sional concern over the use of a literacy test to disfranchise Puerto Ricans in New York State is already a matter of record in this Court. *Katzenbach* v. *Morgan, supra.* And as to the Nation as a whole, Congress had before it statistics which demonstrate that voter registration and voter participation are consistently greater in States without literacy tests.[16]

Congress also had before it this country's history of discriminatory educational opportunities in both the North and the South. The children who were denied an equivalent education by the "separate but equal" rule of *Plessy* v. *Ferguson*, 163 U. S. 537 (1896), overruled in *Brown* v. *Board of Education*, 347 U. S. 483 (1954), are now old enough to vote. There is substantial, if not overwhelming, evidence from which Congress could have concluded that it is a denial of equal protection to condition the political participation of children educated in a dual school system upon their educational achievement. Moreover, the history of this legislation suggests that concern with educational inequality was perhaps uppermost in the minds of the congressmen who sponsored the Act. The hearings are filled with references to educational inequality. Faced with this and other evidence that literacy tests reduce voter participation in a discriminatory manner not only in the South but throughout the Nation, Congress was supported by substantial evidence in concluding that a nationwide ban on literacy tests was appropriate to enforce the Civil War amendments.

Finally, there is yet another reason for upholding the literacy test provisions of this Act. In imposing a nationwide ban on literacy tests, Congress has recognized a national problem for what it is—a serious *national* dilemma that touches every corner of our land.

---

[16] *Id.*, at 401.

In this legislation Congress has recognized that discrimination on account of color and racial origin is not confined to the South, but exists in various parts of the country. Congress has decided that the way to solve the problems of racial discrimination is to deal with nationwide discrimination with nationwide legislation. Compare *South Carolina* v. *Katzenbach, supra,* and *Gaston County* v. *United States, supra.*

### III·

In Title II of the Voting Rights Act Amendments Congress also provided that in presidential and vice-presidential elections, no voter could be denied his right to cast a ballot because he had not lived in the jurisdiction long enough to meet its residency requirements. Furthermore, Congress provided uniform national rules for absentee voting in presidential and vice-presidential elections. In enacting these regulations Congress was attempting to insure a fully effective voice to all citizens in national elections. What I said in Part I of this opinion applies with equal force here. Acting under its broad authority to create and maintain a national government, Congress unquestionably has power under the Constitution to regulate federal elections. The Framers of our Constitution were vitally concerned with setting up a national government that could survive. Essential to the survival and to the growth of our national government is its power to fill its elective offices and to insure that the officials who fill those offices are as responsive as possible to the will of the people whom they represent.

### IV

Our judgments today give the Federal Government the power the Framers conferred upon it, that is, the final control of the elections of its own officers. Our judgments also save for the States the power to control state and

local elections which the Constitution originally reserved to them and which no subsequent amendment has taken from them.[17]  The generalities of the Equal Protection Clause of the Fourteenth Amendment were not designed or adopted to render the States impotent to set voter qualifications in elections for their own local officials and agents in the absence of some specific constitutional limitations.

MR. JUSTICE DOUGLAS.

I dissent from the judgments of the Court insofar as they declare § 302 of the Voting Rights Act, 84 Stat. 318, unconstitutional as applied to state elections and concur in the judgments as they affect federal elections, but for different reasons.  I rely on the Equal Protection Clause and on the Privileges and Immunities Clause of the Fourteenth Amendment.

I

The grant of the franchise to 18-year-olds by Congress is in my view valid across the board.

---

[17] That these views are not novel is demonstrated by Mr. Justice Story in his Commentaries on the Constitution of the United States, vol. 2, pp. 284–285 (1st ed. 1833):

"There is, too, in the nature of such a provision [Art. I, § 4], something incongruous, if not absurd. What would be said of a clause introduced into the national constitution to regulate the state elections of the members of the state legislatures? It would be deemed a most unwarrantable transfer of power, indicating a premeditated design to destroy the state governments. It would be deemed so flagrant a violation of principle, as to require no comment. It would be said, and justly, that the state governments ought to possess the power of self-existence and self-organization, independent of the pleasure of the national government. *Why does not the same reasoning apply to the national government?* What reason is there to suppose, that the state governments will be more true to the Union, than the national government will be to the state governments?" (Emphasis added.) (Footnote omitted.)

I suppose that in 1920, when the Nineteenth Amendment was ratified giving women the right to vote, it was assumed by most constitutional experts that there was no relief by way of the Equal Protection Clause of the Fourteenth Amendment. In *Minor* v. *Happersett,* 21 Wall. 162, the Court held in the 1874 Term that a State could constitutionally restrict the franchise to men. While the Fourteenth Amendment was relied upon, the thrust of the opinion was directed at the Privileges and Immunities Clause with a subsidiary reference to the Due Process Clause. It was much later, indeed not until the 1961 Term—nearly a century after the Fourteenth Amendment was adopted—that discrimination against voters on grounds *other than race* was struck down.

The first case in which this Court struck down a statute under the Equal Protection Clause of the Fourteenth Amendment was *Strauder* v. *West Virginia,* 100 U. S. 303, decided in the 1879 Term.[1] In the 1961 Term we squarely held that the manner of apportionment of members of a state legislature raised a justiciable question under the Equal Protection Clause, *Baker* v. *Carr,* 369 U. S. 186. That case was followed by numerous others, *e. g.:* that one person could not be given twice or 10 times the voting power of another person in a state-wide election merely because he lived in a rural area or

---

[1] Strauder was tried for murder. He had sought removal to federal courts on the ground that "by virtue of the laws of the State of West Virginia no colored man was eligible to be a member of the grand jury. or to serve on a petit jury in the State." *Id.,* at 304. He was convicted of murder and the West Virginia Supreme Court affirmed. This Court held the West Virginia statute limiting jury duty to whites only unconstitutional:

"We do not say that within the limits from which it is not excluded by the amendment a State may not prescribe the qualifications of its jurors, and in so doing make discriminations. . . . [The aim of the Fourteenth Amendment] was against discrimination because of race or color." 100 U. S., at 310.

in the smallest rural county;[2] that the principle of equality applied to both Houses of a bicameral legislature;[3] that political parties receive protection under the Equal Protection Clause just as voters do.[4]

The reapportionment cases, however, are not quite in point here, though they are the target of my Brother HARLAN's dissent. His painstaking review of the history of the Equal Protection Clause leads him to conclude that "political" rights are not protected though "civil" rights are protected. The problem of what questions are "political" has been a recurring issue in this Court from the beginning, and we recently reviewed them all in *Baker* v. *Carr, supra,* and in *Powell* v. *McCormack,* 395. U. S. 486. *Baker* v. *Carr* was a reapportionment case and *Powell* v. *McCormack* involved the exclusio from the House of Representatives of a Congressman. The issue of "political" question versus "justiciable" question was argued *pro* and *con* in those cases; and my Brother HARLAN stated in *Baker* v. *Carr,* 369 U. S., at 330 *et seq.,* and on related occasions (*Gray* v. *Sanders,* 372 U. S. 368, 382; *Wesberry* v. *Sanders,* 376 U. S. 1, 20; *Reynolds* v.

---

[2] *Gray* v. *Sanders,* 372 U. S. 368; *Davis* v. *Mann,* 377 U. S. 678; *Swann* v. *Adams,* 385 U. S. 440; *Kilgarlin* v. *Hill,* 386 U. S. 120; *Avery* v. *Midland County,* 390 U. S. 474; *Moore* v. *Ogilvie,* 394 U. S. 814; *Hadley* v. *Junior College District,* 397 U. S. 50.

[3] *Reynolds* v. *Sims,* 377 U. S. 533; *WMCA* v. *Lomenzo,* 377 U. S. 633; *Roman* v. *Sincock,* 377 U. S. 695.

[4] *Williams* v. *Rhodes,* 393 U. S. 23. We also held in federal elections that the command of Art. I, § 2, of the Constitution that representatives be chosen "by the People of the several States" means that "as nearly as is practicable one man's vote in a congressional election is to be worth as much as another's," *Wesberry* v. *Sanders,* 376 U. S. 1, 7–8, and that that meant "vote-diluting discrimination" could not be accomplished "through the device of districts containing widely varied numbers of inhabitants." *Id.,* at 8; *Lucas* v. *Colorado General Assembly,* 377 U. S. 713; *Kirkpatrick* v. *Preisler,* 394 U. S. 526; *Wells* v. *Rockefeller,* 394 U. S. 542.

*Sims,* 377 U. S. 533, 589) his views on the constitutional dimensions of the "political" question in the setting of the reapportionment problem.

Those cases involved the question whether legislatures must be so structured as to reflect with approximate equality the voice of every voter. The ultimate question was whether, absent a proper apportionment by the legislature, a federal court could itself make an apportionment. That kind of problem raised issues irrelevant here. Reapportionment, as our experience shows, presented a tangle of partisan politics in which geography, economics, urban life, rural constituencies, and numerous other nonlegal factors play varying roles. The competency of courts to deal with them was challenged. Yet we held the issues were justiciable. None of those so-called "political" questions are involved here.

This case, so far as equal protection is concerned, is no whit different from a controversy over a state law that disqualifies women from certain types of employment, *Goesaert* v. *Cleary,* 335 U. S. 464, or that imposes a heavier punishment on one class of offender than on another whose crime is not intrinsically different. *Skinner* v. *Oklahoma,* 316 U. S. 535. The right to vote is, of course, different in one respect from the other rights in the economic, social, or political field which, as indicated in the Appendix to this opinion, are under the Equal Protection Clause. The right to vote is a civil right deeply embedded in the Constitution. Article I, § 2, provides that the House is composed of members "chosen . . . by the People" and the electors "shall have the Qualifications requisite for Electors of the most numerous Branch of the State Legislature." The Seventeenth Amendment states that Senators shall be "elected by the people." The Fifteenth Amendment speaks of the "right of citizens of the United States to vote"—not only in federal

but in state elections.    The Court in *Ex parte Yarbrough*, 110 U. S. 651, 665, stated:

> "This new constitutional right was mainly designed for citizens of African descent.    The principle, however, that the protection of the exercise of this right is within the power of Congress, is as necessary to the right of other citizens to vote as to the colored citizen, and to the right to vote in general as to the right to be protected against discrimination."

It was in that tradition that we said in *Reynolds* v. *Sims, supra*, at 555, "The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government."

This "right to choose, secured by the Constitution," *United States* v. *Classic*, 313 U. S. 299, 315, is a civil right of the highest order.    Voting concerns "political" matters; but the right is not "political" in the constitutional sense.    Interference with it has given rise to a long and consistent line of decisions by the Court; and the claim has always been upheld as justiciable.[5]    Whatever distinction may have been made, following the Civil War, between "civil" and "political" rights, has passed into history.    In *Harper* v. *Virginia Board of Elections*, 383 U. S. 663, 669, we stated: "Notions of what constitutes equal treatment for purposes of the Equal Protection Clause *do* change."    That statement is in harmony with my view of the Fourteenth Amendment, as expressed by my Brother BRENNAN: "We must therefore conclude that its framers understood their Amendment to be a broadly worded injunction capable of being inter-

---

[5] *Ex parte Siebold*, 100 U. S. 371; *Ex parte Yarbrough*, 110 U. S. 651; *Guinn* v. *United States*, 238 U. S. 347; *United States* v. *Mosley*, 238 U. S. 383; *Lane* v. *Wilson*, 307 U. S. 268; *United States* v. *Classic*, 313 U. S. 299; *United States* v. *Saylor*, 322 U. S. 385.

preted by future generations in accordance with the vision and needs of those generations." *Post,* at 278. Hence the history of the Fourteenth Amendment tendered by my Brother HARLAN is irrelevant to the present problem.

Since the right is civil and not "political," it is protected by the Equal Protection Clause of the Fourteenth Amendment which in turn, by § 5 of that Amendment, can be "enforced" by Congress.

In *Carrington* v. *Rash,* 380 U. S. 89, we held that Texas could not bar a person, otherwise qualified, from voting merely because he was a member of the armed services. Occupation, we held, when used to bar a person from voting, was that invidious discrimination which the Equal Protection Clause condemns. In *Evans* v. *Cornman,* 398 U. S. 419, we held that a State could not deny the vote to residents of a federal enclave when it treated them as residents for many other purposes. In *Harper* v. *Virginia Board of Elections,* 383 U. S., at 666, we held a State could not in harmony with the Equal Protection Clause keep a person from voting in state elections because of "the affluence of the voter or payment of any fee." In *Kramer* v. *Union School District,* 395 U. S. 621, we held that a person could not be barred from voting in school board elections merely because he was a bachelor. So far as the Equal Protection Clause was concerned, we said that the line between those qualified to vote and those not qualified turns on whether those excluded have "a distinct and direct interest in the school meeting decisions." *Id.,* at 632. In *Cipriano* v. *City of Houma,* 395 U. S. 701, we held that a state law which gave only "property taxpayers" the right to vote on the issuance of revenue bonds of a municipal utility system violated equal protection as "the benefits and burdens of the bond issue fall indiscriminately on property owner and nonproperty owner alike." *Id.,* at 705. And only on June 23, 1970, we held in *Phoenix* v. *Kolodziejski,* 399 U. S. 204, that

it violates equal protection to restrict those who may vote on general obligation bonds to real property taxpayers. We looked to see if there was any "compelling state interest" in the voting restrictions. We held that "nonproperty owners" are not "substantially less interested in the issuance of these securities than are property owners," *id.,* at 212, and that presumptively "when all citizens are affected in important ways by a governmental decision subject to a referendum, the Constitution does not permit weighted voting or the exclusion of otherwise qualified citizens from the franchise." [6] *Id.,* at 209. And as recently as November 9, 1970, we summarily affirmed a district court decision (310 F. Supp. 1172) on the basis of *Kolodziejski. Parish School Board of St. Charles* v. *Stewart, post,* p. 884, where Louisiana gave a vote on municipal bond issues only to "property taxpayers."

The powers granted Congress by § 5 of the Fourteenth Amendment to "enforce" the Equal Protection Clause are "the same broad powers expressed in the Necessary and Proper Clause, Art. I, § 8, cl. 18." *Katzenbach* v. *Morgan,* 384 U. S. 641, 650. As we stated in that case, "Correctly viewed, § 5 is a positive grant of legislative power authorizing Congress to exercise its discretion in determining whether and what legislation is needed to secure the guarantees of the Fourteenth Amendment." *Id.,* at 651.

Congress might well conclude that a reduction in the voting age from 21 to 18 was needed in the interest of equal protection. The Act itself brands the denial of

---

[6] We noted that general obligation bonds may be satisfied not from real property taxes but from revenues from other local taxes paid by nonowners of property as well as those who own realty. Moreover, we noted that property taxes paid initially by property owners are often passed on to tenants or customers. 399 U. S., at 209–211.

142

the franchise to 18-year-olds as "a particularly unfair treatment of such citizens in view of the national defense responsibilities imposed" on them.   § 301 (a)(1), Voting Rights Act, 84 Stat. 318.   The fact that only males are drafted while the vote extends to females as well is not relevant, for the female component of these families or prospective families is also caught up in war and hit hard by it.   Congress might well believe that men and women alike should share the fateful decision.

It is said, why draw the line at 18?   Why not 17? Congress can draw lines and I see no reason why it cannot conclude that 18-year-olds have that degree of maturity which entitles them to the franchise.  .They are "generally considered by American law to be mature enough to contract, to marry, to drive an automobile, to own a gun, and to be responsible for criminal behavior as an adult." [7]   Moreover, we are advised that under state laws, mandatory school attendance does not, as a matter of practice, extend beyond the age of 18.   On any of these items the States, of course, have leeway to raise or lower the age requirements.   But voting is "a fundamental matter in a free and democratic society," *Reynolds* v. *Sims,* 377 U. S. 533, 561–562.   Where "fundamental rights and liberties are asserted under the Equal Protection Clause, classifications which might invade or restrain them must be closely scrutinized and carefully confined."   *Harper* v. *Virginia Board of Elections,* 383 U. S. 663, 670.   There we were speaking of state restrictions on those rights.   Here we are dealing with the right of Congress to "enforce" the principles of equality enshrined in the Fourteenth Amendment.   The right to "enforce" granted by § 5 of that Amendment is, as noted, parallel with the Necessary and Proper Clause whose reach Chief Justice Marshall described in *McCulloch* v.

[7] Engdahl, Constitutionality of the Voting Age Statute, 39 Geo. Wash. L. Rev. 1, 36 (1970).

*Maryland,* 4 Wheat. 316, 421: "Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional."

Equality of voting by all who are deemed mature enough to vote is certainly consistent "with the letter and spirit of the constitution." Much is made of the fact that Art. I, § 4, of the Constitution [8] gave Congress only the power to regulate the "Manner of holding Elections," not the power to fix qualifications for voting in elections. But the Civil War Amendments—the Thirteenth, Fourteenth, and Fifteenth—made vast inroads on the power of the States. Equal protection became a standard for state action and Congress was given authority to "enforce" it. See *Katzenbach* v. *Morgan,* 384 U. S. 641, 647. The manner of enforcement involves discretion; but that discretion is largely entrusted to the Congress, not to the courts. If racial discrimination were the only concern of the Equal Protection Clause, then across-the-board voting regulations set by the States would be of no concern to Congress. But it is much too late in history to make that claim, as the cases listed in the Appendix to this opinion show. Moreover, election inequalities created by state laws and based on factors other than race may violate the Equal Protection Clause, as we have held over and over again. The reach of § 5 to "enforce" equal protection by eliminating election inequalities would seem quite broad. Certainly there is

---

[8] Article I, § 4, provides: "[1] The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators.

"[2] The Congress shall assemble at least once in every Year, and such Meeting shall be on the first Monday in December, unless they shall by Law appoint a different Day."

not a word of limitation in § 5 which would restrict its applicability to matters of race alone. And if, as stated in *McCulloch* v. *Maryland,* the measure of the power of Congress is whether the remedy is consistent "with the letter and spirit of the constitution," we should have no difficulty here. We said in *Gray* v. *Sanders,* 372 U. S. 368, 381: "The conception of political equality from the Declaration of Independence, to Lincoln's Gettysburg Address, to the Fifteenth, Seventeenth, and Nineteenth Amendments can mean only one thing—one person, one vote."

It is a reasoned judgment that those who have such a large "stake" in modern elections as 18-year-olds, whether in times of war or peace, should have political equality. As was made plain in the dissent in *Colegrove* v. *Green,* 328 U. S. 549, 566 (whose reasoning was approved in *Gray* v. *Sanders,* 372 U. S. 368, 379), the Equal Protection Clause does service to protect the right to vote in federal as well as in state elections.

I would sustain the choice which Congress has made.

## II

I likewise find the objections that Arizona and Idaho make to the literacy and residence requirements of the 1970 Act to be insubstantial.

*Literacy.* We held in *Lassiter* v. *Northampton Election Board,* 360 U. S. 45, that a State could apply a literacy test in selecting qualified voters provided the test is not "discriminatory" and does not contravene "any restriction that Congress, acting pursuant to its constitutional powers, has imposed." *Id.,* at 51. The question in these cases is whether Congress has the power under § 5 of the Fourteenth Amendment to bar literacy tests in all federal, state, or local elections.

Section 201 bars a State from denying the right to vote in any federal, state, or local election because of "any

test or device" which is defined, *inter alia,* to include literacy.[9] We traveled most of the distance needed to sustain this Act in *Katzenbach* v. *Morgan,* 384 U. S. 641, where we upheld the constitutionality of an earlier Act which prohibited the application of English literacy tests to persons educated in Puerto Rico. The power of Congress in § 5 to "enforce" the Equal Protection Clause was sufficiently broad, we held, to enable it to abolish voting requirements which might pass muster under the Equal Protection Clause, absent an Act of Congress. *Id.,* at 648–651.

The question, we said, was whether the Act of Congress was "appropriate legislation to enforce the Equal Protection Clause":

> "It was well within congressional authority to say that this need of the Puerto Rican minority for the vote warranted federal intrusion upon any state interests served by the English literacy requirement. It was for Congress, as the branch that made this judgment, to assess and weigh the various conflicting considerations—the risk or pervasiveness of the discrimination in governmental services, the effectiveness of eliminating the state restriction on the right to vote as a means of dealing with the evil, the adequacy or availability of alternative remedies, and the nature and significance of the state interests that would be affected by the nullification of the English literacy requirement as applied to residents who have successfully com-

---

[9] Section 201 (b) defines "test or device" as "any requirement that a person as a prerequisite for voting or registration for voting (1) demonstrate the ability to read, write, understand, or interpret any matter, (2) demonstrate any educational achievement or his knowledge of any particular subject, (3) possess good moral character, or (4) prove his qualifications by the voucher of registered voters or members of any other class." 84 Stat. 315.

pleted the sixth grade in a Puerto Rican school. It is not for us to review the congressional resolution of these factors. It is enough that we be able to perceive a basis upon which the Congress might resolve the conflict as it did." *Id.*, at 653.

We also held that the Act might be sustained as an attack on the English language test as a device to discriminate. *Id.*, at 654. And we went on to say that Congress might have concluded that "as a means of furthering the intelligent exercise of the franchise, an ability to read or understand Spanish is as effective as ability to read English for those to whom Spanish-language newspapers and Spanish-language radio and television programs are available to inform them of election issues and governmental affairs." *Id.*, at 655.

We took a further step toward sustaining the present type of law in *Gaston County* v. *United States*, 395 U. S. 285. That decision involved a provision of the Voting Rights Act of 1965 which suspended the use of any "test or device," including literacy, as a prerequisite to registration in a State which was found by the Attorney General and the Director of the Census to have used it in any election on November 1, 1964, and in which less than 50, of the residents of voting age were registered or had voted.[10] Gaston County, North Carolina, was so classified and its literacy test was thereupon suspended. In a suit to remove the ban we sustained it. We noted that Congress had concluded that "the County deprived its black residents of equal educational opportunities, which in turn deprived them of an equal chance to pass the literacy test." *Id.*, at 291. Congress, it was argued, should have employed a formula based on educational disparities between the races or one based on

---

[10] The constitutionality of that procedure has been sustained in *South Carolina* v. *Katzenbach*, 383 U. S. 301.

literacy rates. *Id.*, at 292. But the choice of appropriate remedies is for Congress and the range of available ones is wide. It was not a defect in the formula that some literate Negroes would be turned out by Negro schools.

> "It is only reasonable to infer that among black children compelled to endure a segregated and inferior education, fewer will achieve any given degree of literacy than will their better-educated white contemporaries. And on the Government's showing, it was certainly proper to infer that Gaston County's inferior Negro schools provided many of its Negro residents with a subliterate education, and gave many others little inducement to enter or remain in school." *Id.*, at 295–296.

By like reasoning Congress in the present legislation need not make findings as to the incidence of literacy. It can rely on the fact that most States do not have literacy tests; that the tests have been used at times as a discriminatory weapon against some minorities, not only Negroes but Americans of Mexican ancestry, and American Indians; that radio and television have made it possible for a person to be well informed even though he may not be able to read and write. We know from the legislative history that these and other desiderata influenced Congress in the choice it made in the present legislation; and we certainly cannot say that the means used were inappropriate.

*Residence.* The residency requirements of § 202 relate only to elections for President and Vice President. Section 202 abolishes durational residency [11] and provides

---

[11] This Court upheld durational residency requirements as applied in presidential and vice-presidential elections absent an Act of Congress. See *Drueding* v. *Devlin,* 234 F. Supp. 721 (Md. 1964), aff'd, 380 U. S. 125. Subsequently we vacated as moot a case

148

for absentee voting provided that registration may be required 30 days prior to the election. The effect of § 202 is to reduce all state durational residency requirements to 30 days.

In presidential elections no parochial interests of the State, county, or city are involved. Congress found that a durational residency requirement "in some instances has the impermissible purpose or effect of denying citizens the right to vote." § 202 (a)(4). It found in § 202 (a)(3) that a durational residency requirement denies citizens their privileges and immunities.[12]

The Seventeenth Amendment states that Senators shall be "elected by the people." Article I, § 2, provides

---

presenting the same question. *Hall* v. *Beals*, 396 U. S. 45. The district courts have been faced with the issue of durational residency requirements as they would be applied to congressional elections. Two have concluded the requirement is constitutional. *Howe* v. *Brown*, 319 F. Supp. 862 (ND Ohio 1970); *Cocanower* v. *Marston*, 318 F. Supp. 402 (Ariz. 1970). Additionally, one other court has refused a preliminary injunction in a case presenting the issue. *Piliavin* v. *Hoel*, 320 F. Supp. 66 (WD Wis. 1970). Some district courts, however, believe that *Drueding* cannot stand (absent an Act of Congress) after *Carrington* v. *Rash*, 380 U. S. 89; *Kramer* v. *Union School District*, 395 U. S. 621; *Cipriano* v. *City of Houma*, 395 U. S. 701, and *Phoenix* v. *Kolodziejski*, 399 U. S. 204. Accordingly they have held durational residency requirements for congressional elections (and by implication presidential elections) violate the Equal Protection Clause. See *Burg* v. *Canniffe*, 315 F. Supp. 380 (Mass. 1970); *Blumstein* v. *Ellington*, —— F. Supp. —— (MD Tenn. 1970); *Hadnott* v. *Amos*, 320 F. Supp. 107 (MD Ala. 1970); *Bufford* v. *Holton*, 319 F. Supp. 843 (ED Va. 1970).

In none of these cases was an Act of Congress involved.

[12] Article IV, § 2, of the Constitution provides:

"The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States."

The Fourteenth Amendment provides in § 1 that: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States."

that the House shall be chosen "by the People of the several States." The right to vote for national officers is a privilege and immunity of national citizenship. *Ex parte Yarbrough,* 110 U. S. 651; *In re Quarles,* 158 U. S. 532, 534; *Twining v. New Jersey,* 211 U. S. 78, 97; *Burroughs* v. *United States,* 290 U. S. 534; *United States* v. *Classic,* 313 U. S. 299, 315.[13]

---

[13] The cases relied on by my Brother HARLAN, *post,* at 214, are not to the contrary. *Snowden* v. *Hughes,* 321 U. S. 1, 7, states: "The right to become a candidate for *state* office, like the right to vote for the election of *state* officers . . . is a right or privilege of state citizenship." (Emphasis added.) Arguably *Minor* v. *Happersett,* 21 Wall. 162, is to the contrary, but to the extent its dicta indicated otherwise, it was limited in *Ex parte Yarbrough. Breedlove* v. *Suttles,* 302 U. S. 277, overruled by *Harper* v. *Virginia Board of Elections,* 383 U. S. 663, involved a poll tax applied in both federal and state elections; it erroneously cited *Yarbrough* for the proposition voting is not a privilege and immunity of national citizenship. *Pope* v. *Williams,* 193 U. S. 621, involved durational residency requirements, but expressly reserved the question of their application to presidential and vice-presidential elections. Our holdings concerning privileges and immunities of national citizenship were analyzed less than five years ago by my Brother HARLAN. After referring to *Ex parte Yarbrough,* and *United States* v. *Classic,* he stated that those cases "are essentially concerned with the vindication of important relationships with the Federal Government—*voting in federal elections,* involvement in federal law enforcement, communicating with the Federal Government." *United States* v. *Guest,* 383 U. S. 745, 772 (separate opinion) (emphasis added).

Contrary to the suggestion of my Brother HARLAN, *post,* at 213, we need not rely on the power of Congress to declare the meaning of § 1 of the Fourteenth Amendment. This Court had determined that voting for national officers is a privilege and immunity of national citizenship. No congressional declaration was necessary. Congressional power under § 5 of the Fourteenth Amendment is, as stated, buttressed by congressional power under the Necessary and Proper Clause. Thus even if the durational residency requirements do not violate the Privileges and Immunities Clause, Congress can determine that it is necessary and proper to abolish them in national elections to effectuate and further the purpose of § 1 as it has been declared by this Court.

The Fourteenth Amendment provides that: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States." Durational residency laws of the States had such effect, says Congress. The "choice of means" to protect such a privilege presents "a question primarily addressed to the judgment of Congress." *Burroughs* v. *United States*, *supra*, at 547. The relevance of the means which Congress adopts to the condition sought to be remedied, the degree of their necessity, and the extent of their efficacy are all matters for Congress. *Id.*, at 548.

The judgment which Congress has made respecting the ban of durational residency in presidential elections is plainly a permissible one in its efforts under § 5 to "enforce" the Fourteenth Amendment.

## APPENDIX TO OPINION OF DOUGLAS, J.

Cases which have struck down state statutes under the Equal Protection Clause other than statutes which discriminate on the basis of race.

### STATUTES WHICH DISCRIMINATED AGAINST CERTAIN BUSINESSES

*Gulf, C. & S. F. R. Co.* v. *Ellis*, 165 U. S. 150; *Atchison, T. & S. F. R. Co.* v. *Vosburg*, 238 U. S. 56 (railroad must pay attorney fees if it loses suit, but other businesses need not). *Kentucky Finance Corp.* v. *Paramount Auto Exchange*, 262 U. S. 544; *Power Co.* v. *Saunders*, 274 U. S. 490 (burdens placed upon out-of-state corporations in litigation).

### STATUTES WHICH FAVORED CERTAIN BUSINESSES

*Connolly* v. *Union Sewer Pipe Co.*, 184 U. S. 540 (exemption from state antitrust law for agricultural goods); *Smith* v. *Cahoon*, 283 U. S. 553 (act exempting certain motor vehicles from insurance requirements); *Mayflower*

*Farms* v. *Ten Eyck,* 297 U. S. 266 (act allowing certain milk dealers to sell at lower than the regulated price); *Hartford Co.* v. *Harrison,* 301 U. S. 459 (statute permitting mutual, but not stock, insurance companies to act through salaried representatives), and *Morey* v. *Dowd,* 354 U. S. 457 (American Express exempted from licensing requirements applied to "currency exchanges").

## Taxing Statutes Struck Down

*Concordia Ins. Co.* v. *Illinois,* 292 U. S. 535; *Iowa-Des Moines Bank* v. *Bennett,* 284 U. S. 239; *Cumberland Coal Co.* v. *Board,* 284 U. S. 23; *Quaker City Cab Co.* v. *Pennsylvania,* 277 U. S. 389; *Louisville Gas Co.* v. *Coleman,* 277 U. S. 32; *Hanover Fire Ins. Co.* v. *Harding,* 272 U. S. 494; *Schlesinger* v. *Wisconsin,* 270 U. S. 230; *Sioux City Bridge* v. *Dakota County,* 260 U. S. 441; *F. S. Royster Guano Co.* v. *Virginia,* 253 U. S. 412; and *Southern R. Co.* v. *Greene,* 216 U. S. 400.

## Treatment of Convicted Criminals

*Rinaldi* v. *Yeager,* 384 U. S. 305 (statute requiring unsuccessful criminal appellants who were in jail to pay cost of trial transcript); *Baxstrom* v. *Herold,* 383 U. S. 107 (statute denying convict a sanity hearing before a jury prior to civil commitment); and *Skinner* v. *Oklahoma,* 316 U. S. 535 (sterilization of some convicts).

## Indigents

*Douglas* v. *California,* 372 U. S. 353 (Rule of Criminal Procedure which did not provide counsel for appeal to indigents); and *Shapiro* v. *Thompson,* 394 U. S. 618 (denial of welfare benefits based on residency requirement).

## Legitimacy

*Glona* v. *American Guarantee Co.,* 391 U. S. 73 (mother denied right to sue for wrongful death of illegitimate

child); and *Levy* v. *Louisiana,* 391 U. S. 68 (illegitimate children denied recovery for wrongful death of mother).

### ALIENS

*Truax* v. *Raich,* 239 U. S. 33 (statute limiting the number of aliens that could be employed to 20%); and *Takahashi* v. *Fish & Game Commission,* 334 U. S. 410 (denial of fishing rights to aliens ineligible for citizenship).

MR. JUSTICE HARLAN, concurring in part and dissenting in part.

From the standpoint of this Court's decisions during an era of judicial constitutional revision in the field of the suffrage, ushered in eight years ago by *Baker* v. *Carr,* 369 U. S. 186 (1962), I would find it difficult not to sustain all three aspects of the Voting Rights Act Amendments of 1970, Pub. L. 91–285, 84 Stat. 314, here challenged. From the standpoint of the bedrock of the constitutional structure of this Nation, these cases bring us to a crossroad that is marked with a formidable "Stop" sign. That sign compels us to pause before we allow those decisions to carry us to the point of sanctioning Congress' decision to alter state-determined voter qualifications by simple legislation, and to consider whether sound doctrine does not in truth require us to hold that one or more of the changes which Congress has thus sought to make can be accomplished only by constitutional amendment.

The four cases require determination of the validity of the Voting Rights Act Amendments in three respects. In Nos. 43, Orig., and 44, Orig., Oregon and Texas have sought to enjoin the enforcement of § 302 of the Act as applied to lower the voting age in those States from 21 to 18.[1]

---

[1] The Attorney General of the United States, a citizen of New York, is named as defendant. The jurisdictional basis alleged is Art. III, § 2, which gives this Court original jurisdiction over contro-

In Nos. 46, Orig., and 47, Orig., the United States seeks a declaration of the validity of the Act and an injunction requiring Arizona and Idaho to conform their laws to it. The Act would lower the voting age in each State from 21 to 18. It would suspend until August 6, 1975, the Arizona literacy test, which requires that applicants for registration be able to read the United States Constitution in English and write their names. It would require Idaho to make several changes in its laws governing residency, registration, and absentee voting in presidential elections. Among the more substantial changes, Idaho's present 60-day state residency requirement will in effect be lowered to 30 days; its 30-day county residency requirement for intrastate migrants will be abolished; Idaho will have to permit voting by citizens of other States formerly domiciled in Idaho who emigrated too recently to register in their new homes; and it must permit absentee registration and voting by persons who have lived in Idaho for less than six months. The relevant provisions of the Act and of the constitutions and laws of the four States are set out in an Appendix to this opinion.

Each of the States contests the power of Congress to enact the provisions of the Act involved in its suit.[2] The Government places primary reliance on the power of Congress under § 5 of the Fourteenth Amendment to enforce the provisions of that Amendment by appropriate

---

versies between a State and a citizen of another State. We held a similar suit justiciable and otherwise within our original jurisdiction in *South Carolina* v. *Katzenbach,* 383 U. S. 301, 307 (1966). The parties have not asked us to re-examine the validity of that ruling, and since the Court has not undertaken to do so, I am content to sustain jurisdiction on the authority of that decision.

[2] In response to inquiries from the Attorney General, Arizona, Oregon, and Texas indicated willingness to abide by § 202 of the Act, governing residency, registration, and absentee voting in presidential elections and to conform conflicting state laws.

154

legislation. For reasons to follow, I am of the opinion that the Fourteenth Amendment was never intended to restrict the authority of the States to allocate their political power as they see fit and therefore that it does not authorize Congress to set voter qualifications, in either state or federal elections. I find no other source of congressional power to lower the voting age as fixed by state laws, or to alter state laws on residency, registration, and absentee voting, with respect to either state or federal elections. The suspension of Arizona's literacy requirement, however, can be deemed an appropriate means of enforcing the Fifteenth Amendment, and I would sustain it on that basis.

I

It is fitting to begin with a quotation from one of the leading members of the 39th Congress, which proposed the Fourteenth Amendment to the States in 1866:

> "Every Constitution embodies the principles of its framers. It is a transcript of their minds. If its meaning in any place is open to doubt, or if words are used which seem to have no fixed signification, we cannot err if we turn to the framers; and their authority increases in proportion to the evidence which they have left on the question." Cong. Globe, 39th Cong., 1st Sess., 677 (1866) (Sen. Sumner).

Believing this view to be undoubtedly sound, I turn to the circumstances in which the Fourteenth Amendment was adopted for enlightenment on the intended reach of its provisions. This, for me, necessary undertaking has unavoidably led to an opinion of more than ordinary length. Except for those who are willing to close their eyes to constitutional history in making constitutional interpretations or who read such history with a preconceived determination to attain a particular constitutional

goal, I think that the history of the Fourteenth Amendment makes it clear beyond any reasonable doubt that no part of the legislation now under review can be upheld as a legitimate exercise of congressional power under that Amendment.

## A. Historical Setting [3]

The point of departure for considering the purpose and effect of the Fourteenth Amendment with respect to the suffrage should be, I think, the pre-existing provisions of the Constitution. Article I, § 2, provided that in determining the number of Representatives to which a State was entitled, only three-fifths of the slave population should be counted.[4] The section also provided that the qualifications of voters for such Representatives should be the same as those established by the States for electors of the most numerous branch of their respective legislatures. Article I, § 4, provided that, subject to congressional veto, the States might prescribe the times, places, and manner of holding elections for Representatives. Article II, § 1, provided that the States might direct the manner of choosing electors for President and Vice President, except that Congress might fix a uniform time for the choice.[5] Nothing in the original

---

[3] The account in the text is largely drawn from J. James, The Framing of the Fourteenth Amendment (1956) (hereafter James), and to some extent from W. Gillette, The Right To Vote: Politics and the Passage of the Fifteenth Amendment (1969) (hereafter Gillette), and B. Kendrick, The Journal of the Joint Committee of Fifteen on Reconstruction (1914) (hereafter Kendrick), as well.

[4] "Representatives and direct Taxes shall be apportioned among the several States which may be included within this Union, according to their respective Numbers, which shall be determined by adding to the whole Number of free Persons, including those bound to Service for a Term of Years, and excluding Indians not taxed, three fifths of all other Persons."

[5] See infra, at 209–212, for the text of these provisions, and for discussion of the contention that they empower Congress to set qualifications of voters in federal elections.

Constitution controlled the way States might allocate their political power except for the guarantee of a Republican Form of Government, which appears in Art. IV, § 4.[6] No relevant changes in the constitutional structure were made until after the Civil War.

At the close of that war, there were some four million freed slaves in the South, none of whom were permitted to vote. The white population of the Confederacy had been overwhelmingly sympathetic with the rebellion. Since there was only a comparative handful of persons in these States who were neither former slaves nor Confederate sympathizers, the place where the political power should be lodged was a most vexing question. In a series of proclamations in the summer of 1865, President Andrew Johnson had laid the groundwork for the States to be controlled by the white populations which had held power before the war, eliminating only the leading rebels and those unwilling to sign a loyalty oath.[7] The Radicals, on the other hand, were ardently in favor of Negro suffrage as essential to prevent resurgent rebellion, requisite to protect the freedmen, and necessary to ensure continued Radical control of the government. This ardor cooled as it ran into northern racial prejudice. At that time, only six States—Maine, New Hampshire, Vermont, Massachusetts, Rhode Island, and New York—permitted Negroes to vote, and New York imposed special property and residency requirements on Negro voters.[8] In referenda late that year, enfranchising pro-

---

[6] "The United States shall guarantee to every State in this Union a Republican Form of Government."

[7] E. g., Proclamation of May 29, 1865, 13 Stat. 760 (North Carolina).

[8] The texts of the state constitutions are most readily available in F. Thorpe, The Federal and State Constitutions (1909). The qualifications imposed by the various States three years later, when the Fifteenth Amendment was proposed, are presented in tabular form in Hearings on the Voting Rights Bill, S. 1564, before the Senate Committee on the Judiciary, 89th Cong., 1st Sess., 128–129 (1965).

posals were roundly beaten in Connecticut, Wisconsin, Minnesota, the Territory of Colorado, and the District of Columbia. Gillette, *supra,* n. 3, at 25–26. Such popular rebuffs led the Radicals to pull in their horns and hope for a protracted process of reconstruction during which the North could be educated to the advisability of Negro suffrage, at least for the South. In the meantime, of course, it would be essential to bar southern representation in Congress lest a combination of southerners and Democrats obtain control of the government and frustrate Radical goals.

The problem of congressional representation was acute. With the freeing of the slaves, the Three-Fifths Compromise ceased to have any effect. While predictions of the precise effect of the change varied with the person doing the calculating, the consensus was that the South would be entitled to at least 15 new members of Congress, and, of course, a like number of new presidential electors. The Radicals had other rallying cries which they kept before the public in the summer of 1865, but one author gives this description of the mood as Congress convened: [9]

> "Of all the movements influencing the Fourteenth Amendment which developed prior to the first session of the Thirty-ninth Congress, that for Negro suffrage was the most outstanding. The volume of private and public comment indicates that it was viewed as an issue of prime importance. The cry for a changed basis of representation was, in reality, subsidiary to this, and was meant by Radicals to secure in another way what Negro suffrage might accomplish for them: removal of the danger of Democratic dominance as a consequence of Southern restoration. The danger of possible repudiation of the national obligations, and assumption of the rebel

---

[9] James 33.

158

debt, was invariably presented to show the need for Negro suffrage or a new basis of representation. Sentiment for disqualification of ex-Confederates, though a natural growth, well suited such purposes. The movement to guarantee civil rights, spoi...ored originally by the more conservative Republicans, received emphasis from Radicals only when state elections indicated that suffrage would not serve as a party platform."

When Congress met, the Radicals, led by Thaddeus Stevens, were successful in obtaining agreement for a Joint Committee on Reconstruction, composed of 15 members, to "inquire into the condition of the States which formed the so-called confederate States of America, and report whether they, or any of them, are entitled to be represented in either House of Congress . . . ." Cong. Globe, 39th Cong., 1st Sess., 30, 46 (1865) (hereafter Globe).

All papers relating to representation of the Southern States were to be referred to the Committee of Fifteen without debate. The result, which many had not foreseen, was to assert congressional control over Reconstruction and at the same time to put the congressional power in the hands of a largely Radical secret committee.

The Joint Committee began work with the beginning of 1866, and in due course reported a joint resolution, H. R. 51, to amend the Constitution. The proposal would have based representation and direct taxes on population, with a proviso that

"whenever the elective franchise shall be denied or abridged in any State on account of race or color, all persons of such race or color shall be excluded from the basis of representation." Globe 351.

The result, if the Southern States did not provide for Negro suffrage, would be a decrease in southern repre-

sentation in Congress and the electoral college by some 24 seats from their pre-war position instead of an increase of 15. The House, although somewhat balky, approved the measure after lengthy debate. Globe 538. The Senate proved more intractable. An odd combination of Democrats, moderate Republicans, and extreme Radicals combined to defeat the measure, with the Radicals basing their opposition largely on the fear that the proviso would be read to authorize racial voter qualifications and thus prevent Congress from enfranchising the freedmen under powers assertedly granted by other clauses of the Constitution. See, e. g., Globe 673–687 (Sen. Sumner).

At about this same time the Civil Rights Bill and the Second Freedmen's Bureau Bill were being debated. Both bills provided a list of rights secured, not including voting.[10] Senator Trumbull, who reported the Civil Rights Bill on behalf of the Senate Judiciary Committee, stated: "I do not want to bring up the question of negro suffrage in the bill." Globe 606. His House counterpart exhibited the same reluctance. Globe 1162 (Cong. Wilson of Iowa). Despite considerable uncertainty as to the constitutionality of the measures, both ultimately passed. In the midst of the Senate debates on the basis of representation, President Johnson vetoed the Freedmen's Bureau Bill, primarily on constitutional grounds. This veto, which was narrowly sustained, was followed shortly by the President's bitter attack on Radical Reconstruction in his Washington's Birthday speech. These two actions, which were followed a month later by the veto of the Civil Rights Bill, removed any lingering hopes among the Radicals that Johnson would support them in a thoroughgoing plan of reconstruction. By the same token they increased the Radicals' need for an

---

[10] See Globe 209 (Freedmen's Bureau Bill); Globe 211 (Civil Rights Bill).

articulated plan of their own to be put before the country in the upcoming elections as an alternative to the course the President was taking.

. The second major product of the Reconstruction Committee, before the resolution which became the Fourteenth Amendment, was a proposal to add an equal rights provision to the Constitution. This measure, H. R. 63, which foreshadowed § 1 of the Fourteenth Amendment, read as follows:

> "The Congress shall have power to make all laws which shall be necessary and proper to secure to the citizens of each State all privileges and immunities of citizens in the several States, and to all persons in the several States equal protection in the rights of life, liberty, and property." Globe 1034.

It was reported by Congressman Bingham of Ohio, who later opposed the Civil Rights Bill because he believed it unconstitutional. Globe 1292–1293. The amendment immediately ran into serious opposition in the House and the subject was dropped.[11]

Such was the background of the Fourteenth Amendment. Congress, at loggerheads with the President over Reconstruction, had not come up with a plan of its own after six months of deliberations; both friends and foes prodded it to develop an alternative. The Reconstruction Committee had been unable to produce anything which could even get through Congress, much less obtain the adherence of three-fourths of the States. The Radicals, committed to Negro suffrage, were confronted with widespread public opposition to that goal and the necessity for a reconstruction plan that could do service as a party platform in the elections that fall. The language

---

[11] While formally further consideration was postponed until a date in April, six weeks off, Globe 1095, it was generally understood that "April means indefinitely." 2 Nation 289 (Mar. 1, 1866), quoted in James 87.

of the Fourteenth Amendment must be read with aware-
ness that it was designed in response to this situation.

B. The Language of the Amendment and Reconstruction
Measures

Sections 1 and 2 of the Fourteenth Amendment as
originally reported read as follows: [12]

"SEC. 1. No State shall make or enforce any law
which shall abridge the privileges or immunities
of citizens of the United States; nor shall any State
deprive any person of life, liberty, or property with-
out due process of law; nor deny to any person
within its jurisdiction the equal protection of the
laws.

"SEC. 2. Representatives shall be apportioned
among the several States which may be included
within this Union, according to their respective
numbers, counting the whole number of persons in
each State, excluding Indians not taxed. But when-

---

[12] The only change made in § 1 was the addition of the Citizen-
ship Clause by the Senate. Globe 3041. The primary change made
in § 2 was to condition reduction of representation on denial or
abridgment of the right to vote in certain named elections, rather
than to speak generally of denial or abridgment of "the elective
franchise." *Ibid.* That section now reads:

"Representatives shall be apportioned among the several States
according to their respective numbers, counting the whole number
of persons in each State, excluding Indians not taxed. But when the
right to vote at any election for the choice of electors for President
and Vice President of the United States, Representatives in Congress,
the Executive and Judicial officers of a State, or the members of the
Legislature thereof, is denied to any of the male inhabitants of such
State, being twenty-one years of age, and citizens of the United
States, or in any way abridged, except for participation in rebellion,
or other crime, the basis of representation therein shall be reduced
in the proportion which the number of such male citizens shall bear
to the whole number of male citizens twenty-one years of age in
such State."

ever, in any State, the elective franchise shall be denied to any portion of its male citizens not less than twenty-one years of age, or in any way abridged except for participation in rebellion or other crime, the basis of representation in such State shall be reduced in the proportion which the number of such male citizens shall bear to the whole number of male citizens not less than twenty-one years of age." Globe 2286.

In the historical context, no one could have understood this language as anything other than an abandonment of the principle of Negro suffrage, for which the Radicals had been so eager. By the same token, the language could hardly have been understood as affecting the provisions of the Constitution placing voting qualifications in the hands of the States. Section 1 must have been seen as little more than a constitutionalization of the 1866 Civil Rights Act, concededly one of the primary goals of that portion of the Amendment.[13]

While these conclusions may, I think, be confidently asserted, it is not so easy to explain just how contemporary observers would have construed the three clauses of § 1 to reach this result.[14] No doubt in the case of

---

[13] Section 1 of that Act provided in part that

"all persons . . . shall have the same right, in every State and Territory in the United States, to make and enforce contracts, to sue, be parties, and give evidence, to inherit, purchase, lease, sell, hold, and convey real and personal property, and to full and equal benefit of all laws and proceedings for the security of person and property, as is enjoyed by white citizens, and shall be subject to like punishment, pains, and penalties, and to none other, any law, statute, ordinance, regulation, or custom, to the contrary notwithstanding." Act of Apr. 9, 1866, § 1, 14 Stat. 27.

[14] In this connection, Professor Fairman's admonition of 20 years ago is even more forceful than it was when he wrote:

"We know so much more about the constitutional law of the Fourteenth Amendment than the men who adopted it that we should

many congressmen it simply never occurred to them that the States' longstanding plenary control over voter qualifications would be affected without explicit. language to that effect. And since no speaker during the debates on the Fourteenth Amendment pursued the contention that § 1 would be construed to include the franchise, those who took the opposite view rarely explained how they arrived at their conclusions.

In attempting to unravel what was seldom articulated, the appropriate starting point is the fact that the framers of the Amendment expected the most significant portion of § 1 to be the clause prohibiting state laws "which shall abridge the privileges or immunities of citizens of the United States." These privileges were no doubt understood to include the ones set out in the first section of the Civil Rights Act. To be prohibited by law from enjoying these rights would hardly be consistent with full membership in a civil society.

The same is not necessarily true with respect to prohibitions on participation in the political process. Many members of Congress accepted the jurisprudence of the day, in which the rights of man fell into three categories: natural, civil, and political. The privileges of citizens, being "civil" rights, were distinct from the rights arising from governmental organization, which were political in character.[15] Others no doubt relied on

---

remind ourselves not to be surprised to find them vague where we want them to prove sharp. Eighty years of adjudication has taught us distinctions and subtleties where the men of 1866 did not even perceive the need for analysis." Fairman, Does the Fourteenth Amendment Incorporate the Bill of Rights?. ⁇ Stan. L. Rev. 5, 9 (1949).

[15] See, e. g., Globe 599 (Sen. Trumbull); Globe 1117 (Cong. Wilson of Iowa, quoting Kent's Commentaries and Bouvier's Law Dictionary); Globe 1152 (Cong. Thayer). There were some, however, who considered the distinction either nonexistent or too uncertain to be

the experience under the similar language of Art. IV, § 2, which had never been held to guarantee the right to vote. The remarks of Senator Howard of Michigan, who as spokesman for the Joint Committee explained in greater detail than most why the Amendment did not reach the suffrage, contain something of each view. See Globe 2766, quoted *infra,* at 187; nn. 56 and 57, *infra;* cf. *Blake* v. *McClung,* 172 U. S. 239, 256 (1898) (dictum).

Since the Privileges and Immunities Clause was expected to be the primary source of substantive protection, the Equal Protection and Due Process Clauses were relegated to a secondary role, as the debates and other contemporary materials make clear.[16] Those clauses, which appear on their face to correspond with the latter portion of § 1 of the Civil Rights Act, see n. 13, *supra,* and to be primarily concerned with person and property, would not have been expected to enfranchise the freedmen if the Privileges and Immunities Clause did not.

Other members of Congress no doubt saw § 2 of the proposed Amendment as the Committee's resolution of the related problems of suffrage and representation. Since that section did not provide for enfranchisement, but simply reduced representation for disfranchisement, any doubts about the effect of the broad language of § 1 were removed. Congressman Bingham, who was primarily responsible for the language of § 1,

---

a basis for legislation. *E. g.,* Globe 477 (Sen. Saulsbury); Globe 1157 (Cong. Thornton); Globe 1292–1293 (Cong. Bingham).

It hardly seems necessary to point out that the jurisprudential concept of "political" as opposed to "civil" or "natural" rights bears no relation to that class of nonjusticiable issues perhaps inappropriately known as "political questions." See the opinion of MR. JUSTICE DOUGLAS, *ante,* at 137–140.

[16] See generally Fairman, Does the Fourteenth Amendment Incorporate the Bill of Rights?, 2 Stan. L. Rev. 5 (1949), especially at 8–9.

stated this view. Globe 2542, quoted *infra,* at 185. Finally, characterization of the Amendment by such figures as Stevens and Bingham in the House and Howard in the Senate, not contested by the Democrats except in passing remarks, was no doubt simply accepted by many members of Congress; they, repeating it, gave further force to the interpretation, with the result that, as will appear below, not one speaker in the debates on the Fourteenth Amendment unambiguously stated that it would affect state voter qualifications, and only three, all opponents of the measure, can fairly be characterized as raising the possibility.[17] Further evidence of this original understanding can be found in later events.

The 39th Congress, which proposed the Fourteenth Amendment, also enacted the first Reconstruction Act, c. 153, 14 Stat. 428 (1867). This Act required, as a condition precedent to readmission of the Southern States, that they adopt constitutions providing that the elective franchise should be enjoyed by all male citizens over the age of 21 who had been residents for more than one year and were not disfranchised for treason or common-law felony; even so, no State would be readmitted until a legislature elected under the new Constitution had ratified the proposed Fourteenth Amendment and that Amendment had become part of the Constitution.

The next development came when the ratification drive in the North stalled. After a year had passed during which only one Northern State had ratified the proposed Fourteenth Amendment, Arkansas was readmitted to the Union by the Act of June 22, 1868, 15

---

[17] The remarks of these three Democrats, Niblack, Boyer, and Rogers, are discussed *infra,* at 182–185. Also discussed there are the remarks of a fourth Democratic Representative, Phelps, which were delivered before the start of debate on the proposed Fourteenth Amendment.

Stat. 72. This readmission was based on the "fundamental condition" that the state constitution should not be amended to restrict the franchise, except with reference to residency requirements. Three days later the Act of June 25, 1868, 15 Stat. 73, held out a promise of similar treatment to North Carolina, South Carolina, Louisiana, Georgia, Alabama, and Florida if they would ratify the Fourteenth Amendment. By happy coincidence, the assent of those six States was just sufficient to complete the ratification process. It can hardly be suggested, therefore, that the "fundamental condition" was exacted from them as a measure of caution lest the Fourteenth Amendment fail of ratification.

The 40th Congress, not content with enfranchisement in the South, proposed the Fifteenth Amendment to extend the suffrage to northern Negroes. See Gillette, *supra,* n. 3, at 46. This fact alone is evidence that they did not understand the Fourteenth Amendment to have accomplished such a result. Less well known is the fact that the 40th Congress considered and very nearly adopted a proposed amendment which would have expressly prohibited not only discriminatory voter qualifications but discriminatory qualifications for office as well. Each House passed such a measure by the required two-thirds margin. Cong. Globe, 40th Cong., 3d Sess., 1318, 1428 (1869). A conference committee, composed of Senators Stewart and Conkling and Representatives Boutwell, Bingham, and Logan, struck out the officeholding provision, *id.,* at 1563, 1593, and with Inauguration Day only a week away, both Houses accepted the conference report. *Id.,* at 1564, 1641. See generally Gillette 58–77. While the reasons for these actions are unclear, it is unlikely that they were provoked by the idea that the Fourteenth Amendment covered the field; such a rationale seemingly would have made the enfranchising provision itself unnecessary.

The 41st Congress readmitted the remaining three States of the Confederacy. The admitting act in each case recited good-faith ratification of the Fourteenth and Fifteenth Amendments, and imposed the fundamental conditions that the States should not restrict the elective franchise [18] and "[t]hat it shall never be lawful for the said State to deprive any citizen of the United States, on account of his race, color, or previous condition of servitude, of the right to hold office under the constitution and laws of said State." Act of Jan. 26, 1870, c. 10, 16 Stat. 62, 63 (Virginia); Act of Feb. 23, 1870, c. 19, 16 Stat. 67, 68 (Mississippi); Act of Mar. 30, 1870, c. 39, 16 Stat. 80, 81 (Texas).

These materials demonstrate not only that § 1 of the Fourteenth Amendment is susceptible of an interpretation that it does not reach suffrage qualifications, but that this is the interpretation given by the immediately succeeding Congresses. Such an interpretation is the most reasonable reading of the section in view of the background against which it was proposed and adopted, particularly the doubts about the constitutionality of the Civil Rights Act, the prejudice in the North against any recognition of the principle of Negro suffrage, and the basic constitutional structure of leaving suffrage qualifications with the States.[19] If any further clarification were

---

[18] While this provision might seem useless in light of the Fifteenth Amendment, it was doubtless intended to prohibit the imposition of property or literacy qualifications which, even though fairly applied, would have the effect of disfranchising most of the Negroes. The Radicals had sought to prohibit such qualifications in the Fifteenth Amendment, but were unsuccessful. See Gillette 53, 56–62, 69–72, 76.

[19] While the history indicates that the supporters of the Fourteenth Amendment would have been surprised at the suggestion that the Amendment brought qualifications for state office under federal supervision, officeholding was not the focus of attention during the consideration of the Amendment. Moreover, state

needed, one would have thought it provided by the second section of the same Amendment, which specifically contemplated that the right to vote would be denied or abridged by the States on racial or other grounds. As a unanimous Court once asked, "Why this, if it was not in the power of the [state] legislature to deny the right of suffrage to some male inhabitants?" *Minor* v. *Happersett*, 21 Wall. 162, 174 (1875).

.The Government suggests that the list of protected qualifications in § 2 is "no more than descriptive of voting laws as they then stood." Brief for the United States, Nos. 46, Orig., and 47, Orig., 75. This is wholly inaccurate. Aside from racial restrictions, all States had residency requirements and many had literacy, property, or taxation qualifications. On the other hand, several of the Western States permitted aliens to vote if they had satisfied certain residency requirements and had declared

---

power to set voter qualifications, unlike state power to set qualifications for office, is explicitly recognized not only in the original Constitution but in § 2 of the Fourteenth Amendment itself. Whether these distinctions are sufficient to justify testing state qualifications for office by the Fourteenth Amendment is a matter not presented by these cases.

Where the state action has a racial basis, see *Anderson* v. *Martin*, 375 U. S. 399 (1964), I am not prepared to assume that the Fifteenth Amendment provides no protection. Despite the statement in the opinion of MR. JUSTICE BRENNAN, MR. JUSTICE WHITE, and MR. JUSTICE MARSHALL, *post*, at 252, I would find it surprising if a State could undercut the right to vote by taking steps to ensure that all candidates are unpalatable to voters of a certain race. Although an explicit provision on officeholding was deleted from the proposed Fifteenth Amendment at the eleventh hour, the idea that the right to vote without more implies the right to be voted for was specifically referred to by supporters of the Fifteenth Amendment in both Houses of Congress. See Cong. Globe, 40th Cong., 3d Sess., 1425–1426 (1869) (Cong. Boutwell); *id.*, at 1426 (Cong. Butler); *id.*, at 1629 (Sen. Sawyer).

their intention to become citizens.[20] It hardly seems necessary to observe that the politicians who framed the Fourteenth Amendment were familiar with the makeup of the electorate. In any event, the congressional debates contain such proof in ample measure.[21]

Assuming, then, that § 2 represents a deliberate selection of the voting qualifications to be penalized, what is the point of it? The Government notes that "it was intended—although it has never been used—to provide a remedy against exclusion of the newly freed slaves from the vote." Brief for the Defendant, Nos. 43, Orig., and 44, Orig., 20. Undoubtedly this was the primary purpose. But the framers of the Amendment, with their attention thus focused on racial voting qualifications, could hardly have been unaware of § 1. If they understood that section to forbid such qualifications, the simple means of penalizing this conduct would have been to impose a reduction of representation for voting discrimination in violation of § 1. Their adoption instead of the awkward phrasing of § 2 is therefore significant.

To be sure, one might argue that § 2 is simply a rhetorical flourish, and that the qualifications listed there are merely the ones which the framers deemed to be consistent with the alleged prohibition of § 1. This argument is not only unreasonable on its face and untenable in light of the historical record; it is fatal to the validity of the reduction of the voting age in § 302 of the Act before us.

The only sensible explanation of § 2, therefore, is that the racial voter qualifications it was designed to penalize

---

[20] Hearings, *supra,* n. 8, at 128–129.

[21] See, *e. g.,* Globe 141–142 (Cong. Blaine); Globe 2766–2767 (Sen. Howard); Globe 2769–2770 (Sens. Wade and Wilson); Globe 3033 (Sen. Henderson).

were understood to be permitted by § 1 of the Fourteenth Amendment. The Amendment was a halfway measure, adopted to deprive the South of representation until it should enfranchise the freedmen, but to have no practical effect in the North. It was politically acceptable precisely because of its regional consequences and its avoidance of an explicit recognition of the principle of Negro suffrage. As my Brother BLACK states: "[I]t cannot be successfully argued that the Fourteenth Amendment was intended to strip the States of their power, carefully preserved in the original Constitution, to govern themselves." *Ante,* at 127. The detailed historical materials make this unmistakably clear.

## C. The Joint Committee

The first place to look for the understanding of the framers of the Fourteenth Amendment is the Journal of the Joint Committee on Reconstruction.[22] The exact sequence of the actions of this Committee presumably had little or no effect on the members of Congress who were not on the Committee, for the Committee attempted to keep its deliberations secret,[23] and the Journal itself was lost for nearly 20 years.[24] Nevertheless the Journal, although only a record of proposals and votes, illustrates the thoughts of those leading figures of Congress who were members and participated in the drafting of the Amendment.

Two features emerge from such a review with startling clarity. First, the Committee regularly rejected explicitly

---

[22] The Journal is reprinted in Kendrick, *supra,* n. 3, at 37–129.

[23] The attempts were not altogether successful. See James 108–109.

[24] See generally Kendrick 18–22. For reasons to be developed below, *infra,* at 197, the report of the Joint Committee, H. R. Rep. No. 30, 39th Cong., 1st Sess. (1866), is less useful as an indication of the understanding of the Committee and the Congress than as an indication of the understanding of the ratifying States.

enfranchising proposals in favor of plans which would postpone enfranchisement, leave it to congressional discretion, or abandon it altogether. Second, the abandonment of Negro suffrage as a goal exactly corresponded with the adoption of provisions to reduce representation for discriminatory restrictions on the ballot.

This correspondence was present from the start. Five plans were proposed to deal with representation. One would have prohibited racial qualifications for voters and based representation on the whole number of citizens in the State; the other four proposals contained no enfranchising provision but in various ways would have reduced representation for States where the vote was racially restricted. Kendrick 41–44. A subcommittee reduced the five proposals to two, one prohibiting discrimination and the other reducing representation where it was present. On Stevens' motion the latter alternative was accepted by a vote of 11 to 3, Kendrick 51; with minor changes it was subsequently reported as H. R. 51.

The subcommittee also proposed that whichever provision on the basis of representation was adopted, the Congress should be empowered to legislate to secure all citizens "the same political rights 'd privileges" and also "equal protection in the enjoyment of life, liberty and property." Kendrick 51. After the Committee reported H. R. 51, it turned to consideration of this proposal. At a meeting attended by only 10 members, a motion to strike out the clause authorizing Congress to legislate for equal political rights and privileges lost by a vote of six to four. Kendrick 57. At a subsequent meeting, however, Bingham had the subcommittee proposal replaced with another which did not mention *political* rights and privileges, but was otherwise quite similar. Kendrick 61; see the opinion of MR. JUSTICE BRENNAN, MR. JUSTICE WHITE, and MR. JUSTICE

MARSHALL, *post,* at 258–259, for the text of the two provisions. The Committee reported the substitute as H. R. 63. In the House so much concern was expressed over the centralization of power the amendment would work—a few said it would even authorize Congress to regulate the suffrage—that the matter was dropped. *Post,* at 260.

The Fourteenth Amendment had as its most direct antecedent a proposal drafted by Robert Dale Owen, who was not a member of Congress, and presented to the Joint Committee by Stevens.[25] Originally the plan provided for mandatory enfranchisement in 1876 and for reduction of representation until that date. Kendrick 82–84. However, Stevens was pressured by various congressional delegations who wanted nothing to do with Negro suffrage, even at a remove of 10 years.[26] He therefore successfully moved to strike out the enfranchising provision and correspondingly to abolish the 10-year limitation on reduction of representation for racial discrimination. The motion carried by a vote of 12 to 2. Kendrick 101.

Bingham was then successful in replacing § 1 of Owen's proposal, which read:

> "No discrimination shall be made by any State, or by the United States, as to the civil rights of persons, because of race, color, or previous condition of servitude"

with the following now-familiar language:

> "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive

---

[25] Owen's account of the Fourteenth Amendment is given in Political Results from the Varioloid, 35 Atlantic Monthly 660 (June 1875).

[26] See James 109–112; Gillette 24; Owen, *supra,* n. 25, at 666.

any person of life, liberty, or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws." Kendrick 106.

The summary style of the Journal leaves unclear the reasons for the change. However, Bingham himself had rather consistently voted against proposals for direct and immediate enfranchisement,[27] and on the face of things it seems unlikely that the other members of the Joint Committee understood his provision to be an enfranchising proposal.[28] That they did not so understand is

[27] See the votes on Stevens' motion to select the alternative which reduced representation rather than that which prohibited racial restrictions on the ballot, Kendrick 52; Boutwell's motion to condition readmission of Tennessee on that State's agreement not to discriminate in its voter qualifications, Kendrick 70; Stevens' motion to strike out the provision of the Owen plan enfranchising Negroes after 1876, Kendrick 101; and the motion to condition readmission of Tennessee and Arkansas on their having provided impartial male suffrage, as well as on conforming their laws and constitutions to the requirements of the proposed amendment (which included Bingham's provision when this motion was made), Kendrick 109.

Bingham was not, however, wholly opposed to Negro suffrage. As chairman of the subcommittee, he reported the equal-rights provision which would have empowered Congress to provide for equal political rights and privileges, Kendrick 56, although he was the one who subsequently had that replaced with the first equal-rights provision reported to Congress. Kendrick 61. As already noted, the substitute contained substantially identical language, but omitted reference to political rights and privileges. Bingham also voted for Owen's plan, which would have enfranchised Negroes in 1876, when it was first presented. Kendrick 85. In February 1867 he moved to condition readmission of the Southern States on impartial male suffrage as well as on the States' ratifying the Fourteenth Amendment and conforming their laws thereto. Kendrick 123.

[28] While any guess as to the motives of Bingham and the other members of the committee is sheer speculation, it is not necessarily true that they believed they were replacing specific language with

demonstrated by the speeches in the debates on the floor.[29]

Before I examine those debates, a word of explanation is in order. For obvious reasons, the discussions of voter qualifications in the 39th Congress and among the public were cast primarily in terms of racial disqualifications. This does not detract from their utility as guides to interpretation. When an individual speaker said that the Amendment would not result in the enfranchisement of Negroes, he must have taken one of two views: either the Amendment did not reach voter qualifications at all; or it set standards limiting state restrictions on the ballot, but those standards did not prohibit racial discrimination. I have already set out some of the reasons which lead me to conclude that the former interpretation is correct, and that it is the under-

---

general. The author of the original plan, for one, seems to have taken the opposite view. He gave the following characterization of § 1 some years later:

"A declaration who is a citizen: unnecessary, if we had given suffrage to the negro; since there could be no possible doubt that an elector, nativeborn, is a citizen of the United States. Also a *specification* of the *particular* civil rights to be assured: out of place, I think, in a constitutional amendment, though necessary and proper in a civil rights bill." Owen, *supra*, n. 25, at 666 (emphasis added).

[29] The proceedings of the Joint Committee are examined in greater detail in the opinion of MR. JUSTICE BRENNAN, MR. JUSTICE WHITE, and MR. JUSTICE MARSHALL. *Post*, at 257–263. I agree with their apparent conclusion that the Journal sheds little light on the contemporary construction of the Fourteenth Amendment. One is left to do what he can with the two facts noted at the outset of this section: that of the plans considered by the Joint Committee, all provided either for reduction of representation or for enfranchisement while none provided for both at the same time; and that the Committee consistently rejected provisions to enfranchise the freedmen, with the conceivable exception of a plan which was defeated in the House largely because of the scope of the powers it transferred from the States to the Federal Government.

standing shared by the framers of the. Amendment, as well as by almost all of the opponents. The mere statement of the latter position appears to me to be a complete refutation of it. Even on its wholly unsupportable assumptions (1) that certain framers of the Amendment contemplated that the privileges and immunities of citizens included the vote, (2) that they intended to permit state laws to abridge the privileges and immunities of citizens whenever it was rational to do so, and (3) that they agreed on the rationality of prohibiting the freed slaves from voting, this remarkable theory still fails to explain why they understood the Amendment to permit racial voting qualifications in the free States of the North.

## D. In Congress

On May 8, 1866, Thaddeus Stevens led off debate on H. R. 127, the Joint Resolution proposing the Fourteenth Amendment. After explaining the delay of the Joint Committee in coming up with a plan of reconstruction, he apologized for his proposal in advance:

> "This proposition is not all that the committee desired. It falls far short of my wishes, but it fulfills my hopes. I believe it is all that can be obtained in the present state of public opinion. Not only Congress but the several States are to be consulted. Upon a careful survey of the whole ground, we did not believe that nineteen of the loyal States could be induced to ratify any proposition more stringent than this." Globe 2459.

In the climate of the times, Stevens could hardly have been understood as referring to anything other than the failure of the measure to make some provision for the enfranchisement of the freedmen. However, lest any mistake be made, he recounted the history of the Committee's prior effort in the field of representation and suf-

frage, H. R. 51, which "would surely have secured the enfranchisement of every citizen at no distant period." That measure was dead, "slaughtered by a puerile and pedantic criticism," and "unless this (less efficient, I admit) shall pass, its death has postponed the protection of the colored race perhaps for ages." *Ibid.*

With this explanation made, Stevens turned to a section-by-section study of the proposed resolution. The results to be achieved by § 1, as he saw it, would be equal punishment for crime, equal entitlement to the benefits of "[w]hatever law protects the white man," equal means of redress, and equal competence to testify. *Ibid.* If he thought the section provided equal access to the polls, despite his immediately preceding apology for the fact that it did not, his failure to mention that application is remarkable.[30]

Turning then to § 2, Stevens again discussed racial qualifications for voting. He explained the section as follows:

> "If any State shall exclude any of her adult male citizens from the elective franchise, or abridge that right, she shall forfeit her right to representation in the same proportion. The effect of this provision will be either to compel the States to grant universal suffrage or so to shear them of their power as to keep them forever in a hopeless minority in the national Government, both legislative and executive." *Ibid.*

Stevens recognized that it might take several years for the coercive effect of the Amendment to result in Negro suffrage, but since this would give time for education and enlightenment of the freedmen, "That short delay would

---

[30] Unless, of course, one adopts a "conspiracy theory" of the history of the Fourteenth Amendment. Thus far no one has (quite) done so in this context.

not be injurious." *Ibid.* He did not indicate that he believed it would be unconstitutional. He admitted that § 2 was not so good as the proposal which had been defeated in the Senate, for that, by reducing representation by all the members of a race if any one was discriminated against, would have hastened full enfranchisement. Section 2 allowed proportional credit. "But it is a short step forward. The large stride which we in vain proposed is dead . . . ." Globe 2460.

I have dealt at length with Stevens' remarks because of his prominent position in the House and in the Joint Committee. The remaining remarks, except for Bingham's summation, can be treated in more summary fashion. Of the supporters of the Amendment, Garfield of Ohio,[31] Kelley of Pennsylvania,[32] Boutwell of Massachusetts (a member of the Joint Committee),[33]

---

[31] "I regret more than I shall be able to tell this House that we have not found the situatiou [*sic*] of affairs in this country such, and the public virtue such that we might come out on the plain, unanswerable proposition that every adult intelligent citizen of the United States, unconvicted of crime, shall enjoy the right of suffrage." Globe 2462.

[32] "I shall, Mr. Speaker, vote for this amendment; not because I approve it. Could I have controlled the report of the committee of fifteen, it would have proposed to give the right of suffrage to every loyal man in the country." Globe 2469.

"So far as I am individually concerned, I object to the amendment as a whole, because it does not go far enough and propose to at once enfranchise every loyal man in the country." *Ibid.*

[33] "The proposition in the matter of suffrage falls short of what I desire, but so far as it goes it tends to the equalization of the inequality at present existing; and while I demand and shall continue to demand the franchise for all loyal male citizens of this country—and I cannot but admit the possibility that ultimately those eleven States may be restored to representative power without the right of franchise being conferred upon the colored people—I should feel myself doubly humiliated and disgraced, and criminal even, if I hesitated to do what I can for a proposition which equalizes representation." Globe 2508.

Eliot of Massachusetts,[34] Beaman of Michigan,[35] and Farnsworth of Illinois,[36] expressed their regret that the Amendment did not prohibit restrictions on the franchise. As the quotations set out in the margin indicate, the absence of such a prohibition was generally attributed to prejudice in the Congress, in the States, or both, to such an extent- that an enfranchising amendment could not pass. This corresponds with the first part of Stevens' introductory speech.

---

[34] "The second section, Mr. Speaker, is, in my judgment, as nearly correct as it can be without being fully, in full measure, right. But ·one thing is right, and that is secured by the amendment. Manifestly no State should have its basis of national .representation enlarged by reason of a portion of citizens within its borders to which the elective franchise is denied. If political power shall be lost because of such denial, not imposed because of participation in rebellion or other crime, it is to be hoped that political interests may work in the line of justice, and that the end will be the impartial enfranchisement of all citizens not- disqualified by crime. Whether that end shall be attained or not, this will be secured: that the measure of political power of any State shall be determined by that portion of its citizens which can speak and act at the polls, and shall not be enlarged because of the residence within the State of portions of its citizens denied the right of franchise. So much for the second section of the amendment. It is not all that I wish and would demand; but odious inequalities are removed by it and representation will be equalized, and the political rights of all citizens will under its operation be, as we believe, ultimately recognized and admitted." Globe 2511.

[35] "I did hope to see the rights of the freedmen completely established. . . . I did hope . . . that we should have the manhood and magnanimity to declare that men who have wielded the sword in defense of their country are fit to be intrusted with the ballot. But I am convinced that my expectations, hitherto fondly cherished, are doomed to some disappointment." Globe 2537.

[36] "This is a step in the right direction; and although I should prefer to see incorporated into the Constitution a guarantee of universal suffrage, as we cannot get the required two thirds for that, I cordially support this proposition as the next best." Globe 2540.

Other supporters of the Amendment obviously based their remarks on their understanding that it did not affect state laws imposing discriminatory voting qualifications, but did not indicate that the omission was a drawback in their view. In this group were Thayer of Pennsylvania,[37] Broomall of Pennsylvania,[38] Raymond of New York,[39] McKee of Kentucky,[40] Miller of Pennsyl-

[37] "[If the freed slaves had been added] to the thinking, voting men of the southern States, it would be just and proper that that addition should be represented in this body. But we all know that such is not the case. In those States themselves the late slaves do not enter into the basis of local representation. . . .

"Would it not be a most unprecedented thing that when this population are not permitted where they reside to enter into the basis of representation in their own State, we should receive it as an element of representation here . . . ." Globe 2464.

[38] "The second proposition is, in short, to limit the representation of the several States as those States themselves shall limit suffrage. . . .

". . . And why not? If the negroes of the South are not to be counted as a political element in the government of the South in the States, why should they be counted as a political element in the government of the country in the Union? If they are not to be counted as against the southern people themselves, why should they be counted as against us?" Globe 2498.

[39] H. R. 51 "deprived [the southern States] of all inducement for [the] gradual admission [of the freedmen] to the right of suffrage, inasmuch as it exacted universal suffrage as the only condition upon which they should be counted in the basis of representation at all. . . . I voted against a proposition which seemed to me so unjust and so injurious, not only to the whites of the southern States, but to the colored race itself. Well, sir, that amendment was rejected in the Senate, and the proposition, as embodied in the committee's report, comes before us in a very different form. It is now proposed to base representation upon suffrage, upon the number of voters, instead of upon the aggregate population in every State of the Union. And as I believe that to be essentially just, and likely to remedy the unequal representation of which complaint is so justly made, I shall give it my vote." Globe 2502.

Later, in discussion of § 3, which at that time would have dis-

180

vania,[41] Banks of Massachusetts,[42] and Eckley of Ohio.[43]

The remaining members of the House who supported the Fourteenth Amendment either did not speak at all or did not address themselves to the suffrage issue in any very clear terms. Those in the latter group who gave speeches on the proposed Amendment included

franchised certain rebels in federal elections, Raymond remarked that the effect would be to allow "one fifth, one eighth, or one tenth, as the case may be, of the people of these southern States to elect members from those States, to hold seats upon this floor." *Ibid.* It is obvious that the possibility of Negroes' voting in these elections did not cross his mind.

[40] "But this House is not prepared to enfranchise all men; the nation, perhaps, is not prepared for it to-day; the colored race are not prepared for it, probably, and I am sure the rebels are unfit for it; and as Congress has not the moral courage to vote for it, then put in this provision which cuts off the traitor from all political power in the nation, and then we have secured to the loyal men that control which they so richly deserve." Globe 2505.

[41] "This amendment will settle the complication in regard to suffrage and representation, leaving each State to regulate that for itself, so that it will be for it to decide whether or not it shall have a representation for all its male citizens not less than twenty-one years of age." Globe 2510.

[42] "I have no doubt that the Government of the United States has full power to extend the elective franchise to the colored population of the insurgent States. I mean authority; I said power. I have no doubt that the Government of the United States has authority to do this under the Constitution; but I do not think they have the power. The distinction I make between authority and power is this: we have, in the nature of our Government, the right to do it; but the public opinion of the country is such at this precise moment as to make it impossible we should do it. It was therefore most wise on the part of the committee on reconstruction to waive this matter in deference to public opinion." Globe 2532.

[43] "If South Carolina persists in withholding the ballot from the colored man, then let her take the alternative we offer, of confining her to the white basis of representation . . . ." Globe 2535.

Spalding of Ohio,[44] Longyear of Michigan,[45] and Shellabarger of Ohio.[46] The remaining Republican members of the Joint Committee—Washburne of Illinois, Morrill of Vermont, Conkling of New York, and Blow of Missouri—did not participate in the debates over the Amendment.

In the opposition to the Amendment were only the handful of Democrats. Even they, with one seeming exception, did not assert that the Amendment was applicable to suffrage, although they would have been expected to do so if they thought such a reading plausible. Finck of Ohio and Shanklin of Kentucky did not even

[44] Spalding's speeches are given at Globe 2509–2510. His only remarks addressed to §§ 1 and 2 read:

"As to the first measure proposed, a person may read it five hundred years hence without gathering from it any idea that this rebellion ever existed. The same may be said of the second proposition, for it only proposes that, the bondsmen being made free, the apportionment of Representatives in Congress shall be based upon the whole number of persons who exercise the elective franchise, instead of the population." Globe 2509.

A month later, in the debate over the Amendment when it had returned from the Senate, Spalding expressed his views more clearly:

"I say, as an individual, that I would more cheerfully give my vote if that provision allowed all men of proper age whom we have made free to join in the exercise of the right of suffrage in this country. But if I cannot obtain all that I wish, I will go heartily to secure all we can obtain." Globe 3146.

[45] Longyear's speech is published at Globe 2536–2537. He did not in terms address himself to any section except the third. However, it is not difficult to read his statement that the proposals of the Joint Committee disappointed "the expectations of the people" and his personal hopes as having reference to the absence of any provision on suffrage.

[46] Shellabarger spoke only briefly, and this in connection with the disfranchising section. In the course of his remarks he expressed the view that congressional power to regulate voter qualifications in federal elections was granted by Art. I, § 4. Globe 2512.

mention Negro suffrage in their attacks on the Amendment, although Finck discussed the reasons why the Southern States could not be expected to ratify it, Globe 2460–2462, and Shanklin characterized the Amendment as "tyrannical and oppressive." Globe 2501. Eldridge of Wisconsin [47] and Randall of Pennsylvania [48] affirmatively indicated their understanding that with the Amendment the Radicals had at least temporarily abandoned their crusade for Negro suffrage, as did Finck when the measure returned from the Senate with amendments.[49]

The other two Democrats to participate in the three days of debate on H. R. 127, Boyer of Pennsylvania and Rogers of New Jersey, have been a source of great comfort to those who set out to prove that the history of the Fourteenth Amendment is inconclusive on this issue. Each, in the course of a lengthy speech, included a sentence which, taken out of context, can be read to indicate a fear that § 1 might prohibit racial restrictions on the ballot. Boyer said, "The first section embodies the principles of the civil rights bill, and is intended to secure ultimately, and to some extent in-

---

[47] "Why is it that the gentleman from Pennsylvania [Mr. Stevens] gives up universal suffrage? Why is it that he and other gentlemen give up universal confiscation? Why is it that other gentlemen give up universal butchery of that people? It is a compromise of what they call principle for the purpose of saving their party in the next fall election." Globe 2506.

[48] "Gentlemen here admit that they desire [federal control over suffrage], but that the weak kneed of their party are not equal to the issue. Your purpose is the same, and but for that timidity you would now ingraft negro suffrage upon our Constitution and force it on the entire people of this Union." Globe 2530.

[49] "While this [second] section admits the right of the States thus to exclude negroes from voting, it says to them, if you do so exclude them they shall also be excluded from all representation; and you shall suffer the penalty by loss of representation." Globe 3145.

directly, the political equality of the negro race."
Globe 2467. Rogers, commenting on the uncertain scope
of the Privileges and Immunities Clause, observed: "The
right to vote is a privilege." Globe 2538.

While these two statements are perhaps innocuous
enough to be left alone, it is noteworthy that each
speaker had earlier in the session delivered a tirade
against the principle of Negro suffrage; [50] if either seri-
ously believed that the Fourteenth Amendment might
enfranchise the freedmen, he was unusually calm about
the fact. That they did not seriously interpret the
Amendment in this way is indicated as well by other
portions of their speeches.[51]

---

[50] Boyer's speech was made in opposition to a proposal to en-
franchise Negroes in the District of Columbia. He then thought
Negro suffrage a "monstrous proposition," Globe 176, which was
incompatible with "the broad general principle that this is, and of
right ought to be, a white man's Government." Globe 175. One
of Rogers' harangues on the subject came in connection with the
same bill. There he spoke of "the monstrous doctrine of political
equality of the negro race with the white at the ballot-box," Globe
198, and launched into an attack remarkable for its vitriol.

[51] Boyer viewed § 3, which at that time would have prohibited
voluntary participants in the rebellion from voting in federal elec-
tions, as "the most objectionable of all the parts," Globe 2467, as it
would disfranchise nine-tenths of the voting population of the South
for more than four years. The second section he found objectionable
as designed "to reduce the number of southern representatives in
Congress and in the Electoral College; and also to operate as a stand-
ing inducement to negro suffrage." Globe 2467. These remarks
indicate no awareness that the first section would increase the number
of voters in the Southern States and also render any "inducement" to
Negro suffrage unnecessary.

Rogers later in his speech asserted:

"The committee dare not submit the broad proposition to the
people of the United States of negro suffrage. They dare not to-day
pass the negro suffrage bill which passed this House in the Senate
of the United States because, as I have heard one honorable and
leading man on the Republican side of the House say, it would

Two other opponents of the Fourteenth Amendment, Phelps of Maryland and Niblack of Indiana, made statements which have been adduced to show that there was no consensus on the applicability of the Fourteenth Amendment to suffrage laws. Phelps voiced his sentiments on May 5, three days before the beginning of debate.[52] In the course of a speech urging a soft policy on reconstruction, he expressed the fear that the Amendment would authorize Congress to define the privileges of citizens to include the suffrage—or indeed that it might have that effect *proprio vigore*. Globe 2398. Phelps did not repeat this sentiment after he was contradicted by speaker after speaker during the debates proper; indeed, he did not take part in the debates at all, but simply voted against the Amendment, along with most of his Democratic colleagues. Globe 2545.[53]

As for Niblack, on the first day of debate he made the following remarks:

"I give notice that I will offer the following amendment if I shall have the opportunity:

---

sink into oblivion the party that would advocate before the American people the equal right of the negro with the white man to suffrage." Globe 2538.

When H. R. 127 was returned by the Senate with amendments, Rogers addressed the House and stated that when the records of the Joint Committee were made public, it would be revealed that the Committee at first agreed to recommend universal Negro suffrage, but reconsidered because of the force of public opinion. Globe App. 230. Rogers was himself a member of the Joint Committee, and he presumably was referring to the acceptance and then rejection of Owen's plan for enfranchisement in 1876.

[52] The Amendment, however, had been released to the press on April 28. James 115.

[53] It is not amiss to point out that whatever force Phelps' and Rogers' interpretations may have in the face of the contrary authority, even they foresaw no danger from the Equal Protection Clause as a source of federal power over the suffrage.

" 'Add to the fifth section as follows:

" '*Provided,* That nothing contained in this article shall be so construed as to authorize Congress to regulate or control the elective franchise within any State, or to abridge or restrict the power of any State to regulate or control the same within its own jurisdiction, except as in the third section hereof prescribed.' " Globe 2465.

Like Phelps, Niblack found it unnecessary to participate in the debates. He was not heard from again until the vote on the call for the previous question. As Garfield ascertained at the time, the only opportunity to amend H. R. 127 would arise if the demand was voted down. Niblack voted to sustain it. Globe 2545.

Debate in the House was substantially concluded by Bingham, the man primarily responsible for the language of § 1. Without equivocation, he stated:

"The amendment does not give, as the second section shows, the power to Congress of regulating suffrage in the several States.

"The second section excludes the conclusion that by the first section suffrage is subjected to congressional law; save, indeed, with this exception, that as the right in the people of each State to a republican government and to choose their Representatives in Congress is of the guarantees of the Constitution, by this amendment a remedy might be given directly for a case supposed by Madison, where treason might change a State government from a republican to a despotic government, and thereby deny suffrage to the people." Globe 2542.

Stevens then arose briefly in rebuttal. He attacked Bingham for saying in another portion of his speech that the disqualification provisions of § 3 were unenforceable. He did not contradict—or even refer to—Bingham's

interpretation of §§ 1 and 2. Globe 2544. The vote was taken and the resolution passed immediately thereafter. Globe 2545.

To say that Stevens did not contradict Bingham is to minimize the force of the record. Not once, during the three days of debate, did *any* supporter of the Amendment criticize or correct *any* of the Republicans or Democrats who observed that the Amendment left the ballot "exclusively under the control of the States." Globe 2542 (Bingham). This fact is tacitly admitted even by those who find the debates "inconclusive." The only contrary authority they can find in the debates is the pale remarks of the four Democrats already discussed.[54]

In the Senate, which did not have a gag rule, matters proceeded at a more leisurely pace. The introductory speech would normally have been given by Senator Fessenden of Maine, the Chairman of the Joint Committee on behalf of the Senate, but he was still weak with illness and unable to deliver a lengthy speech. The duty of presenting the views of the Joint Committee therefore devolved on Senator Howard of Michigan.[55]

---

[54] Like my colleagues, *post,* at 264, I find it difficult to understand what Bingham meant when he said that "the exercise of the elective franchise, though it be one of the privileges of a citizen of the Republic, is exclusively under the control of the States." Globe 2542. However, I do not find this mysterious sentence to mean that the exercise of the elective franchise is exclusively under the control of the States and Congress, nor do I find it to dilute the force of his explicit statements quoted above that § 1 did not reach the right to vote. The general statements by Bingham and Stevens to the effect that the Amendment was designed to achieve equality before the law, or would be effectuated by legislation in part, likewise do not weaken the force of the statements specifically addressed to the suffrage question quoted above.

[55] Fessenden, however, was present in the Senate and participated in the discussion. See Globe 2763, 2769, 2770. He was therefore in a position to correct any gross misinterpretation of his views or of those of the Committee.

Howard minced no words. He stated that

> "the first section of the proposed amendment does
> not give to either of these classes the right of voting.
> The right of suffrage is not, in law, one of the privi-
> leges or immunities thus secured by the Constitution.
> It is merely the creature of law. It has always
> been regarded in this country as the result of positive
> local law, not regarded as one of those fundamental
> rights lying at the basis of all society and without
> which a people cannot exist except as slaves, subject
> to a depotism [*sic*].' Globe 2766.

"The second section leaves the right to regulate the elec-
tive franchise still with the States, and does not meddle
with that right." *Ibid.* Howard stated that while he
personally would have preferred to see the freedmen en-
franchised, the Committee was confronted with the
necessity of proposing an amendment which could be
ratified.

> "The committee were of opinion that the States
> are not yet prepared to sanction so fundamental
> a change as would be the concession of the right
> of suffrage to the colored race. We may as well
> state it plainly and fairly, so that there shall be
> no misunderstanding on the subject. It was 'our
> opinion that three fourths of the States of this
> Union could not be induced to vote to grant the
> right of suffrage, even in any degree or under any
> restriction, to the colored race." *Ibid.*

Howard's forthright attempt to prevent misunderstand-
ing was completely successful insofar as the Senate
was concerned; at least, no one has yet discovered a
remark during the Senate debates on the proposed Four-
teenth Amendment which indicates any contrary impres-

sion.[56] For some, however, time has muddied the clarity with which he spoke.[57]

The Senate, like the House, made frequent reference to the fact that the proposed amendment would not result in the enfranchisement of the freedmen. The sup-

---

[56] My colleagues, *post*, at 264, point to Howard's reference to *Corfield* v. *Coryell*, 6 Fed. Cas. 546 (No. 3230) (CCED Pa. 1825), in order to "gather some intimation of what probably will be the opinion of the judiciary" on the scope of the Privileges and Immunities Clause of § 1. Globe 2765. As the text indicates, Howard rejected Justice Washington's lengthy dictum insofar as it said that the protected privileges and immunities included "the elective franchise, as regulated and established by the laws or constitution of the State in which it is to be exercised." No other Senator quoted or referred to this portion of Washington's opinion during the debates over the proposed Fourteenth Amendment. *Corfield,* which held that New Jersey could constitutionally restrict access to her oyster beds to her own residents, was the leading authority on privileges and immunities in the mind of the 39th Congress, but it was not the only one. *Campbell* v. *Morris,* 3 H. & McH. 535 (Md. 1797) (Samuel Chase, J.), and *Abbot* v. *Bayley,* 6 Pick. 89 (Mass. 1827) (Parker, C. J.), were also cited. See Fairman, Does the Fourteenth Amendment Incorporate the Bill of Rights?, 2 Stan. L. Rev. 5, 12–15 (1949). Both specifically stated that the privileges and immunities protected by Art. IV, § 2, did not include the right of suffrage or the right to hold office.

[57] Howard was a very clear-spoken man. When it was suggested, during the debates over the Fifteenth Amendment, that the freedmen were entitled to the ballot by virtue of the Privileges and Immunities Clause of the Fourteenth Amendment, he recalled his role in the framing of that Amendment and said: "I feel constrained to say here now that this is the first time it ever occurred to me that the right to vote was to be derived from the fourteenth article. I think such a construction cannot be maintained." Cong. Globe, 40th Cong., 3d Sess., 1003 (1869). He then referred to the debates, § 2 of the Fourteenth Amendment, and the fact that "[n]obody ever supposed that the right of voting or of holding office was guarantied by that second section of the fourth article of the old Constitution" to bolster his construction of § 1 of the Fourteenth Amendment. *Ibid.*

porters who expressed their regret at the fact were Wade of Ohio,[58] Poland of Vermont,[59] Stewart of Nevada,[60] Howe of Wisconsin,[61] Henderson of Mis-

[58] "I think our friends, the colored people of the South, should not be excluded from the right of voting, and they shall not be if my vote and the votes of a sufficient number who agree with me in Congress shall be able to carry it. I do not agree in this particular with the Senator from Michigan [Mr. Howard]. He yields to the provision in the committee's resolution on the subject reluctantly, because he does not believe three fourths of the States can be got to ratify that proposition which is right and just in itself. My own opinion is that if you go down to the very foundation of justice, so far from weakening yourself with the people, you will strengthen yourself immensely by it; but I know that it is not the opinion of many here, and I suppose we must accommodate ourselves to the will of majorities, and if we cannot do all we would, do all we can. I propose for myself to contend for all I can get in the right direction, and finally to go with those who will give us anything that is beneficial." Globe 2769.

[59] "I should be much better satisfied if the right of suffrage had been given at once to the more intelligent of ["the colored people of the South"] and such as had served in our Army. . . . Believing that this amendment probably goes as far in favor of suffrage to the negro as is practicable to accomplish now, and hoping it may in the end accomplish all I desire in this respect, I shall vote for its adoption, although I should be glad to go further." Globe 2963-2964.

[60] "It declares that all men are entitled to life, liberty, and property, and imposes upon the Government the duty of discharging these solemn obligations, but fails to adopt the easy and direct means for the attainment of the results proposed. It refuses the aid of four million people in maintaining the Government of the people. . . . [But] it furnishes a conclusive argument in favor of universal amnesty and impartial suffrage. . . . The utter impossibility of a final solution of the difficulties by the means proposed will cause the North to clamor for suffrage." Globe 2964.

[61] "I am sorry to have to put that clause [§ 2] into our Constitution, as I am sorry for the necessity which calls upon us to put the preceding clause into the Constitution. I wish there was no community and no State in the United States that was not

souri,[62] and Yates of Illinois.[63]   The remarks of Senator Sherman of Ohio, whose support for the amendment was lukewarm, see Globe 2986, seem to have been based on the common interpretation.[64]

Doolittle of Wisconsin, whose support for the President resulted in his virtually being read out of the Republican Party, proposed to base representation on adult male voters.   Globe 2942.   In a discussion with Senator Grimes of Iowa, a member of the Joint Committee, about the desirability of this change, Doolittle defended himself by pointing out that: "Your amendment proposes to

---

prepared to say with my friend from Nevada [Mr. Stewart] that all men may be represented in the Congress of the United States and shall be represented and shall choose their own representatives. That is the better doctrine; that is the true doctrine.   I would much prefer, myself, to unite with the people of the United States in saying that hereafter no man shall be excluded from the right to vote, than to unite with them in saying that hereafter some men may be excluded from the right of representation."   Globe App. 219.

[62] Henderson, who had offered a direct enfranchising provision as an alternative to the Committee's first effort in the field of representation, see Globe App. 115, stated that he now recognized that "the country is not yet prepared" to share political power with Negroes, and he supported the Committee plan.   Globe 3035.

[63] "[A]lthough we do not obtain suffrage now, it is not far off, because the grasping desire of the South for office, that old desire to rule and reign over this Government and control its destinies, will at a very early day hasten the enfranchisement of the loyal blacks."   Globe 3038.

[64] "There is no reason why the white citizens of South Carolina should vote the political power of a class of people whom they say are entirely unfit to vote for themselves.   If there is any portion of the people of this country who are unfit to vote for themselves, their neighbors ought not to vote for them."   Globe 2986.

There was no indication that Sherman considered South Carolina's disqualification on racial grounds any more improper than Massachusetts' limitations of the franchise to men, which he mentioned in the next breath.

allow the States to say who shall vote." Globe 2943.-
Grimes did not respond. Among the Democrats, no dif-
ferent view was expressed. Those whose remarks are
informative are Hendricks of Indiana,[65] Cowan of
Pennsylvania,[66] Davis of Kentucky,[67] and Johnson of
Maryland.[68]

Senator Howard, who had opened debate, made the
last remarks in favor of the Amendment. He said:

> "We know very well that the States retain the
> power, which they have always possessed, of regu-
> lating the right of suffrage in the States. It is the
> theory of the Constitution itself. That right has
> never been taken from them; no endeavor has ever
> been made to take it from them; and the theory of
> this whole amendment is, to leave the power of
> regulating the suffrage with the people or Legis-
> latures of the States, and not to assume to regulate

[65] "If you think the negro ought to have the right of voting;
if you are in favor of it, and intend it shall be given, why do you
not in plain words confer it upon them? It is much fairer than
to seek it by indirection, and the people will distinctly understand
you when you propose such a change of the Constitution." Globe
2939.

[66] "What is to be the operation of this amendment? Just this:
your whip is held over Pennsylvania, and you say to her that she
must either allow her negroes to vote or have one member of
Congress less." Globe 2987.

[67] "[The second section's] true meaning was intended to be diffi-
cult to be reached, but when understood it is a measure which
shrinks from the responsibility of openly forcing negro suffrage
upon the late slave States, but attempts by a great penalty to coerce
them to accept it." Globe App. 240.

[68] "It says that each of the southern States, and, of course, each
other State in the Union, has a right to regulate for itself the fran-
chise, and that consequently, as far as the Government of the United
States is concerned, if the black man is not permitted the right to
the franchise, it will be a wrong (if a wrong) which the Government
of the United States will be impotent to redress." Globe 3027.
Johnson was the only Democratic Senator on the Joint Committee.

it by any clause of the Constitution of the United States." Globe 3039.

Shortly thereafter the Amendment was approved. Globe 3041–3042.

In the House, there was a brief discussion of the Senate amendments and the measure generally, chiefly by the Democrats. Stevens then concluded the debate as he had begun it, expressing his regret that the Amendment would not enfranchise the freedmen.[69] The House accepted the Senate changes and sent the measure to the States. Globe 3149.

### E. Collateral Evidence of Congressional Intent

It has been suggested that despite this evidence of congressional understanding, which seems to me overwhelming, the history is nonetheless inconclusive. Primary reliance is placed on debates over H. R. 51, the Joint Committee's first effort in the field of the basis of representation. In these debates, some of the more extreme Radicals, typified by Senator Sumner of Massachusetts, suggested that Congress had power to interfere with state voter qualifications at least to the extent of enfranchising the freedmen. This power was said to exist in a variety of constitutional provisions, including Art. I, § 2, Art. I, § 4, the war power, the power over territories, the guarantee of a republican form of government, and § 2 of the Thirteenth Amendment. Those who held this view expressed concern lest the Committee's proposal be read to authorize the States to discriminate on racial grounds and stated that they could not vote for the measure if such was the correct construction. They were sometimes comforted by sup-

---

[69] "With [the rebel States'] enlarged basis of representation, and exclusion of the loyal men of color from the ballot-box, I see no hope of safety unless in the prescription of proper enabling acts, which shall do justice to the freedmen and enjoin enfranchisement as a condition-precedent." Globe 3148.

porters of the committee proposal, who assured them that there would be no such effect. From these statements, and the fact that some of those who took the extreme view ultimately did vote for the proposed Fourteenth Amendment, it is sought to construct a counterargument: if H. R. 51, properly interpreted, would not have precluded congressional exercise of power otherwise existing under the constitutional provisions referred to, then § 2 of the Fourteenth Amendment, properly interpreted, does not preclude the exercise of congressional power under §§ 1 and 5 of that Amendment.

This argument, however, is even logically fallacious, and quite understandably none of the opinions filed today place much reliance on it. I do not maintain that the framers of the Fourteenth Amendment took away with one hand what they had given with the other, but simply that the Amendment must be construed as a whole, and that for the reasons already given, *supra,* at 167–170, the inclusion of § 2 demonstrates that the framers never intended to confer the power which my Brethren seek to find in §§ 1 and 5. Bingham, for one, distinguished between these two positions. When it was suggested in the debates over H. R. 51 that the proviso would remove pre-existing congressional power over voting qualifications, Bingham made the response quoted by my colleagues. Globe 431–432; see *post,* at 276–277. When it was observed during the debates over the proposed Fourteenth Amendment that § 2 demonstrated that the Amendment did not reach state control over voting qualifications, Bingham was the one making the observation. Globe 2542, quoted *supra,* at 185. As Bingham seems to have recognized, the sort of argument he made in connection with H. R. 51 is beside the point with respect to the Fourteenth Amendment.

In any event, even disregarding its analytical difficulties, the argument is based on blatant factual shortcomings. All but one of the speakers on whose statements

primary reliance is placed stated, either during the debates on the Fourteenth Amendment or subsequently, that the Amendment did not enfranchise the freedmen.[70]

Finally, some of those determined to sustain the legislation now before us rely on speeches made between two and three years after Congress had sent the proposed Amendment to the States. . Boutwell and Stevens in the House, and Sumner in the Senate, argued that the Fif-

---

[70] Kelley: see Globe 2469, quoted at n. 32, *supra*.

Farnsworth: see Globe 2540, quoted at n. 36, *supra*.

Eliot: see Globe 2511, quoted at n. 34, *supra*.

Higby: see Globe 3978 (debate over readmission of Tennessee despite all-white electorate).

Bingham: see Globe 2542, quoted *supra*, at 185; see also Globe 3979 (debate over readmission of Tennessee).

Stevens: see Globe 2459–2460, quoted *supra*, at 175–177; Globe 3148, quoted at n. 69, *supra*.

Raymond: see Globe 2502, quoted at n. 39, *supra*.

Ashley: see Globe 2882.

Sumner: see n. 71, *infra*.

Fessenden: see H. R. Rep. No. 30, 39th Cong., 1st Sess., XIII–XIV (1866), quoted *infra*, at 197–198.

Yates: see Globe 3038, quoted at n. 63, *supra*.

Stewart: see Globe 2964, quoted at n. 60, *supra*.

Wade: see Globe 2769, quoted at n. 58, *supra*.

The exception is Senator Wilson of Massachusetts, who did not address himself to this issue. However, he participated in the debates, see Globe 2770, 2986–2987, and was therefore in a position to express disagreement with the interpretation uniformly offered in the Senate.

Secondary reliance is placed on Shellabarger, Cook, Boutwell, Julian, and Lawrence of Ohio. These Representatives, with the exception of Boutwell, see n. 33, *supra*, did not participate significantly in the debates over the Fourteenth Amendment. The substance of their earlier remarks is that Congress had some power, usually by way of the Guarantee Clause, see n. 6, *supra*, to oversee state voter qualifications. Shellabarger also relied on Art. I, § 4, see n. 46, *supra; infra*, at 210; Julian relied on the Thirteenth Amendment; and Boutwell looked to the Declaration of Independence. The relevance of these views to the scope of § 1 of the Fourteenth Amendment is not apparent.

teenth Amendment or enfranchising legislation was unnecessary because the Fourteenth Amendment prohibited racial discrimination in voter qualifications. Each had earlier expressed the opposite position.[71] Their subsequent attempts to achieve by assertion what they had not had the votes to achieve by constitutional processes can hardly be entitled to weight.

## F. Ratification

State materials relating to the ratification process are not very revealing. For the most part only gubernatorial messages and committee reports have survived.[72] So far as my examination of these materials reveals, while the opponents of the Amendment were divided

---

[71] Stevens: see Globe 2459–2460, quoted *supra,* at 175–177; Globe 3148, quoted at n. 69, *supra;* James 163 (campaign speech in fall of 1866).

Boutwell: see Globe 2508, quoted at n. 33, *supra;* Globe 3976 (debate over readmission of Tennessee).

Sumner did not actually participate in the debates on H. R. 127. However, after the caucus of Republican Senators had agreed on the form of the Amendment, Sumner gave notice that he intended to move to amend the bill accompanying the proposed Amendment. This bill, S. 292, provided that any Confederate State might be readmitted to representation in Congress once the proposed Amendment had become part of the Constitution and the particular State should have ratified it and modified its constitution and laws in conformity therewith. The bill is reprinted in H. R. Rep. No. 30, 39th Cong., 1st Sess., V–VI, and in Kendrick 117–119. Sumner's amendment would have provided that a State might be readmitted when it should have ratified the Fourteenth Amendment and modified its constitution and laws in conformity therewith "and shall have *further* provided that there shall be no denial of the elective franchise to citizens of the United States because of race or color, and that all persons shall be equal before the law." Globe 2869 (emphasis added).

Sumner also referred to Negro suffrage as unfinished business in speeches that fall. James 173, 178.

[72] For citations to the state materials, see Fairman, Does the Fourteenth Amendment Incorporate the Bill of Rights?, 2 Stan. L. Rev. 5, 84–132 (1949).

and sometimes equivocal on whether it might be con-
strued to require enfranchisement,[73] the supporters of
the Amendment in the States approached the congres-
sional proponents in the unanimity of their interpreta-
tion. I have discovered only one brief passage in
support of the Amendment which appears to be based
on the assumption that it would result in enfranchise-
ment.[74] These remarks, in the message of the Governor
of Illinois, had to compete in the minds of the legislators
with the viewpoint of the Chicago Tribune. This Radi-
cal journal repeatedly criticized the Amendment's lack
of an enfranchising provision, and at one time it even
expressed the hope that the South would refuse to
ratify the Amendment so that the North would turn to
enfranchisement of the freedmen as the only means of
reconstruction. June 25, 1866, quoted in James 177.
In all the other States I have examined, where the
materials are sufficiently full for the understanding of
a supporter of the Amendment to appear, his under-

---

[73] Fear that the Amendment would reach voting was expressed in
Brevier Legis. Rep. [Indiana] 45–46, 80, 88–89 (1867); Tenn.
H. R. J. 38 (Extra Sess. 1866); Fla. S. J. 102 (1866); N. C. S. J.
96–97 (1866–1867); S. C. H. R. J. 34 (1866); and Tex. S. J. 422–
423 (1866). The last four States rejected the proposed Amendment.
Opponents of the Amendment stated or assumed that it would not
reach voting qualifications in Ark. H. R. J. 288–289 (1866); Fla.
S. J. 8–9 (1866); Report of the Joint Committee on Federal Rela-
tions, Md. H. R. Doc. MM, p. 15 (Mar. 18, 1867); Mass. H. R.
Doc. No. 149, pp. 7–9, 16–17 (1867); and Wis. S. J. 102–103 (1867).
Fla. H. R. J. 76–78 (1866); Ind. H. R. J. 102–103 (1867); and
N. H. S. J. 71–72 (1866) are equivocal.

[74] "Are not all persons born or naturalized in the United States
and subject to its jurisdiction, rightfully citizens of the United States
and of each State, and justly entitled to all the political and civil
rights citizenship confers? and should any State possess the power to
divest them of these great rights except for treason or other infamous
crime?" Ill. H. R. J. 40 (1867).

standing has been that enfranchisement would not result.[75]

The scanty official materials can be supplemented by other sources. There was a congressional election in the fall of the year the Fourteenth Amendment went to the States. The Radicals ran on the Amendment as their reconstruction program, attempting to force voters to choose between their plan and that of President Johnson. From the campaign speeches and from newspaper reactions, we can get some further idea of the understanding of the States.

The tone of the campaign was set by the formal report of the Joint Committee, which Fessenden openly stated he had composed as a partisan document. James 147. Indeed, it was not even submitted to Congress until the day the Senate approved the measure, and then only in manuscript form. Globe 3038. On the delicate issue of Negro suffrage, the report read as follows: [76]

> "Doubts were entertained whether Congress had power, even under the amended Constitution, to prescribe the qualifications of voters in a State, or could act directly on the subject. It was doubtful, in the opinion of your committee, whether the States would consent to surrender a power they had always exercised, and to which they were attached. As the best if not the only method of surmounting the difficulty, and as eminently just and proper in itself, your committee came to the conclusion that political power should be possessed in all the States exactly in proportion as the right of suffrage should be granted, without distinction of color or race.

[75] Ind. H. R. J. 47–48 (1867); Kan. S. J. 45 (1867); Maine S. J. 23 (1867); Mass. H. R. Doc. No. 149, pp. 25–26 (1867); Nev. S. J. App. 9 (1867); Vt. S. J. 28 (1866); W. Va. S. J. 19 (1867); Wis. Assembly J. 33 (1867).

[76] H. R. Rep. No. 30, 39th Cong., 1st Sess., XIII–XIV (1866).

198

This it was thought would leave the whole question with the people of each State, holding out to all the advantage of increased political power as an inducement to allow all to participate in its exercise. Such a provision would be in its nature gentle and persuasive, and would lead, it was hoped, at no distant day, to an equal participation of all, without distinction, in all the rights and privileges of citizenship, thus affording a full and adequate protection to all classes of citizens, since all would have, through the ballot-box, the power of self-protection.

"Holding these views, your committee prepared an amendment to the Constitution to carry out this idea, and submitted the same to Congress. Unfortunately, as we think, it did not receive the necessary constitutional support in the Senate, and therefore could not be proposed for adoption by the States. The principle involved in that amendment is, however, believed to be sound, and your committee have again proposed it in another form, hoping that it may receive the approbation of Congress."

Newspapers expressed the same view of the reach of the Amendment. Even while deliberations were underway, predictions that Congress would come up with a plan involving enfranchisement of the freedmen had gradually ceased. James 91. When the Amendment was released to the press, Andrew Johnson was reported as seeing in it a "practical abandonment of the negro suffrage issue." Cincinnati Daily Commercial, April 30, 1866, quoted in James 117. The New York Herald had reported editorially that the Amendment reflected an abandonment of the Radical push for Negro suffrage and acceptance of Johnson's position that control over suffrage rested exclusively with the States. May 1, 1866, reported in James 119. The Nation, a Radical organ,

attributed the absence of any provision on Negro suffrage to "sheer want of confidence in the public." 2 Nation 545 (May 1, 1866), quoted in James 120. The Chicago Tribune, another Radical organ, complained that § 1 was objectionable as "surplusage," May 5, 1866, quoted in James 123, and later in the same month criticized the measure for "postponing, and not settling" the matter of equal political rights for Negroes. May 31, 1866, quoted in James 146. As deliberations continued, the reporting went on in the same vein. The New York Times reported that with elections approaching, "No one now talks or dreams of forcing Negro suffrage upon the Southern States." June 6, 1866. The Cincinnati Daily Commercial and the Boston Daily Journal for June 7, 1866, commented on the Radicals' abandonment of Negro suffrage. James 145.

Much the same picture emerges from the campaign speeches. Although an occasional Democrat expressed the fear that the Amendment would or might result in political equality,[77] the supporters of the Amendment denied such effects without exception that I have discovered. Among the leading congressional figures who stated in campaign speeches that the Amendment did not prohibit racial voting qualifications were Senators Howe, Lane, Sherman, Sumner, and Trumbull, and Congressmen Bingham, Delano, Schenck, and Stevens. See James 159–168, 173, 178; Fairman, Does the Fourteenth Amendment Incorporate the Bill of Rights?, 2 Stan. L. Rev. 5, 70–78 (1949).

As was pointed out above, all but a handful of Northern States prohibited blacks from voting at all,

---

[77] I have found references to only two such speeches, one by Senator Hendricks and the other by one George M. Morgan, a candidate for Congress in Ohio. Cincinnati Daily Commercial, Aug. 9, 1866, p. 1, col. 4, quoted in Fairman, *supra*, n. 14, at 72; Cincinnati Daily Commercial, Aug. 23, 1866, p. 2, col. 3, quoted in Fairman, *supra*, at 75.

and opposition to a change was intense. Between 1865 and 1869 referenda on the issue rejected impartial Negro suffrage in Colorado Territory, Connecticut, Wisconsin, Minnesota (twice), the District of Columbia, Nebraska Territory, Kansas, Ohio, Michigan, Missouri, and New York. Only Iowa and Minnesota accepted it, and that on the day Grant was elected to the Presidency.[78] It is inconceivable that those States, in that climate, could have ratified the Amendment with the expectation that it would require them to permit their black citizens to vote.

Small wonder, then, that in early 1869 substantially the same group of men who three years earlier had proposed the Fourteenth Amendment felt it necessary to make further modifications in the Constitution if state suffrage laws were to be controlled even to the minimal degree of prohibiting qualifications which on their face discriminated on the basis of race. If the consequences for our federal system were not so serious, the contention that the history is "inconclusive" would be undeserving of attention. And, with all respect, the transparent failure of attempts to cast doubt on the original understanding is simply further evidence of the force of the historical record.

## II

The history of the Fourteenth Amendment with respect to suffrage qualifications is remarkably free of the problems which bedevil most attempts to find a reliable guide to present decision in the pages of the past. Instead, there is virtually unanimous agreement, clearly and repeatedly expressed, that § 1 of the Amendment did not reach discriminatory voter qualifications. In this rather remarkable situation, the issue of the bearing of the historical understanding on constitutional interpretation squarely arises.

---

[78] See Gillette, *supra*, n. 3, at 25–27.

I must confess to complete astonishment at the posi-. tion of some of my Brethren that the history of the Fourteenth Amendment has become irrelevant. *Ante,* at 139–140. In the six years since I first set out much of this history,[79] I have seen no justification for such a result which appears to me at all adequate. With matters in this posture, I need do no more by way of justifying my reliance on these materials than sketch the familiar outlines of our constitutional system.

When the Constitution with its original Amendments came into being, the States delegated some of their sovereign powers to the Federal Government, surrendered other powers, and expressly retained all powers not delegated or surrendered. Amdt. X. The power to set state voting qualifications was neither surrendered nor delegated, except to the extent that the guarantee of a republican form of government[80] may be thought to require a certain minimum distribution of political power. The power to set qualifications for voters for national office, created by the Constitution, was expressly committed to the States by Art. I, § 2, and Art. II, § 1.[81] By Art. V, States may be deprived of their retained powers only with the concurrence of two-thirds of each House of Congress and three-fourths of the States. No one asserts that the power to set voting qualifications was taken from the States or subjected to federal control by any Amendment before the Fourteenth. The historical evidence makes it plain that the Congress and the States proposing and ratifying that Amendment affirmatively understood that they were not limiting state power over voting qualifications. The

---

[79] *Reynolds* v. *Sims,* 377 U. S. 533, 589 (1964) (dissenting opinion).

[80] Art. IV, § 4. See n. 6, *supra,* for the text.

[81] The contention that Congress has power to override state judgments as to qualifications for voting in federal elections is discussed *infra,* at 209–212.

existence of the power therefore survived the amending process, and, except as it has been limited by the Fifteenth, Nineteenth, and Twenty-fourth Amendments, it still exists today.[82] Indeed, the very fact that constitutional amendments were deemed necessary to bring about federal abolition of state restrictions on voting by reason of race (Amdt. XV), sex (Amdt. XIX), and, even with respect to federal elections, the failure to pay state poll taxes (Amdt. XXIV), is itself forceful evidence of the common understanding in 1869, 1919, and 1962, respectively, that the Fourteenth Amendment did not empower Congress to legislate in these respects.

It must be recognized, of course, that the amending process is not the only way in which constitutional understanding alters with time. The judiciary has long been entrusted with the task of applying the Constitution in changing circumstances, and as conditions change the Constitution in a sense changes as well. But when the Court gives the language of the Constitution an

---

[82] Amdt. XV: "Section 1. The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude.

"Section 2. The Congress shall have power to enforce this article by appropriate legislation."

Amdt. XIX: "The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of sex.

"Congress shall have power to enforce this article by appropriate legislation."

Amdt. XXIV: "Section 1. The right of citizens of the United States to vote in any primary or other election for President or Vice President, for electors for President or Vice President, or for Senator or Representative in Congress, shall not be denied or abridged by the United States or any State by reason of failure to pay any poll tax or other tax.

"Sec. 2. The Congress shall have power to enforce this article by appropriate legislation."

unforeseen application, it does so, whether explicitly or implicitly, in the name of some underlying purpose of the Framers.[83]   This is necessarily so; the federal judiciary, which by express constitutional provision is appointed for life, and therefore cannot be held responsible by the electorate, has no inherent general authority to establish the norms for the rest of society.   It is limited to elaboration and application of the precepts ordained in the Constitution by the political representatives of the people.   When the Court disregards the express intent and understanding of the Framers, it has invaded the realm of the political process to which the amending power was committed, and it has violated the constitutional structure which it is its highest duty to protect.[84]

---

[83] See, *e. g., Harper* v. *Virginia Board of Elections,* 383 U. S. 663, 670 (1966): "Our conclusion, like that in *Reynolds* v. *Sims,* [377 U. S. 533 (1964),] is founded not on what we think governmental policy should be, but on what the Equal Protection Clause requires."

[84] Most of the cases in which this Court has used the Equal Protection Clause to strike down state voter qualifications have been decided since 1965.   Eight such cases have been decided by opinion. *Carrington* v. *Rash,* 380 U. S. 89 (1965); *Louisiana* v. *United States,* 380 U. S. 145 (1965); *Harper* v. *Virginia Board of Elections,* 383 U. S. 663 (1966); *Katzenbach* v. *Morgan,* 384 U. S. 641 (1966); *Kramer* v. *Union School District,* 395 U. S. 621 (1969); *Cipriano* v. *City of Houma,* 395 U. S. 701 (1969); *Evans* v. *Cornman,* 398 U. S. 419 (1970); *Phoenix* v. *Kolodziejski,* 399 U. S. 204 (1970). Other cases have been summarily disposed of.   In none of these cases did the Court advert to the argument based on the historical understanding.

Before 1965, although this Court had occasionally entertained on the merits challenges to state voter qualifications under the Equal Protection Clause, only two cases had sustained the challenges. *Nixon* v. *Herndon,* 273 U. S. 536 (1927), held that a Texas statute limiting participation in the Democratic Party primary to whites violated the Fourteenth Amendment.   *Nixon* v. *Condon,* 286 U. S. 73 (1932), held that Texas did not avoid the reach of the *Herndon*

204

As the Court is not justified in substituting its own views of wise policy for the commands of the Constitution, still less is it justified in allowing Congress to disregard those commands as the Court understands them. Although Congress' expression of the view that it does have power to alter state suffrage qualifications is entitled to the most respectful consideration by the judiciary, coming as it does from a coordinate branch of government,[85] this cannot displace the duty of this Court to make an independent determination whether Congress has exceeded its powers. The reason for this goes beyond Marshall's assertion that: "It is emphatically the province and duty of the judicial department to say what the law is." *Marbury* v. *Madison,* 1 Cranch 137, 177 (1803).[86] It inheres in the structure of the

decision by transferring to the party's executive committee the power to set qualifications for participation in the primary. In neither of the *Nixon* cases was the history of the Fourteenth Amendment suggested to the Court. Both cases were argued on the assumption that racial prohibitions on voting in state general elections would violate the Fourteenth as well as the Fifteenth Amendment. This potential line of decisions proved abortive when *United States* v. *Classic,* 313 U. S. 299 (1941), laid the groundwork for holding that participation in party primaries was included within the "right . . . to vote" protected by the Fifteenth Amendment. See *Reynolds* v. *Sims,* 377 U. S. 533, 614 n. 72 (1964) (dissenting opinion). The *Nixon* opinions were not relied on by the Court in the subsequent white-primary cases, *Smith* v. *Allwright,* 321 U. S. 649 (1944), and *Terry* v. *Adams,* 345 U. S. 461 (1953), and they were not even referred to in the recent cases on voter qualifications cited above.

[85] In this particular instance the other two branches of the Government have in fact expressed conflicting views as to the validity of Title III of the Act, the voting-age provision. See H. R. Doc. No. 91–326 (1970).

[86] In fact, however, I do not understand how the doctrine of deference to rational constitutional interpretation by Congress, espoused by the majority in *Katzenbach* v. *Morgan,* 384 U. S. 641 (1966), is consistent with this statement of Chief Justice Marshall or

constitutional system itself. Congress is subject to none of the institutional restraints imposed on judicial decisionmaking; it is controlled only by the political process. In Article V, the Framers expressed the view that the political restraints on Congress alone were an insufficient control over the process of constitution making. The concurrence of two-thirds of each House and of three-fourths of the States was needed for the political check to be adequate. To allow a simple majority of Congress to have final say on matters of constitutional interpretation is therefore fundamentally out of keeping with the constitutional structure. Nor is that structure adequately protected by a requirement that the judiciary be able to perceive a basis for the congressional interpretation, the only restriction laid down in *Katzenbach* v. *Morgan,* 384 U. S. 641 (1966).

It is suggested that the proper basis for the doctrine enunciated in *Morgan* lies in the relative factfinding competence of Court, Congress, and state legislatures. *Post,* at 246–249. In this view, as I understand it, since Congress is at least as well qualified as a state legislature to determine factual issues, and far better qualified than this Court, where a dispute is basically factual in nature the congressional finding of fact should control, subject only to review by this Court for reasonableness.

In the first place, this argument has little or no force as applied to the issue whether the Fourteenth Amendment covers voter qualifications. Indeed, I do not understand the adherents of *Morgan* to maintain the con-

---

with our reaffirmation of it in *Cooper* v. *Aaron,* 358 U. S. 1, 18 (1958):

"[*Marbury*] declared the basic principle that the federal judiciary is supreme in the exposition of the law of the Constitution, and that principle has ever since been respected by this Court and the Country as a permanent and indispensable feature of our constitutional system."

trary. But even on the assumption that the Fourteenth Amendment does place a limit on the sorts of voter qualifications which a State may adopt, I still do not see any real force in the reasoning.

When my Brothers refer to "complex factual questions," *post,* at 248, they call to mind disputes about primary, objective facts dealing with such issues as the number of persons between the ages of 18 and 21, the extent of their education, and so forth. The briefs of the four States in these cases take no issue with respect to any of the facts of this nature presented to Congress and relied on by my Brothers DOUGLAS, *ante,* at 141–143, and BRENNAN, WHITE, and MARSHALL, *post,* at 243–246, 279–280. Except for one or two matters of dubious relevance, these facts are not subject to rational dispute. The disagreement in these cases revolves around the evaluation of this largely uncontested factual material.[87] On the assumption that maturity and experience are relevant to intelligent and responsible exercise of the elective franchise, are the immaturity and inexperience of the average 18-, 19-, or 20-year-old sufficiently serious to justify denying such a person a direct voice in decisions affecting his or her life? Whether or not this judgment is characterized as "factual," it calls for striking a balance between incommensurate interests. Where the balance is to be struck depends ultimately on the values and the perspective of the decisionmaker. It is a matter as to which men of good will can and do reasonably differ.

I fully agree that judgments of the sort involved here are beyond the institutional competence and constitu-

---

[87] Contrast *Metropolitan Cas. Ins. Co.* v. *Brownell,* 294 U. S. 580 (1935), relied on by my colleagues. In that case the crucial factual issue, on which the record was silent, was whether casualty insurance companies not incorporated in Indiana "generally keep their funds and maintain their business offices, and their agencies for the settlement of claims, outside the state." 294 U. S., at 585.

tional authority of the judiciary. See, *e. g., Baker* v. *Carr,* 369 U. S. 186, 266–330 (1962) (Frankfurter, J., dissenting); *Kramer* v. *Union School District,* 395 U. S. 621, 634–641 (1969) (STEWART, J., dissenting). They are pre-eminently matters for legislative discretion, with judicial review, if it exists at all, narrowly limited. But the same reasons which in my view would require the judiciary to sustain a reasonable state resolution of the issue also require Congress to abstain from entering the picture.

Judicial deference is based, not on relative factfinding competence, but on due regard for the decision of the body constitutionally appointed to decide. Establishment of voting qualifications is a matter for state legislatures. Assuming any authority at all, only when the Court can say with some confidence that the legislature has demonstrably erred in adjusting the competing interests is it justified in striking down the legislative judgment. This order of things is more efficient and more congenial to our system and, in my judgment, much more likely to achieve satisfactory results than one in which the Court has a free hand to replace state legislative judgments with its own. See *Ferguson* v. *Skrupa,* 372 U. S. 726 (1963).

The same considerations apply, and with almost equal force, to Congress' displacement of state decisions with its own ideas of wise policy. The sole distinction between Congress and the Court in this regard is that Congress, being an elective body, presumptively has popular authority for the value judgment it makes. But since the state legislature has a like authority, this distinction between Congress and the judiciary falls short of justifying a congressional veto on the state judgment. The perspectives and values of national legislators on the issue of voting qualifications are likely to differ from those of state legislators, but I see no reason

*a priori* to prefer those of the national figures, whose collective decision, applying nationwide, is necessarily less able to take account of peculiar local conditions. Whether one agrees with this judgment or not, it is the one expressed by the Framers in leaving voter qualifications to the States. The Supremacy Clause does not, as my colleagues seem to argue, represent a judgment that federal decisions are superior to those of the States whenever the two may differ.

To be sure, my colleagues do not expressly say that Congress or this Court is empowered by the Constitution to substitute its own judgment for those of the States. However, before sustaining a state judgment they require a "clear showing that the burden imposed is necessary to protect a compelling and substantial governmental interest." [88] *Post*, at 238; see *post*, at 247 n. 30. I should think that if the state interest were truly "compelling" and "substantial," and a clear showing could be made that the voter qualification was "necessary" to its preservation, no reasonable person would think the qualification undesirable. Equivalently, if my colleagues or a majority of Congress deem a given voting qualification undesirable as a matter of policy, they must consider that the state interests involved are not "compelling" or "substantial" or that they can be adequately protected in other ways. It follows that my colleagues must be prepared to hold invalid as a matter

---

[88] It might well be asked why this standard is not equally applicable to the congressional expansion of the franchise before us. Lowering of voter qualifications dilutes the voting power of those who could meet the higher standard, and it has been held that "the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Reynolds* v. *Sims,* 377 U. S. 533, 555 (1964) (footnote omitted). Interference with state control over qualifications for voting in presidential elections in order to encourage interstate migration appears particularly vulnerable to analysis in terms of compelling federal interests.

of federal constitutional law all state voting qualifications which they deem unwise, as well as all such qualifications which Congress reasonably deems unwise. For this reason, I find their argument subject to the same objection as if it explicitly acknowledged such a conclusion.

It seems to me that the notion of deference to congressional interpretation of the Constitution, which the Court promulgated in *Morgan*, is directly related to this higher standard of constitutionality which the Court intimated in *Harper* v. *Virginia Board of Elections*, 383 U. S. 663 (1966), and brought to fruition in *Kramer*. When the scope of federal review of state determinations became so broad as to be judicially unmanageable, it was natural for the Court to seek assistance from the national legislature. If the federal role were restricted to its traditional and appropriate scope, review for the sort of "plain error" which is variously described as "arbitrary and capricious," "irrational," or "invidious," there would be no call for the Court to defer to a congressional judgment on this score that it did not find convincing. Whether a state judgment has so exceeded the bounds of reason as to authorize federal intervention is not a matter as to which the political process is intrinsically likely to produce a sounder or more acceptable result. It is a matter of the delicate adjustment of the federal system. In this area, to rely on Congress would make that body a judge in its own cause. The role of final arbiter belongs to this Court.

### III

Since I cannot agree that the Fourteenth Amendment empowered Congress, or the federal judiciary, to control voter qualifications, I turn to other asserted sources of congressional power. My Brother BLACK would find that such power exists with respect to *federal* elections by

virtue of Art. I, § 4, and seemingly other considerations that he finds implicit in federal authority.

The constitutional provisions controlling the regulation of congressional elections are the following:

> Art. I, § 2: "the Electors [for Representatives] in each State shall have the Qualifications requisite for Electors of the most numerous Branch of the State Legislature."

> Art. I, § 4: "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators."

> Amdt. XVII: "The electors [for Senators] in each State shall have the qualifications requisite for electors of the most numerous branch of the State legislatures."

It is difficult to see how words could be clearer in stating what Congress can control and what it cannot control. Surely nothing in these provisions lends itself to the view that voting qualifications in federal elections are to be set by Congress. The reason for the scheme is not hard to find. In the Constitutional Convention, Madison expressed the view that: "The qualifications of electors and elected were fundamental articles in a Republican Govt. and ought to be fixed by the Constitution. If the Legislature could regulate those of either, it can by degrees subvert the Constitution." 2 M. Farrand, Records of the Federal Convention of 1787, pp. 249–250 (1911). He explained further in The Federalist No. 52, p. 326 (C. Rossiter ed. 1961):

> "To have reduced the different qualifications in the different States to one uniform rule would probably have been as dissatisfactory to some of the

States as it would have been difficult to the convention. The provision made by the convention appears, therefore, to be . the best that lay within their option. It must be satisfactory to every State, because it is conformable to the standard already established, or which may be established, by the State itself. It will be safe to the United States because, being fixed by the State constitutions, it is not alterable by the State governments, and it cannot be feared that the people of the States will alter this part of their constitutions in such a manner as to abridge the rights secured to them by the federal Constitution."

See also Federalist No. 60, p. 371 (C. Rossiter ed. 1961) (Hamilton), quoted in the opinion of MR. JUSTICE STEWART, *post*, at 290, which is to the same effect.

As to presidential elections, the Constitution provides:

"Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors . . . ." Art. II, § 1, cl. 2.

"The Congress may determine the Time of chusing the Electors, and the Day on which they shall give their Votes; which Day shall be the same throughout the United States." Art. II, § 1, cl. 4.

Even the power to control the "Manner" of holding elections, given with respect to congressional elections by Art. I, § 4, is absent with respect to the selection of presidential electors.[89] And, of course, the fact that it was deemed necessary to provide separately for con-

---

[89] Although MR. JUSTICE BLACK rests his decision in part on the assumption that the selection of presidential electors is a "federal" election, the Court held in *In re Green*, 134 U. S. 377, 379 (1890), and repeated in *Ray* v. *Blair*, 343 U. S. 214, 224–225 (1952), that presidential electors act by authority of the States and are not federal officials.

gressional power to regulate the time of choosing presidential electors and the President himself demonstrates that the power over "Times, Places and Manner" given by Art. I, § 4, does not refer to presidential elections, but only to the elections for Congressmen. Any shadow of a justification for congressional power with respect to congressional elections therefore disappears utterly in presidential elections.

## IV

With these major contentions resolved, it is convenient to consider the three sections of the Act individually to determine whether they can be supported by any other basis of congressional power.

### A. Voting Age

The only constitutional basis advanced in support of the lowering of the voting age is the power to enforce the Equal Protection Clause, a power found in § 5 of the Fourteenth Amendment. For the reasons already given, it cannot be said that the statutory provision is valid as declaratory of the meaning of that clause. Its validity therefore must rest on congressional power to lower the voting age as a means of preventing invidious discrimination that is within the purview of that clause.

The history of the Fourteenth Amendment may well foreclose the possibility that § 5 empowers Congress to enfranchise a class of citizens so that they may protect themselves against discrimination forbidden by the first section, but it is unnecessary for me to explore that question. For I think it fair to say that the suggestion that members of the age group between 18 and 21 are threatened with unconstitutional discrimination, or that any hypothetical discrimination is likely to be affected by lowering the voting age, is little short of fanciful. I see no justification for stretching to find any such possibility

when all the evidence indicates that Congress—led on by recent decisions of this Court—thought simply that 18-year-olds were fairly entitled to the vote and that Congress could give it to them by legislation.[90]

I therefore conclude, for these and other reasons given in this opinion, that in § 302 of the Voting Rights Act Amendments of 1970 Congress exceeded its delegated powers.

### B. Residency

For reasons already stated, neither the power to regulate voting qualifications in presidential elections, asserted by my Brother BLACK, nor the power to declare the meaning of § 1 of the Fourteenth Amendment, relied on by my Brother DOUGLAS, can support § 202 of the Act. It would also be frivolous to contend that requiring States to allow new arrivals to vote in presidential elections is an appropriate means of preventing local discrimination against them in other respects, or of forestalling violations of the Fifteenth Amendment. The remaining grounds relied on are the Privileges and Immunities Clause of Art. IV, § 2,[91] and the right to travel across state lines.

While the right of qualified electors to cast their ballots and to have their votes counted was held to be a privilege of citizenship in *Ex parte Yarbrough,* 110 U. S. 651 (1884), and *United States* v. *Classic,* 313 U. S. 299 (1941), these decisions were careful to observe that it

---

[90] At the time these suits were filed only two of the 50 States, Georgia and Kentucky, allowed 18-year-olds to vote, and only two other States, Hawaii and Alaska, set the voting age below 21. In subsequent referenda, voters in 10 States declined to lower the voting age; five States lowered the voting age to 19 or 20; and Alaska lowered the age from 19 to 18. See the Washington Post, Nov. 5, 1970, p. A13, col. 5.

[91] "The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States."

214

remained with the States to determine the class of qualified voters. It was federal law, acting on this state-defined class, which turned the right to vote into a privilege of national citizenship. As the Court has consistently held, the Privileges and Immunities Clauses do not react on the mere status of citizenship to enfranchise any citizen whom an otherwise valid state law does not allow to vote. *Minor* v. *Happersett,* 21 Wall. 162, 170–175 (1875); *Pope* v. *Williams,* 193 U. S. 621, 632 (1904); *Breedlove* v. *Suttles,* 302 U. S. 277, 283 (1937); cf. *Snowden* v. *Hughes,* 321 U. S. 1, 6–7 (1944). Minors, felons, insane persons, and persons who have not satisfied residency requirements are among those citizens who are not allowed to vote in most States.[92] The Privileges and Immunities Clause of Art. IV of the Constitution is a direct descendant of Art. IV of the Articles of Confederation:

> "The better to secure and perpetuate mutual friendship and intercourse among the people of the different States in this Union, the free inhabitants of each of these States, paupers, vagabonds and fugitives from justice excepted, shall be entitled to all privileges and immunities of free citizens in the several States . . . ."

It is inconceivable that these words when used in the Articles could have been understood to abolish state durational residency requirements.[93] There is not a

---

[92] At the time the Constitution was adopted, additional restrictions based on payment of taxes and ownership of property, as well as creed and sex, were imposed, making the proposition even clearer.

[93] See Art. II: "Each State retains its sovereignty, freedom and independence, and every power, jurisdiction and right, which is not by this confederation expressly delegated to the United States, in Congress assembled."

vestige of evidence that any further extent was envisioned for them when they were carried over into the Constitution. And, as I have shown, when they were substantially repeated in § 1 of the Fourteenth Amendment it was affirmatively understood that they did not include the right to vote. The Privileges and Immunities Clause is therefore unavailing to sustain any portion of § 202.

The right to travel across state lines, see *United States* v. *Guest,* 383 U. S. 745, 757–758 (1966), and *Shapiro* v. *Thompson,* 394 U. S. 618, 630 (1969), is likewise insufficient to require Idaho to conform its laws to the requirements of § 202. MR. JUSTICE STEWART justifies § 202 solely on the power under § 5 of the Fourteenth Amendment to enforce the Privileges and Immunities Clause of § 1 which he deems the basis for the right to travel. *Post,* at 285–287. I find it impossible to square the position that § 5 authorizes Congress to abolish state voting qualifications based on residency with the position that it does not authorize Congress to abolish such qualifications based on race. Since the historical record compels me to accept the latter position, I must reject the former.

MR. JUSTICE BRENNAN, MR. JUSTICE WHITE, and MR. JUSTICE MARSHALL do not anchor the right of interstate travel to any specific constitutional provision. *Post,* at 237–238. Past decisions to which they refer have relied on the two Privileges and Immunities Clauses, just discussed, the Due Process Clause of the Fifth Amendment, and the Commerce Clause. See *Shapiro* v. *Thompson,* 394 U. S., at 630 n. 8; *id.,* at 663–671 (dissenting opinion). The Fifth Amendment is wholly inapplicable to state laws; and surely the Commerce Clause cannot be seriously relied on to sustain the Act here challenged. With no specific clause of the Constitution

empowering Congress to enact § 202, I fail to see how that nebulous judicial construct, the right to travel, can do so.

## C. Literacy

The remaining provision of the Voting Rights Act Amendments involved in these cases is the five-year suspension of Arizona's requirement that registrants be able to read the Constitution in English and to write their names. Although the issue is not free from difficulty, I am of the opinion that this provision can be sustained as a valid means of enforcing the *Fifteenth* Amendment.

Despite the lack of evidence of specific instances of discriminatory application or effect, Congress could have determined that racial prejudice is prevalent throughout the Nation, and that literacy tests unduly lend themselves to discriminatory application, either conscious or unconscious.[94] This danger of violation of § 1 of the Fifteenth Amendment was sufficient to authorize the exercise of congressional power under § 2.

Whether to engage in a more particularized inquiry into the extent and effects of discrimination, either as a condition precedent or as a condition subsequent to suspension of literacy tests, was a choice for Congress to make.[95] The fact that the suspension is only for five years will require Congress to re-evaluate at the close of that period. While a less sweeping approach

---

[94] The legislative history of the Voting Rights Act Amendments contains sufficient evidence to this effect, if any be needed.

[95] Cf. § 4 of the Voting Rights Act of 1965, 79 Stat. 438, which suspended literacy tests only in areas falling within a coverage formula and allowed reinstatement of the tests upon judicial determination that during the preceding five years no tests had been used with discriminatory purpose or effect. 42 U. S. C. § 1973b (a) (1964 ed., Supp. V), amended by Pub. L. No. 91–285 § 3, 84 Stat. 315.

in this delicate area might well have been appropriate, the choice which Congress made was within the range of the reasonable.[96]   I therefore agree that § 201 of the Act is a valid exercise of congressional power to the extent it is involved in this case.   I express no view about its validity as applied to suspend tests such as educational qualifications, which do not lend themselves so readily to discriminatory application or effect.

For the reasons expressed in this opinion, I would grant the relief requested in Nos. 43, Orig., and 44, Orig. I would dismiss the complaint in No. 47, Orig., for failure to state a claim on which relief can be granted.   In No. 46, Orig., I would grant declaratory relief with respect to the validity of § 201 of the Voting Rights Act Amendments as applied to Arizona's current literacy test; I would deny relief in all other respects, with leave to reapply to the United States District Court for the District of Arizona for injunctive relief in the event it proves necessary, which I am confident it will not.

V

In conclusion I add the following.  The consideration that has troubled me most in deciding that the 18-year-old and residency provisions of this legislation should be held unconstitutional is whether I ought to regard the doctrine of *stare decisis* as preventing me from arriving at that result.   For as I indicated at the outset of this opinion, were I to continue to consider myself constricted by recent past decisions holding that the Equal Protection Clause of the Fourteenth Amendment reaches

---

[96] I assume that reasonableness is the applicable standard, notwithstanding the fact that the instant legislation is challenged on the ground that it improperly dilutes the votes of literate Arizona citizens.   But see *Kramer* v. *Union School District*, 395 U. S. 621 (1969) ; n. 88, *supra.*

state electoral processes, I would, particularly perforce of the decisions cited in n. 84, *supra,* be led to cast my vote with those of my Brethren who are of the opinion that the lowering of the voting age and the abolition of state residency requirements in presidential elections are within the ordinary legislative power of Congress.

After much reflection I have reached the conclusion that I ought not to allow *stare decisis* to stand in the way of casting my vote in accordance with what I am deeply convinced the Constitution demands. In the annals of this Court few developments in the march of events have so imperatively called upon us to take a fresh hard look at past decisions, which could well be mustered in support of such developments, as do the legislative lowering of the voting age and, albeit to a lesser extent, the elimination of state residential requirements in presidential elections. Concluding, as I have, that such decisions cannot withstand constitutional scrutiny, I think it my duty to depart from them, rather than to lend my support to perpetuating their constitutional error in the name of *stare decisis.*

In taking this position, I feel fortified by the evident *malaise* among the members of the Court with those decisions. Despite them, a majority of the Court holds that this congressional attempt to lower the voting age by simple legislation is unconstitutional, insofar as it relates to state elections. Despite them, four members of the Court take the same view of this legislation with respect to federal elections as well; and the fifth member of the Court who considers the legislation constitutionally infirm as regards state elections relies not at all on any of those decisions in reaching the opposite conclusion in federal elections. And of the eight members of the Court who vote to uphold the residential provision of the stat-

ute, only four appear to rely upon any of those decisions in reaching that result.

In these circumstances I am satisfied that I am free to decide these cases unshackled by a line of decisions which I have felt from the start entailed a basic departure from sound constitutional principle.

## APPENDIX TO OPINION OF HARLAN, J.

VOTING RIGHTS ACT AMENDMENTS OF 1970,
PUB. L. 91–285, 84 STAT. 314

### TITLE II—SUPPLEMENTAL PROVISIONS

#### APPLICATION OF PROHIBITION TO OTHER STATES

SEC. 201. (a) Prior to August 6, 1975, no citizen shall be denied, because of his failure to comply with any test or device, the right to vote in any Federal, State, or local election conducted in any State or political subdivision of a State as to which the provisions of section 4 (a) of this Act are not in effect by reason of determinations made under section 4 (b) of this Act.

(b) As used in this section, the term "test or device" means any requirement that a person as a prerequisite for voting or registration for voting (1) demonstrate the ability to read, write, understand, or interpret any matter, (2) demonstrate any educational achievement or his knowledge of any particular subject, (3) possess good moral character, or (4) prove his qualifications by the voucher of registered voters or members of any other class.

#### RESIDENCE REQUIREMENTS FOR VOTING

SEC. 202. (a) The Congress hereby finds that the imposition and application of the durational residency requirement as a precondition to voting for the offices of President and Vice President, and the lack of sufficient

opportunities for absentee registration and absentee balloting in presidential elections—

(1) denies or abridges the inherent constitutional right of citizens to vote for their President and Vice President;

(2) denies or abridges the inherent constitutional right of citizens to enjoy their free movement across State lines;

(3) denies or abridges the privileges and immunities guaranteed to the citizens of each State under article IV, section 2, clause 1, of the Constitution;

(4) in some instances has the impermissible purpose or effect of denying citizens the right to vote for such officers because of the way they may vote;

(5) has the effect of denying to citizens the equality of civil rights, and due process and equal protection of the laws that are guaranteed to them under the fourteenth amendment; and

(6) does not bear a reasonable relationship to any compelling State interest in the conduct of presidential elections.

(b) Upon the basis of these findings, Congress declares that in order to secure and protect the above-stated rights of citizens under the Constitution, to enable citizens to better obtain the enjoyment of such rights, and to enforce the guarantees of the fourteenth amendment, it is necessary (1) to completely abolish the durational residency requirement as a precondition to voting for President and Vice President, and (2) to establish nationwide, uniform standards relative to absentee registration and absentee balloting in presidential elections.

(c) No citizen of the United States who is otherwise qualified to vote in any election for President and Vice President shall be denied the right to vote for electors for President and Vice President, or for President and Vice President, in such election because of the failure of such citizen to comply with any durational residency

requirement of such State or political subdivision; nor shall any citizen of the United States be denied the right to vote for electors for President and Vice President, or for President and Vice President, in such election because of the failure of such citizen to be physically present in such State or political subdivision at the time of such election, if such citizen shall have complied with the requirements prescribed by the law of such State or political subdivision providing for the casting of absentee ballots in such election.

(d) For the purposes of this section, each State shall provide by law for the registration or other means of qualification of all duly qualified residents of such State who apply, not later than thirty days immediately prior to any presidential election, for registration or qualification to vote for the choice of electors for President and Vice President or for President and Vice President in such election; and each State shall provide by law for the casting of absentee ballots for the choice of electors for President and Vice President, or for President and Vice President, by all duly qualified residents of such State who may be absent from their election district or unit in such State on the day such election is held and who have applied therefor not later than seven days immediately prior to such election and have returned such ballots to the appropriate election official of such State not later than the time of closing of the polls in such State on the day of such election.

(e) If any citizen of the United States who is otherwise qualified to vote in any State or political subdivision in any election for President and Vice President has begun residence in such State or political subdivision after the thirtieth day next preceding such election and, for that reason, does not satisfy the registration requirements of such State or political subdivision he shall be allowed to vote for the choice of electors for President and Vice

President, or for President and Vice President, in such election, (1) in person in the State or political subdivision in which he resided immediately prior to his removal if he had satisfied, as of the date of his change of residence, the requirements to vote in that State or political subdivision, or (2) by absentee ballot in the State or political subdivision in which he resided immediately prior to his removal if he satisfies, but for his nonresident status and the reason for his absence, the requirements for absentee voting in that State or political subdivision.

(f) No citizen of the United States who is otherwise qualified to vote by absentee ballot in any State or political subdivision in any election for President and Vice President shall be denied the right to vote for the choice of electors for President and Vice President, or for President and Vice President, in such election because of any requirement of registration that does not include a provision for absentee registration.

(g) Nothing in this section shall prevent any State or political subdivision from adopting less restrictive voting practices than those that are prescribed herein.

#### SEPARABILITY

SEC. 205. If any provision of this Act or the application of any provision thereof to any person or circumstance is judicially determined to be invalid, the remainder of this Act or the application of such provision to other persons or circumstances shall not be affected by such determination.

### TITLE III—REDUCING VOTING AGE TO EIGHTEEN IN FEDERAL, STATE, AND LOCAL ELECTIONS

#### DECLARATION AND FINDINGS

SEC. 301. (a) The Congress finds and declares that the imposition and application of the requirement that a

citizen be twenty-one years of age as a precondition to voting in any primary or in any election—

(1) denies and abridges the inherent constitutional rights of citizens eighteen years of age but not yet twenty-one years of age to vote—a particularly unfair treatment of such citizens in view of the national defense responsibilities imposed upon such citizens;

(2) has the effect of denying to citizens eighteen years of age but not yet twenty-one years of age the due process and equal protection of the laws that are guaranteed to them under the fourteenth amendment of the Constitution; and

(3) does not bear a reasonable relationship to any compelling State interest.

(b) In order to secure the constitutional rights set forth in subsection (a), the Congress declares that it is necessary to prohibit the denial of the right to vote to citizens of the United States eighteen years of age or over.

### PROHIBITION

SEC. 302. Except as required by the Constitution, no citizen of the United States who is otherwise qualified to vote in any State or political subdivision in any primary or in any election shall be denied the right to vote in any such primary or election on account of age if such citizen is eighteen years of age or older.

### EFFECTIVE DATE

SEC. 305. The provisions of title III shall take effect with respect to any primary or election held on or after January 1, 1971.

### ARIZONA CONSTITUTION

Art. 7, § 2. No person shall be entitled to vote at any general election, or for any office that now is, or hereafter may be, elective by the people, or upon any question

224

which may be submitted to a vote of the people, unless such person be a citizen of the United States of the age of twenty-one years or over, and shall have resided in the State one year immediately preceding such election, provided that qualifications for voters at a general election for the purpose of electing presidential electors shall be as prescribed by law. The word "citizen" shall include persons of the male and female sex.

ARIZONA REVISED STATUTES ANNOTATED

§ 16–101. Qualifications of elector

A. Every resident of the state is qualified to become an elector and may register to vote at all elections authorized by law if he:

1. Is a citizen of the United States.

2. Will be twenty-one years or more of age prior to the regular general election next following his registration.

3. Will have been a resident of the state one year and of the county in which he claims the right to vote thirty days next preceding the election.

4. Is able to read the constitution of the United States in the English language in a manner showing that he is neither prompted nor reciting from memory, unless prevented from so doing by physical disability.

5. Is able to write his name, unless prevented from so doing by physical disability.

B. At an election held between the date of registration and the next regular general election, the elector is eligible to vote if at the date of the intervening election he is twenty-one years of age and has been a resident of the state one year and the county thirty days.

C. A person convicted of treason or a felony, unless restored to civil rights, or an idiot, insane person or person under guardianship is not qualified to register. As amended, Laws 1970, c. 151, § 1.

§ 16–107. Closing of registrations

A. No elector shall be registered to vote between five o'clock p. m. of the day which is two months preceding the date of the next primary election and seven o'clock p. m. of the day of the primary election.

B. No elector shall be registered to vote between five o'clock p. m. of the eighth Monday preceding a general election and seven o'clock p. m. of the day thereof. As amended, Laws 1958, c. 48, § 1; Laws 1970, c. 151, § 5.

### IDAHO CONSTITUTION

Art. 6, § 2. Qualifications of electors.—Except as in this article otherwise provided, every male or female citizen of the United States, twenty-one years old, who has actually resided in this state or territory for six months, and in the county where he or she offers to vote, thirty days next preceding the day of election, if registered as provided by law, is a qualified elector; provided however, that every citizen of the United States, twenty-one years old, who has actually resided in this state for sixty days next preceding the day of election, if registered as required by law, is a qualified elector for the sole purpose of voting for presidential electors; and until otherwise provided by the legislature, women who have the qualifications prescribed in this article may continue to hold such school offices and vote at such school elections as provided by the laws of Idaho territory.

### IDAHO CODE

Sec. 34–401. Qualifications of voters.—Every person over the age of twenty-one (21) years, possessing the qualifications following, shall be entitled to vote at all elections: He shall be a citizen of the United States and shall have resided in this state six (6) months immediately preceding the election at which he offers to vote,

and in the county thirty (30) days: provided, that no person shall be permitted to vote at any county seat election who has not resided in the county six (6) months, and in the precinct ninety (90) days, where he offers to vote; nor shall any person be permitted to vote at any election for the division of the county, or striking off from any county any part thereof, who has not the qualifications provided for in section 3, article 18, of the constitution; nor shall any person be denied the right to vote at any school district election, nor to hold any school district office on account of sex.

34-408. Eligibility of new residents to vote.—Each citizen of the United States who, immediately prior to his removal to this state, was a citizen of another state and who has been a resident of this state for sixty (60) days next preceding the day of election but for less than the six (6) month period of required residence for voting prior to a presidential election, is entitled to vote for presidential and vice-presidential electors at that election, but for no other offices, if

(1) he otherwise possesses the substantive qualifications to vote in this state, except the requirement of residence and registration, and

(2) he complies with the provisions of this act.

34-409. Application for presidential ballot by new residents.—A person desiring to qualify under this act in order to vote for presidential and vice-presidential electors shall be considered as registered within the meaning of this act if on or before ten (10) days prior to the date of the general election, he shall make an application in the form of an affidavit executed in duplicate in the presence of the county auditor, substantially as follows . . . .

34-413. Voting by new residents.—(1) The applicant, upon receiving the ballot for presidential and vice-presidential electors shall mark forthwith the ballot in the

presence of the county auditor, but in a manner that the official cannot know how the ballot is marked. He shall then fold the ballot in the county auditor's presence so as to conceal the markings, and deposit and seal it in an envelope furnished by the county auditor.

34-1101. Absent voting authorized.—Any qualified elector of the state of Idaho who is absent or expects to be absent from the election precinct in which he resides on the day of holding any election under any of the laws of this state in which an official ballot is required, or who is within the election precinct and is, or will be, unable, because of physical disability, or because of blindness, to go to the voting place, and if registration is required for such election, who is duly registered therefor, may vote at any such election, as hereinafter provided.

34-1105. Return of ballot.—On marking such ballot or ballots such absent or disabled or blind elector shall refold same as theretofore folded and shall inclose the same in said official envelope and seal said envelope securely and mail by registered or certified mail or deliver it in person to the officer who issued same; provided, that an absentee ballot must be received by the issuing officer by 12:00 o'clock noon on the day of the election before such ballot may be counted. Said ballot or ballots shall be so marked, folded and sealed by said voter in private and secretly. Provided, that whenever the disability or blindness makes it necessary that the voter shall be assisted in marking his ballot, such voter may have the assistance of any person of his choice in marking his ballot.

### OREGON CONSTITUTION

Art. II, § 2. Qualifications of electors. (1) Every citizen of the United States is entitled to vote in all elections not otherwise provided for by this Constitution if such citizen:

(a) Is 21 years of age or older . . . .

## TEXAS CONSTITUTION

Art. 6, § 1. Classes of persons not allowed to vote

Section 1. The following classes of persons shall not be allowed to vote in this State, to wit:

First: Persons under twenty-one (21) years of age.

Second: Idiots and lunatics.

Third: All paupers supported by any county.

Fourth: All persons convicted of any felony, subject to such exceptions as the Legislature may make.

§ 2. Qualified elector; registration; absentee voting

Sec. 2. Every person subject to none of the foregoing disqualifications who shall have attained the age of twenty-one (21) years and who shall be a citizen of the United States and who shall have resided in this State one (1) year next preceding an election and the last six (6) months within the district or county in which such person offers to vote, shall be deemed a qualified elector; provided, however, that before offering to vote at an election a voter shall have registered annually, but such requirement for registration shall not be considered a qualification of an elector within the meaning of the term "qualified elector" as used in any other Article of this Constitution in respect to any matter except qualification and eligibility to vote at an election. Any legislation enacted in anticipation of the adoption of this Amendment shall not be invalid because of its anticipatory nature. The Legislature may authorize absentee voting. And this provision of the Constitution shall be self-enacting without the necessity of further legislation.

## TEXAS ELECTION CODE

Article 5.01. Classes of persons not qualified to vote

The following classes of persons shall not be allowed to vote in this state:

1. Persons under twenty-one years of age.

2. Idiots and lunatics.

3. All paupers supported by the county.

4. All persons convicted of any felony except those restored to full citizenshp and right of suffrage or pardoned.

Art. 5.02. Qualification and requirements for voting

Every person subject to none of the foregoing disqualifications who shall have attained the age of twenty-one years and who shall be a citizen of the United States and who shall have resided in this state one year next preceding an election and the last six months within the district or county in which such person offers to vote, and who shall have registered as a voter, shall be deemed a qualified elector. No person shall be permitted to vote unless he has registered in accordance with the provisions of this code. The provisions of this section, as modified by Sections 35 and 39 of this code, shall apply to all elections, including general, special, and primary elections, whether held by the state, by a county, municipality, or other political subdivision of the state, or by a political party.

MR. JUSTICE BRENNAN, MR. JUSTICE WHITE, and MR. JUSTICE MARSHALL dissent from the judgments insofar as they declare § 302 unconstitutional as applied to state and local elections, and concur in the judgments in all other respects, for the following reasons.

These cases draw into question the power and judgment of Congress in enacting Titles II and III of the Voting Rights Act Amendments of 1970, 84 Stat. 314. The State of Arizona challenges the power of Congress to impose a nationwide ban, until August 6, 1975, on the use of literacy and certain other tests to limit the franchise in any election. The State of Idaho takes issue with the asserted congressional power to find that the imposition of a durational residence requirement to deny the right to vote in elections for President and Vice President imposes a burden upon the right of free inter-

state migration that is not necessary to further a compelling state interest.[1]  Finally, the States of Oregon, Texas, Arizona, and Idaho would have us strike down as unreasonable and beyond congressional power the findings, embodied in § 301 (a) of the Amendments, that denying the vote to otherwise qualified persons 18 to 21 years of age, while granting it to those 21 years of age and older, violates the Equal Protection Clause and is, in any event, not reasonably related to any compelling state interest.[2]  In Nos. 43, Orig., and 44, Orig., Oregon and Texas have invoked our original jurisdiction under Art. III, § 2, of the Constitution to restrain the Attorney General of the United States, a citizen of New York, from enforcing the 18-year-old voting provisions of the Amend-

---

[1] Section 202 (a) of the Amendments embodies a congressional finding that

"the imposition and application of the durational residency requirement as a precondition to voting for the offices of President and Vice President, and the lack of sufficient opportunities for absentee registration and absentee balloting in presidential elections—

"(2) denies or abridges the inherent constitutional right of citizens to enjoy their free movement across State lines;

"(6) does not bear a reasonable relationship to any compelling State interest in the conduct of presidential elections."

[2] Section 301 (a) of the Amendments provides:

"The Congress finds and declares that the imposition and application of the requirement that a citizen be twenty-one years of age as a precondition to voting in any primary or in any election—

"(1) denies and abridges the inherent constitutional rights of citizens eighteen years of age but not yet twenty-one years of age to vote—a particularly unfair treatment of such citizens in view of the national defense responsibilities imposed upon such citizens;

"(2) has the effect of denying to citizens eighteen years of age but not yet twenty-one years of age the due process and equal protection of the laws that are guaranteed to them under the fourteenth amendment of the Constitution; and

"(3) does not bear a reasonable relationship to any compelling State interest."

ments. *South Carolina* v. *Katzenbach*, 383 U. S. 301, 307 (1966). In Nos. 46, Orig., and 47, Orig., the United States seeks orders enjoining Arizona from enforcing age and literacy limitations on the franchise,[3] and enjoining Idaho from enforcing age, residence, and absentee voting limitations,[4] insofar as those limitations are inconsistent with the 1970 Amendments. Original jurisdiction, again, is founded upon Art. III, § 2, of the Constitution. See *United States* v. *California*, 332 U. S 19, 22 (1947). Since, in our view, congressional power to enact the challenged Amendments is found in the enforcement clauses of the Fourteenth and Fifteenth Amendments, and since we may easily perceive a rational basis for the congressional judgments underlying each of them, we would deny relief in Nos. 43, Orig., and 44, Orig., and issue the requested orders in Nos. 46, Orig., and 47, Orig.

## I

The Voting Rights Act of 1965, 79 Stat. 438, 42 U. S. C. § 1973 *et seq.* (1964 ed., Supp. V), proscribed the use of any "test or device,"[5] including literacy tests, in States

---

[3] Arizona Constitution, Art. 7, § 2, limits the franchise to those 21 years of age and older. Ariz. Rev. Stat. Ann. § 16–101 (Supp. 1970) requires voters to be able to read the Federal Constitution (in English), and to write their names.

[4] Idaho Constitution, Art. 6, § 2, requires all voters to be 21 years of age or older, and requires 60 days' residence within the State as a precondition to voting in presidential elections. Idaho Code § 34–408 (1963) further requires that 60-day residents have been citizens of another State prior to their removal to Idaho. Provisions for absentee balloting are contained in *id.*; §§ 34–1101 to 34–1125.

[5] Section 4 (c) of the 1965 Act, 42 U. S. C. § 1973b (c) (1964 ed., Supp. V), defines a "test or device" as "any requirement that a person as a prerequisite for voting or registration for voting (1) demonstrate the ability to read, write, understand, or interpret any matter, (2) demonstrate any educational achievement or his knowledge of any particular subject, (3) possess good moral character, or (4) prove his qualifications by the voucher of registered voters or members of any other class."

or their political subdivisions that fell within a coverage formula set forth in § 4 (b) of the 1965 Act. 42 U. S. C. §§ 1973b (a), (b) (1964 ed., Supp. V). Although we had previously concluded that literacy tests, fairly administered, violate neither the Fourteenth nor the Fifteenth Amendment, *Lassiter* v. *Northampton Election Board,* 360 U. S. 45 (1959), we nevertheless upheld their selective proscription by Congress. *South Carolina* v. *Katzenbach,* 383 U. S. 301 (1966). Canvassing the "voluminous" legislative history of the 1965 Act, we found ample basis for a legislative conclusion that such a proscription was necessary to combat the "insidious and pervasive evil" of racial discrimination with regard to voting. *Id.,* at 308–315. Accordingly, we held the proscription to be well within the power of Congress granted by § 2 of the Fifteenth Amendment. *Id.,* at 327–334. Three years later, in *Gaston County* v. *United States,* 395 U. S. 285 (1969), we sustained application of the ban on literacy tests to a county where there was no evidence that the test itself was discriminatory or that—at least since 1962 [6]—it had been administered in a discriminatory manner. Notwithstanding this fact, we noted that the record did contain substantial evidence that in years past, "Gaston County [had] systematically deprived its black citizens of the educational opportunities it granted to its white citizens." *Id.,* at 297. Since this "in turn deprived them of an equal chance to pass the literacy test," *id.,* at 291, even impartial administration of an impartial test would inevitably result in just the discrimination that Congress

---

[6] *Gaston County* was a suit by the county under § 4 (a) of the 1965 Act, 42 U. S. C. § 1973b (a) (1964 ed., Supp. V), to reinstate the county's literacy test. The county would have been entitled to do so upon demonstration that, for the preceding five years, no "test or device" had been there used for the purpose or with the effect of abridging the right to vote on account of race or color.

and the Fifteenth Amendment had sought to proscribe. *Id.*, at 296–297; see *South Carolina* v. *Katzenbach*, 383 U. S., at 308, 333–334.

No challenge is made in the present cases either to the 1965 Act or to the five-year extension of its ban on "tests or devices" embodied in Title I of the 1970 Amendments. Arizona does, however, challenge § 201 of the Amendments, which extends (until August 6, 1975) the 1965 Act's selective ban on the use of "tests or devices" to all States and political subdivisions in which it is not already in force by virtue of the 1965 Act. In substance, Arizona argues that it is and has been providing education of equal quality for all its citizens; that its literacy test is both fair and fairly administered; and that there is no evidence in the legislative record upon which Congress could have relied to reach a contrary conclusion. It urges that to the extent that any citizens of Arizona have been denied the right to vote because of illiteracy resulting from discriminatory governmental practices, the unlawful discrimination has been by governments other than the State of Arizona or its political subdivisions. Arizona, it suggests, should not have its laws overridden to cure discrimination on the part of governmental bodies elsewhere in the country.

We need not question Arizona's assertions as to the nondiscriminatory character, past and present, of its educational system. Congressional power to remedy the evils resulting from state-sponsored racial discrimination does not end when the subject of that discrimination removes himself from the jurisdiction in which the injury occurred. "The Constitution was framed under the dominion of a political philosophy less parochial in range. It was framed upon the theory that the peoples of the several states must sink or swim together, and that in the long run prosperity and salvation are in union and not division." *Baldwin* v. *G. A. F. Seelig, Inc.*, 294 U. S.

234

511, 523 (1935); see *Edwards* v. *California,* 314 U. S. 160, 173–176 (1941). In upholding the suspension of literacy tests as applied to Gaston County under the 1965 Act, we could see "no legal significance" in the possibility that adult residents of the county might have received their education "in other counties or States also maintaining segregated and unequal school systems." *Gaston County* v. *United States,* 395 U. S., at 293 n. 9.[7]

The legislative history of the 1970 Amendments contains substantial information upon which Congress could have based a finding that the use of literacy tests in Arizona and in other States where their use was not proscribed by the 1965 Act has the effect of denying the vote to racial minorities whose illiteracy is the consequence of a previous, governmentally sponsored denial of equal educational opportunity. The Attorney General of Arizona told the Senate Subcommittee on Constitutional Rights that many older Indians in the State were "never privileged to attend a formal school."[8] Extensive testimony before both Houses indicated that racial minorities have long received inferior educational opportunities throughout the United States.[9] And in-

---

[7] We there reserved only the question of the application of the 1965 Act to suspend literacy tests "in the face of racially disparate educational or literacy achievements *for which a government bore no responsibility.*" 395 U. S., at 293 n. 8 (emphasis supplied).

[8] Hearings on Amendments to the Voting Rights Act of 1965 before the Subcommittee on Constitutional Rights of the Senate Committee on the Judiciary, 91st Cong., 1st and 2d Sess.; 675 (1969–1970) (hereafter Senate Hearings). Schooling of Indians has for some time been the responsibility of the Federal Government. See *Warren Trading Post Co.* v. *Arizona Tax Commission,* 380 U. S. 685, 690–691 (1965).

[9] *E. g.,* Senate Hearings 185–187; Hearings on the Voting Rights Act Extension before Subcommittee No. 5 of the House Committee on the Judiciary, 91st Cong., 1st Sess., ser. 3, pp. 55–57, 223–225 (1969) (hereafter House Hearings).

terstate migration of such persons, particularly of Negroes from the Southern States, has long been a matter of common knowledge.[10]

Moreover, Congress was given testimony explicitly relating the denial of educational opportunity to inability to pass literacy tests in States not covered by the formula contained in the 1965 Act. The United States Commission on Civil Rights reported a survey of the Northern and Western States which concluded that literacy tests have a negative impact upon voter registration which "falls most heavily on blacks and persons of Spanish surname."[11] With regard specifically to Arizona, the Chairman of the Navajo Tribal Council testified that a greater percentage of Navajos are registered in New Mexico, which has no literacy test, than in Arizona.[12]

In short, there is no question but that Congress could legitimately have concluded that the use of literacy tests anywhere within the United States has the inevitable effect of denying the vote to members of racial minorities whose inability to pass such tests is the direct consequence of previous governmental discrimination in education. Almost five years ago, we found in § 2 of the Fifteenth Amendment an ample grant of legislative power for Congress to decree a selective proscription of such tests in certain portions of the country. *South Carolina* v. *Katzenbach,* 383 U. S., at 327–334. We have since held that power ample to cover the proscription of fair literacy tests, fairly administered, which

---

[10] For example, 1960 census data indicate that from 1955 to 1960, 4,388 blacks moved from Southern States to Arizona, 74,804 to California, and 74,821 to New York. Table 100 in 1 1960 Census of Population, pts. 4, 6; and 34.

[11] Senate Hearings 399; see *id.,* at 400–407.

[12] Senate Hearings 678. Tribal Chairman Nakai viewed Arizona's literacy test as the primary cause of this disparity.

nevertheless operate to disenfranchise racial minorities because of previous governmental discrimination against them in education. *Gaston County* v. *United States,* 395 U. S., at 287, 289–293. Five years of experience with the 1965 Act persuaded Congress that a nationwide ban on literacy and other potentially discriminatory tests was necessary to prevent racial discrimination in voting throughout the country. That conclusion is amply supported in the legislative record and § 201 of the 1970 Amendments is accordingly well within the scope of congressional power.

## II

Section 202 of the 1970 Amendments abolishes all durational state residence requirements restricting the right to vote in presidential elections. In their place, Congress has undertaken to prescribe a uniform nationwide system of registration and absentee voting designed to allow all otherwise qualified persons to vote in such elections regardless of the length of time they have lived in a particular jurisdiction.[13] The States are required to keep open their registration rolls for presidential elections until 30 days preceding the election. § 202 (d). Persons who have changed their residence within 30 days of the election are, if otherwise qualified, entitled to vote either in person or by absentee ballot in the State of their previous residence, § 202 (e), and the States are compelled to permit the casting of absentee ballots by all properly qualified persons who have made application not less than seven days prior to the election, and returned the ballot to the appropriate officials not later than the closing of polls on election day. §§ 202 (b), (d). Provision must also be made by the States to allow absentee registration. § 202 (f).

---

[13] The States are permitted, should they desire, to adopt practices less restrictive than those prescribed by the 1970 Amendments. § 202 (g).

Idaho challenges the power of Congress to enact such legislation insofar as it conflicts with Idaho's statutory and constitutional provisions regarding durational residence requirements for voting; regarding absentee voting; and regarding absentee registration.[14] The State's argument in brief is that the Constitution has left to the States the power to set qualifications for voters in both state and federal elections, subject only to certain explicit limitations such as, for example, those imposed by the Fourteenth, Fifteenth, Nineteenth, and Twenty-fourth Amendments. Admitting that unreasonable residence requirements may not withstand judicial scrutiny, *Carrington* v. *Rash,* 380 U. S. 89 (1965), Idaho urges that its 60-day residence requirement is necessary for protection against fraud, and for administrative purposes. In consequence, § 202 of the 1970 Amendments is said to be of no weight against these compelling state interests.

Whether or not the Constitution vests Congress with particular power to set qualifications for voting in strictly federal elections,[15] we believe there is an adequate constitutional basis for § 202 in § 5 of the Fourteenth Amendment. For more than a century, this Court has recognized the constitutional right of all citizens to unhindered interstate travel and settlement. *Passenger Cases,* 7 How. 283, 492 (1849) (Taney, C. J.); *Crandall* v. *Nevada,* 6 Wall. 35, 43–44 (1868); *Paul* v. *Virginia,* 8 Wall. 168, 180 (1869); *Edwards* v. *California,* 314 U. S. 160 (1941); *United States* v. *Guest,* 383 U. S. 745, 757–758 (1966); *Shapiro* v. *Thompson,* 394 U. S. 618, 629–631, 634 (1969). From whatever constitutional provision this right may be said to flow,[16] both its existence

[14] See n. 4, *supra.*

[15] See the opinion of MR. JUSTICE DOUGLAS; *ante,* at 148–150.

[16] See *Shapiro* v. *Thompson,* 394 U. S., at 630 and n. 8; *United States* v. *Guest,* 383 U. S., at 757–758.

and its fundamental importance to our Federal Union
have long been established beyond question.

By definition, the imposition of a durational residence
requirement operates to penalize those persons, and only
those persons, who have exercised their constitutional
right of interstate migration. Of course, governmental
action that has the incidental effect of burdening the
exercise of a constitutional right is not *ipso facto* uncon-
stitutional. But in such a case, governmental action
may withstand constitutional scrutiny only upon a clear
showing that the burden imposed is necessary to protect
a compelling and substantial governmental interest.
*Shapiro* v. *Thompson,* 394 U. S., at 634; *United States*
v. *Jackson,* 390 U. S. 570, 582–583 (1968); *Sherbert* v.
*Verner,* 374 U. S. 398, 406–409 (1963). And once it be
determined that a burden has been placed upon a con-
stitutional right, the onus of demonstrating that no less
intrusive means will adequately protect compelling state
interests is upon the party seeking to justify the burden.
See *Speiser* v. *Randall,* 357 U. S. 513, 525–526 (1958).

In the present case, Congress has explicitly found both
that the imposition of durational residence requirements
abridges the right of free interstate migration and that
such requirements are not reasonably related to any
compelling state interests. 1970 Amendments, §§ 202
(a)(2), (6). The latter finding was made with full
cognizance of the possibility of fraud and administrative
difficulty. Senator Goldwater, testifying at Senate hear-
ings on the bill, pointed out that 40 States presently allow
registration until 30 days or less prior to the election.[17]
Idaho itself allows registration by those desiring to vote
as new residents in presidential elections within 10
days of balloting. Idaho Code § 34–409 (1963). And
Idaho's assertion of the administrative unfeasibility

---

[17] Senate Hearings 282.

of maintaining separate registration lists for fully qualified voters and for those qualified only for presidential balloting is difficult to credit in light of the fact that the Idaho Constitution, Art. 6, § 2, itself sets separate qualifications for voting in general and in presidential elections. The provisions for absentee voting, as Senator Goldwater pointed out on the floor of the Senate, were likewise "drawn from the proven practice of the States themselves." [18] Thirty-seven States allow application within a week of the election, and 40 permit the marked ballot to be returned on election day.[19] Finally, Idaho has provided no evidence beyond the mere assertion that the scheme of § 202 is inadequate to protect against fraud. But the only kind of fraud asserted is the possibility of dual voting, and Idaho has provided no explanation why the 30-day period between the closing of new registrations and the date of election would not provide, in light of modern communications, adequate time to insure against such frauds. Accordingly, we find ample justification for the congressional conclusion that § 202 is a reasonable means for eliminating an unnecessary burden on the right of interstate migration. *United States v. Guest, supra.*

### III

The final question presented by these cases is the propriety of Title III of the 1970 Amendments, which

---

[18] 116 Cong. Rec. 6991.

[19] *Ibid.* Idaho Code §§ 34–1101, 34–1102, 34–1103 appear to allow application to be made at any time. *Id.,* § 34–1121 allows application up to five days before the election for persons in United States service. The ballot may be returned any time prior to noon on election day, *id.,* § 34–1105 (Supp. 1969). Finally, effective January 1, 1971, applications may be made up to 5 p. m. the day before the election. *Id.,* § 34–1002 (Supp. 1970). In such circumstances, the argument of administrative impossibility from the viewpoint of Idaho seems almost chimerical.

forbids the States from disenfranchising persons over the age of 18 because of their age. Congress was of the view that this prohibition, embodied in § 302 of the Amendments, was necessary among other reasons in order to enforce the Equal Protection Clause of the Fourteenth Amendment. See §§ 301 (a)(2), (b). The States involved in the present litigation question the assertion of congressional power to make that judgment.

It is important at the outset to recognize what is not involved in these cases. We are not faced with an assertion of congressional power to regulate any and all aspects of state and federal elections, or even to make general rules for the determination of voter qualifications. Nor are we faced with the assertion that Congress is possessed of plenary power to set minimum ages for voting throughout the States. Every State in the Union has conceded by statute that citizens 21 years of age and over are capable of intelligent and responsible exercise of the right to vote. The single, narrow question presented by these cases is whether Congress was empowered to conclude, as it did, that citizens 18 to 21 years of age are not substantially less able.

We believe there is serious question whether a statute granting the franchise to citizens 21 and over while denying it to those between the ages of 18 and 21 could, in any event, withstand present scrutiny under the Equal Protection Clause. Regardless of the answer to this question, however, it is clear to us that proper regard for the special function of Congress in making determinations of legislative fact compels this Court to respect those determinations unless they are contradicted by evidence far stronger than anything that has been adduced in these cases. We would uphold § 302 as a valid exercise of congressional power under § 5 of the Fourteenth Amendment.

## A

All parties to these cases are agreed that the States are given power, under the Constitution, to determine the qualifications for voting in state elections. Art. I, § 2; *Lassiter* v. *Northampton Election Board,* 360 U. S. 45, 50 (1959); *Carrington* v. *Rash,* 380 U. S. 89, 91 (1965). But it is now settled that exercise of this power, like all other exercises of state power, is subject to the Equal Protection Clause of the Fourteenth Amendment. *Carrington* v. *Rash, supra; Harper* v. *Virginia Board of Elections,* 383 U. S. 663 (1966); *Kramer* v. *Union School District,* 395 U. S. 621 (1969); *Evans* v. *Cornman,* 398 U. S. 419 (1970). Although it once was thought that equal protection required only that a given legislative classification, once made, be evenly applied, see *Hayes* v. *Missouri,* 120 U. S. 68, 71–72 (1887), for more than 70 years we have consistently held that the classifications embodied in a state statute must also meet the requirements of equal protection. *Gulf, C. & S. F. R. Co.* v. *Ellis,* 165 U. S. 150, 155 (1897); see *McLaughlin* v. *Florida,* 379 U. S. 184, 189–191 (1964), and cases cited.

The right to vote has long been recognized as a "fundamental political right, because preservative of all rights." *Yick Wo* v. *Hopkins,* 118 U. S. 356, 370 (1886); see *Reynolds* v. *Sims,* 377 U. S. 533, 562 (1964); *Williams* v. *Rhodes,* 393 U. S. 23, 31 (1968). "Any unjustified discrimination in determining who may participate in political affairs . . . undermines the legitimacy of representative government." *Kramer* v. *Union School District,* 395 U. S., at 626. Consequently, when exclusions from the franchise are challenged as violating the Equal Protection Clause, judicial scrutiny is not confined to the question whether the exclusion may reasonably be thought to further a permissible interest of the State.

Cf. *Metropolitan Cas. Ins. Co.* v. *Brownell,* 294 U. S. 580, 583–584 (1935). "A more exacting standard obtains." *Kramer* v. *Union School District,* 395 U. S., at 633. In such cases, "the Court must determine whether the exclusions are necessary to promote a compelling state interest." *Id.,* at 627; *Cipriano* v. *City of Houma,* 395 U. S. 701, 704 (1969).

In the present cases, the States justify exclusion of 18- to 21-year-olds from the voting rolls solely on the basis of the States' interests in promoting intelligent and responsible exercise of the franchise.[20] There is no reason to question the legitimacy and importance of these interests. But standards of intelligence and responsibility, however defined, may permissibly be applied only to the means whereby a prospective voter determines how to exercise his choice, and not to the actual choice itself. Were it otherwise, such standards could all too easily serve as mere epithets designed to cloak the exclusion of a class of voters simply because of the way they might vote. Cf. *Evans* v. *Cornman,* 398 U. S., at 422–423. Such a state purpose is, of course, constitutionally impermissible. *Carrington* v. *Rash,* 380 U. S., at 94. We must, therefore, examine with particular care the asserted connection between age limitations and the admittedly laudable state purpose to further intelligent and responsible voting.

We do not lack a starting point for this inquiry. Although the question has never been squarely presented, we have in the past indicated that age is a factor not necessarily irrelevant to qualifications for voting. *Lassi-*

---

[20] Idaho, in addition, claims that its interest in setting qualifications for voters in its own elections serves, without more, as a compelling state interest sufficient to justify the challenged exclusion. But there is no state interest in the mere exercise of power; the power must be exercised for some reason. The only reason asserted by Idaho for the exercise of its power is that already mentioned—promotion of intelligent and responsible voting.

*ter* v. *Northampton Election Board,* 360 U. S., at 51; *Kramer* v. *Union School District,* 395 U. S., at 625–626. But recognition that age is not in all circumstances a "capricious or irrelevant factor," *Harper* v. *Virginia Board of Elections,* 383 U. S., at 668, does not insure the validity of the particular limitation involved here. *Evans* v. *Cornman,* 398 U. S., at 425–426. Every State in the Union has concluded for itself that citizens 21 years of age and over are capable of responsible and intelligent voting. Accepting this judgment, there remains the question whether citizens 18 to 21 years of age may fairly be said to be less able.

State practice itself in other areas casts doubt upon any such proposition. Each of the 50 States has provided special mechanisms for dealing with persons who are deemed insufficiently mature and intelligent to understand, and to conform their behavior to, the criminal laws of the State.[21] Forty-nine of the States have concluded that, in this regard, 18-year-olds are invariably to be dealt with according to precisely the same standards prescribed for their elders.[22] This at the very least is evidence of a nearly unanimous legislative judgment on the part of the States themselves that differences in maturity and intelligence between 18-year-olds and persons 21 years of age and over are too trivial to warrant specialized treatment for *any* of the former class in the critically important matter of criminal responsibility.[23] Similarly,

---

[21] 116 Cong. Rec. 6970 (Library of Congress, Legislative Reference Service survey).

[22] *Ibid.*

[23] Nor does the California statute, Cal. Welf. & Inst'ns Code § 602 (1966), necessarily evidence a contrary conclusion. California permits its juvenile court to waive jurisdiction of persons over the age of 16 to the regular criminal courts, and state practice appears to be that very few if any felony defendants over the age of 18 are ever tried as juveniles. R. Boches & J. Goldfarb, California Juvenile Court Practice 35–36 (1968). This may well indicate that the Cali-

every State permits 18-year-olds to marry, and 39 States do not require parental consent for such persons of one or both sexes.[24]   State statutory practice in other areas follows along these lines, albeit not as consistently.[25]

Uniform state practice in the field of education points the same way.   No State in the Union requires attendance at school beyond the age of 18.   Of course, many 18-year-olds continue their education to 21 and beyond. But no 18-year-old who does not do so will be disenfranchised thereby once he reaches the age of 21.[26]

---

fornia statute reflects merely a legislative conclusion that the slight burden of waiver hearings is outweighed by the possibility, however slight, that a very few individuals between the ages of 18 and 21 might in fact be more appropriately treated as juveniles.

[24] 116 Cong. Rec. 6970.

[25] For example, in California any woman 18 years old may marry without parental consent, and any man of that age may marry with the consent of one parent. Cal. Civ. Code § 4101 (1970). Any married person who has attained the age of 18 is treated in precisely the same way as all persons of the age of 21 and over with regard to all provisions of the Civil Code, Probate Code, and Code of Civil Procedure, as well as for the purposes of making contracts or entering into any agreement regarding property or his estate. Cal. Civ. Code § 25 (Supp. 1970).   The State Labor Department treats males of the age of 18 and over as adults.   Cal. Labor Code §§ 1172, 3077 (1955).   Persons of the age of 18 and over may serve civil process in the State.   Cal. Civ. Proc. Code § 410 (Supp. 1970).

[26] Some States, of course, do attempt to condition exercise of the franchise upon the ability to pass a literacy test.   Presumably some 18-year-old illiterates will be literate at 21.   But in light of the fact that 81 percent of the disenfranchised class are high school graduates, it would seem that the number of 18-year-old illiterates who are literate three years later is vanishingly small.   See Hearings on S. J. Res. 147 and Others before the Subcommittee on Constitutional Amendments of the Senate Committee on the Judiciary, 91st Cong., 2d Sess., 133 (1970) (Sen. Goldwater).   Of course, for reasons that apply as well to 18-year-olds as to others, we have today upheld a nationwide suspension of all literacy tests. *Ante,* at 118.   But in any event, that some 18-year-olds may be illiterate is hardly sufficient reason for disenfranchising the entire class.   See *Kramer* v. *Union School District,* 395 U. S., at 632–633.

Whether or not a State could in any circumstances condition exercise of the franchise upon educational achievements beyond the level reached by 18-year-olds today, there is no question but that no State purports to do so. Accordingly, that 18-year-olds as a class may be less educated than some of their elders [27] cannot justify restriction of the franchise, for the States themselves have determined that this incremental education is irrelevant to voting qualifications. And finally, we have been cited to no material whatsoever that would support the proposition that intelligence, as opposed to educational attainment, increases between the ages of 18 and 21.

One final point remains. No State seeking to uphold its denial of the franchise to 18-year-olds has adduced anything beyond the mere difference in age. We have already indicated that the relevance of this difference is contradicted by nearly uniform state practice in other areas. But perhaps more important is the uniform experience of those States—Georgia since 1943, and Kentucky since 1955—that have permitted 18-year-olds to vote.[28] We have not been directed to a word of testimony or other evidence that would indicate either that 18-year-olds in those States have voted any less intelligently and responsibly than their elders, or that there is any reasonable ground for belief that 18-year-olds in other States are less able than those in Georgia and Kentucky. On the other hand, every person who spoke to the issue in either the House or Senate was agreed that 18-year-

---

[27] Eighteen-year-olds as a class are better educated than some of their elders. The median number of school years completed by 18- and 19-year-olds two years ago was 12.2; it was 8.8 for persons 65 to 74. Bureau of the Census, Educational Attainment, table 1 (Current Population Reports, Series P–20, No. 182) (1969).

[28] Hawaii and Alaska have, since their admission to the Union in 1959, allowed the vote to 19-year-olds (Alaska) and 20-year-olds (Hawaii).

olds in both States were at least as interested, able, and responsible in voting as were their elders.[29]

In short, we are faced with an admitted restriction upon the franchise, supported only by bare assertions and long practice, in the face of strong indications that the States themselves do not credit the factual propositions upon which the restriction is asserted to rest.   But there is no reason for us to decide whether, in a proper case, we would be compelled to hold this restriction a violation of the Equal Protection Clause.  For as our decisions have long made clear, the question we face today is not one of judicial power under the Equal Protection Clause. The question is the scope of congressional power under § 5 of the Fourteenth Amendment.  To that question we now turn.

### B

As we have often indicated, questions of constitutional power frequently turn in the last analysis on questions of fact.   This is particularly the case when an assertion of state power is challenged under the Equal Protection Clause of the Fourteenth Amendment.   For although equal protection requires that all persons "under like circumstances and conditions" be treated alike, *Hayes* v. *Missouri,* 120 U. S., at 71, such a formulation merely raises, but does not answer the question whether a legislative classification has resulted in different treatment of persons who are in fact "under like circumstances and conditions."

Legislatures, as well as courts, are bound by the provisions of the Fourteenth Amendment.   *Cooper* v. *Aaron,* 358 U. S. 1, 18–20. (1958).   When a state legislative classification is subjected to judicial challenge as violating the Equal Protection Clause, it comes before the

---

[29] See, *e. g.,* 116 Cong. Rec. 6433–6434 (Sen. Cook), 6929–6930 (Sens. Talmadge and Ervin); Senate Hearings 343 (Gov. Maddox).

courts cloaked by the presumption that the legislature has, as it should, acted within constitutional limitations. *Kotch* v. *Board of River Port Pilots,* 330 U. S. 552, 556, 563–564 (1947); see *Kramer* v. *Union School District,* 395 U. S., at 627–628. Accordingly, "[a] statutory discrimination will not be set aside as the denial of equal protection of the laws if any state of facts reasonably may be conceived to justify it." *Metropolitan Cas. Ins. Co.* v. *Brownell,* 294 U. S., at 584.

But, as we have consistently held, this limitation on judicial review of state legislative classifications is a limitation stemming, not from the Fourteenth Amendment itself, but from the nature of judicial review. It is simply a "salutary principle of judicial decision," *Metropolitan Cas. Ins. Co.* v. *Brownell, supra,* at 584, one of the "self-imposed restraints intended to protect [the Court] and the state against irresponsible exercise of [the Court's] unappealable power." *Fay* v. *New York,* 332 U. S. 261, 282 (1947). The nature of the judicial process makes it an inappropriate forum for the deter-

---

[30] The state of facts necessary to justify a legislative discrimination will of course vary with the nature of the discrimination involved. When we have been faced with statutes involving nothing more than state regulation of business practices, we have often found mere administrative convenience sufficient to justify the discrimination. *E. g., Williamson* v. *Lee Optical Co.,* 348 U. S. 483, 487, 488–489 (1955). But when a discrimination has the effect of denying or inhibiting the exercise of fundamental constitutional rights, we have required that it be not merely convenient, but necessary. *Kramer* v. *Union School District,* 395 U. S., at 627; *Carrington* v. *Rash,* 380 U. S., at 96; see *United States* v. *O'Brien,* 391 U. S. 367, 377 (1968); *United States* v. *Jackson,* 390 U. S. 570, 582–583 (1968). And we have required as well that it be necessary to promote not merely a constitutionally permissible state interest, but a state interest of substantial importance. *Kramer* v. *Union School District, supra; Carrington* v. *Rash, supra; Shelton* v. *Tucker,* 364 U. S. 479, 487–490 (1960); see *United States* v. *O'Brien, supra.*

mination of complex factual questions of the kind so often involved in constitutional adjudication. Courts, therefore, will overturn a legislative determination of a factual question only if the legislature's finding is so clearly wrong that it may be characterized as "arbitrary," "irrational," or "unreasonable." *Communist Party* v. *Control Board,* 367 U. S. 1, 94–95 (1961); *United States* v. *Carolene Products Co.,* 304 U. S. 144, 152–154 (1938); *Metropolitan Cas. Ins. Co.* v. *Brownell,* 294 U. S., at 583–584.

Limitations stemming from the nature of the judicial process, however, have no application to Congress. Section 5 of the Fourteenth Amendment provides that "[t]he Congress shall have power to enforce, by appropriate legislation, the provisions of this article." Should Congress, pursuant to that power, undertake an investigation in order to determine whether the factual basis necessary to support a state legislative discrimination actually exists, it need not stop once it determines that some reasonable men could believe the factual basis exists. Section 5 empowers Congress to make its own determination on the matter. See *Katzenbach* v. *Morgan,* 384 U. S. 641, 654–656 (1966). It should hardly be necessary to add that if the asserted factual basis necessary to support a given state discrimination does not exist, § 5 of the Fourteenth Amendment vests Congress with power to remove the discrimination by appropriate means. *Id.,* at 656–657; *Fay* v. *New York,* 332 U. S., at 282–283; *Ex parte Virginia,* 100 U. S. 339, 347–348 (1880).

The scope of our review in such matters has been established by a long line of consistent decisions. "It is not for the courts to re-examine the validity of these legislative findings and reject them." *Communist Party* v. *Control Board,* 367 U. S., at 94. "[W]here we find that the legislators, in light of the facts and testimony before them, have a rational basis for finding a chosen regu-

latory scheme necessary . . . our investigation is at an end." *Katzenbach* v. *McClung,* 379 U. S. 294, 303–304 (1964); *Katzenbach* v. *Morgan,* 384 U. S., at 653; see *Galvan* v. *Press,* 347 U. S. 522, 529 (1954).[31]

This scheme is consistent with our prior decisions in related areas. The core of dispute over the constitutionality of Title III of the 1970 Amendments is a conflict between state and federal legislative determinations of the factual issues upon which depends decision of a federal constitutional question—the legitimacy, under the Equal Protection Clause, of state discrimination against persons between the ages of 18 and 21. Our cases have repeatedly emphasized that, when state and federal claims come into conflict, the primacy of federal power requires that the federal finding of fact control. See *England* v. *Louisiana State Board of Medical Examiners,* 375 U. S. 411, 415–417 (1964); *Townsend* v. *Sain,* 372 U. S. 293, 311–312 (1963); *Tarble's Case,* 13 Wall. 397, 406–407 (1872); cf. *United States* v. *Darby,* 312 U. S. 100, 119 (1941). The Supremacy Clause requires an identical result when the conflict is one of legislative, not judicial, findings.

Finally, it is no answer to say that Title III intrudes upon a domain reserved to the States—the power to set qualifications for voting. It is no longer open to question that the Fourteenth Amendment applies to this, as to any other, exercise of state power. *Kramer* v.

---

[31] As we emphasized in *Katzenbach* v. *Morgan, supra,* "§ 5 does not grant Congress power to . . . enact 'statutes so as in effect to dilute equal protection and due process decisions of this Court.'" 384 U. S., at 651 n. 10. As indicated above, a decision of this Court striking down a state statute expresses, among other things, our conclusion that the legislative findings upon which the statute is based are so far wrong as to be unreasonable. Unless Congress were to unearth new evidence in its investigation, its identical findings on the identical issue would be no more reasonable than those of the state legislature.

*Union School District, supra,* and cases cited. As we said in answer to a similar contention almost a century ago, "the Constitution now expressly gives authority for congressional interference and compulsion in the cases embraced within the Fourteenth Amendment. It is but a limited authority, true, extending only to a single class of cases; but within its limits it is complete." *Ex parte Virginia,* 100 U. S., at 347–348.

## C

Our Brother HARLAN has set out in some detail the historical evidence that persuades him that the framers of the Fourteenth Amendment did not believe that the Equal Protection Clause, either through judicial action or through congressional enforcement under § 5 of the Amendment, could operate to enfranchise Negroes in States that denied them the vote. *Ante,* at 154–200. From this he has concluded "that the Fourteenth Amendment was never intended to restrict the authority of the States to allocate their political power as they see fit and therefore that it does not authorize Congress to set voter qualifications, in either state or federal elections." *Ante,* at 154. This conclusion, if accepted, would seem to require as a corollary that although States may not, under the Fifteenth Amendment, discriminate against Negro *voters,* they are free so far as the Federal Constitution is concerned to discriminate against Negro or unpopular *candidates* in any way they desire. Not surprisingly, our Brother HARLAN's thesis is explicitly disavowed by all the States party to the present litigation,[32] and has been presented to us only in the briefs *amici*

[32] Brief for the State of Oregon 10–13; Brief for the State of Texas 10–12; Brief for the State of Arizona 19; Brief for the State of Idaho 22, 28–30.

*curiae* of Virginia and, perhaps, Mississippi.[33] We
could not accept this thesis even if it were supported
by historical evidence far stronger than anything ad-
duced here today. But in our view, our Brother HAR-
LAN's historical analysis is flawed by his ascription of
20th-century meanings to the words of 19th-century
legislators. In consequence, his analysis imposes an arti-
ficial simplicity upon a complex era, and presents, as
universal, beliefs that were held by merely one of several
groups competing for political power. We can accept
neither his judicial conclusion nor his historical premise
that the original understanding of the Fourteenth
Amendment left it within the power of the States to deny
the vote to Negro citizens.

It is clear that the language of the Fourteenth Amend-
ment, which forbids a State to "deny to any person within
its jurisdiction the equal protection of the laws," applies
on its face to all assertions of state power, however made.
More than 40 years ago, this Court faced for the first time
the question whether a State could deny Negroes the
right to vote in primary elections. Writing for a unani-
mous Court, Mr. Justice Holmes observed tartly that
"[w]e find it unnecessary to consider the Fifteenth
Amendment, because it seems to us hard to imagine a
more direct and obvious infringement of the Four-
teenth." *Nixon* v. *Herndon,* 273 U. S. 536, 540–541
(1927); see *Nixon* v. *Condon,* 286 U. S. 73, 83, 87–89
(1932) (Cardozo, J.); *Anderson* v. *Martin,* 375 U. S. 399
(1964); cf. *Raymond* v. *Chicago Union Traction Co.,* 207
U. S. 20, 35–36 (1907). If the broad language of the
Equal Protection Clause were to be read as nevertheless
allowing the States to deny equal political rights to any
citizens they see fit to exclude from the political process,

---

[33] Brief *amicus curiae* for the Commonwealth of Virginia 13–22;
see Brief *amicus curiae* for the State of Mississippi 7–11.

far more is involved than merely shifting the doctrinal basis of such cases as *Nixon* v. *Herndon* from the Fourteenth to the Fifteenth Amendment. For the Fifteenth Amendment applies only to voting, not to the holding of public office; in consequence, our Brother HARLAN's view would appear to leave the States free to encourage citizens to cast their votes solely on the basis of race (a practice found to violate the Fourteenth Amendment in *Anderson* v. *Martin, supra*), or even presumably to deny Negro citizens the right to run for office at all.[34] We cannot believe that the Equal Protection Clause would permit such discrimination.

In any event, it seems to us, the historical record will not bear the weight our Brother HARLAN has placed upon it. His examination of the historical background of the Fourteenth Amendment leads him to conclude that it is "clear beyond any reasonable doubt that no part of the legislation now under review can be upheld as a legitimate exercise of congressional power under that Amendment," *ante,* at 155, because the Amendment was not intended "to restrict the authority of the States to allocate their political power as they see fit." *Ante,* at 154. Our own reading of the historical background, on the other hand, results in a somewhat imperfect picture of an era of constitutional confusion, confusion that the Amendment did little to resolve. As the leading constitutional historian of the Civil War has observed, constitutional law was characterized during the war years by "a noticeable lack of legal precision" and by "[a] tendency toward irregularity . . . in legislation, and in legal interpretation." J. Randall, Constitutional Problems under Lin-

---

[34] Indeed, since the First Amendment is applicable to the States only through the Fourteenth, our Brother HARLAN's view would appear to allow a State to exclude any unpopular group from the political process solely upon the basis of its political opinions.

coln 515–516 (rev. ed. 1951). Nor would the postwar period of Reconstruction be substantially different.

For several decades prior to the Civil War, constitutional interpretation had been a pressing concern of the Nation's leading statesmen and lawyers, whose attention focused especially on the nature of the relationship of the States to the Federal Government. The onset of the Civil War served only to raise new problems upon which the original Constitution offered, at best, only peripheral guidance. The greatest problem of all, perhaps, was the character of the civil conflict—whether it was to be treated as a rebellion, as a war with a belligerent state, or as some combination of the two. Another issue concerned the scope of federal power to emancipate the slaves; even President Lincoln doubted whether his Emancipation Proclamation would be operative when the war had ended and his special war powers had expired. This particular issue was resolved by the Thirteenth Amendment, but that Amendment only raised new issues, for some men doubted the validity of even a constitutional change upon such a fundamental matter as slavery, particularly while the status of the eleven Confederate States remained unsettled. See *id.,* at 12–24, 59–73, 342–404.

The end of the war did not bring an end to difficult constitutional questions. Two perplexing problems remained. The one was the relation of the former Confederate States to the Federal Government; the other was the relation of the former slaves to the white citizens of the Nation. Both were intimately related to the politics of the day, an understanding of which is essential since the Fourteenth Amendment was presented to the Nation as the Republican Party's solution for these problems. See J. James, The Framing of the Fourteenth Amendment 169–173 (1956) (hereafter James).

The starting point must be the key fact that, as of 1860, the Republicans were very much the Nation's minority party. Lincoln had won the Presidency that year with less than 40% of the popular vote, while the Republicans had secured control of Congress only when southern Democrats had left Washington following the secession of their States. The compromise in the original Constitution, by which only three-fifths of the slaves in Southern States were computed in determining representation in the House of Representatives and votes in the electoral college also was a matter of critical importance in 1865; with slavery abolished, southern and hence Democratic power in the House and in the electoral college would increase. The Republicans had calculated this matter rather carefully; as the Chicago Tribune had demonstrated as early as the summer of 1865, the increased southern delegation would need only 29 readily obtainable Democratic votes from the North in order to dominate the House. See James 21–23. But Republicans had no intention of permitting such a Democratic resurgence to occur; in their view, as one Republican Senator observed, Republicans would be "faithless" to their "trust," if they allowed "men who have thus proven themselves faithless" to recover "the very political power which they have hitherto used for the destruction of this Government." Cong. Globe, 39th Cong., 1st Sess. (hereafter Globe) 2918 (1866) (remarks of Sen. Willey). Whether one looks upon such sentiments as a grasp for partisan political power or as an idealistic determination that the gains of the Civil War not be surrendered, the central fact remains that Republicans found it essential to bar or at least to delay the return of all-white southern delegations to Congress.

Temporarily, they proposed to do so by refusing to seat Congressmen from the seceded States. They usually justified their refusal on constitutional grounds,

presenting a variety of theories as to how the former Confederate States had forfeited their rights by secession. See generally E. McKitrick, Andrew Johnson and Reconstruction 93–119 (1960). But exclusion of southern representatives could not be a permanent solution; a better solution seemed to be to elect at least some Republican representatives from the South by enfranchising the only class that could be expected to vote Republican in large numbers—the freedmen.

According to the census of 1860, Negroes had constituted some 4,200,000 of the total population of 12,200,000 in the 15 slave States. In two States—Mississippi and South Carolina—Negroes were a substantial majority of the population, while in several other States the population was at least 40% Negro. Thus, Negro suffrage would probably result in a number of Negro and presumably Republican representatives from the South. The difficulty was with the means of bringing Negro suffrage about. Some, including Chief Justice Chase, looked back toward the Emancipation Proclamation and contended that Negro suffrage could be achieved, at least in the South, by means of a presidential proclamation. See James 5–7; 1 W. Fleming, Documentary History of Reconstruction 142 (1906). Others thought congressional legislation the appropriate vehicle for granting the suffrage, see James 13, 52–53; Van Alstyne, The Fourteenth Amendment, The "Right" to Vote, and the Understanding of the Thirty-Ninth Congress, 1965 Supreme Court Review 33, 49–51, while still others argued for a constitutional amendment. See Cincinnati Daily Commercial, Sept. 19, 1865, in James 11–12 (reporting speech of Cong. Bingham). Disagreement over means, however, was but a minor obstacle in the path of equal suffrage; racial prejudice in the North was a far more significant one. Only five New England States and New York permitted any Negroes to vote

as of 1866, see Van Alstyne, *supra,* at 70, and extension of the suffrage was rejected by voters in 17 of 19 popular referenda held on the subject between 1865 and 1868. Moreover, Republicans suffered some severe election setbacks in 1867 on account of their support of Negro suffrage. See W. Gillette, The Right to Vote 25–27, 32–38 (1969).

Meeting in the winter and spring of 1866 and facing elections in the fall of the same year, the Republicans in Congress thus faced a difficult dilemma: they desperately needed Negro suffrage in order to prevent total Democratic resurgence in the South, yet they feared that by pressing for suffrage they might create a reaction among northern white voters that would lead to massive Democratic electoral gains in the North. Their task was thus to frame a policy that would prevent total southern Democratic resurgence and that simultaneously would serve as a platform upon which Republicans could go before their northern constituents in the fall. What ultimately emerged as the policy and political platform of the Republican Party was the Fourteenth Amendment.[35]

As finally adopted, relevant portions of the Fourteenth Amendment read as follows:

> Sec. 1. "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

---

[35] Republicans explicitly looked upon the Fourteenth Amendment as a political platform. See 2 F. Fessenden, Life and Public Services of William Pitt Fessenden 62 (1907); B. Kendrick, The Journal of the Joint Committee of Fifteen on Reconstruction 302 (1914). See also *infra,* at 262.

Sec. 2. "Representatives shall be apportioned among the several States according to their respective numbers . . . . But when the right to vote at any election . . . is denied to any of the male inhabitants of such State, being twenty-one years of age, and citizens of the United States, or in any way abridged, except for participation in rebellion, or other crime, the basis of representation therein shall be reduced in the proportion which the number of such male citizens shall bear to the whole number of male citizens twenty-one years of age in such State."

Sec. 5. "The Congress shall have power to enforce, by appropriate legislation, the provisions of this article."

The key provision on the suffrage question was, of course, § 2, which was to have the effect of reducing the representation of any State which did not permit Negroes to vote. Section 1 also began, however, as a provision aimed at securing equality of "political rights and privileges"—a fact hardly surprising in view of Republican concern with the question. In their earliest versions in the Joint Congressional Committee on Reconstruction, which framed the Fourteenth Amendment, §§ 1 and 2 read as follows:

Sec. 1.] Congress shall have power to make all laws necessary and proper to secure to all citizens of the United States, in every State, the same political rights and privileges; and to all persons in every State equal protection in the enjoyment of life, liberty and property." B. Kendrick, The Journal of the Joint Committee of Fifteen on Reconstruction 51 (1914) (hereafter Kendrick).

"[Sec. 2.] Representatives and direct taxes shall be apportioned among the several States, which

may be included within this Union, according to their respective numbers of persons, deducting therefrom all of any race or color, whose members or any of them are denied any of the civil or political rights or privileges." *Id.*, at 43.

The question that must now be pursued is whether § 1 of the Amendment ever lost its original connection with the suffrage question.

It became evident at an early date that the Joint Committee did not wish to make congressional power over the suffrage more explicit than did the language of the original version of the future § 1. Six days after that section had been proposed by a subcommittee, the full committee refused to adopt an amendment offered by Senator Howard to make the section refer expressly to "political and *elective* rights and privileges," *id.*, at 55 (emphasis added), and refused as well to substitute for the language:

> "Congress shall have power to make all laws necessary and proper to secure to all citizens of the United States in each State the same political rights and privileges; and to all persons in every State equal protection in the enjoyment of life, liberty and property."

the following language offered by Congressman Boutwell:

> "Congress shall have power to abolish any distinction in the exercise of the elective franchise in any State, which by law, regulation or usage may exist therein." *Id.*, at 54–55.

The committee did agree, however, to return the proposal to a special subcommittee, chaired by Congressman John A. Bingham, which at the next meeting of the full committee reported back the following language:

> "Congress shall have power to make all laws which shall be necessary and proper to secure all

persons in every state full protection in the enjoyment of life, liberty and property; and to all citizens of the United States in any State the same immunities and also equal political rights and privileges." *Id.*, at 56.

This language, it seems clear, did not change the meaning of the section as originally proposed, but the next change in language, proposed several days later by Bingham, arguably did. Bingham moved the following substitute:

"The Congress shall have power to make all laws which shall be necessary and proper to secure to the citizens of each state all privileges and immunities of citizens in the several states (Art. 4, Sec. 2); and to all persons in the several States equal protection in the rights of life, liberty and property (5th Amendment)." *Id.*, at 61.

This substitute was accepted by a committee vote of 7-6.

No record of the committee's debates has been preserved, and thus one can only guess whether Bingham's substitute was intended to change the meaning of the original proposal. The breakdown of the committee vote suggests, however, that no change in meaning was intended. The substitute was supported by men of all political views, ranging from Senator Howard and Congressman Boutwell, radicals who had earlier sought to make the section's coverage of suffrage explicit, to Congressman Rogers, a Democrat. Similarly, among the six voting against the substitute were a radical, Stevens; a moderate, Fessenden; and a Democrat, Grider. *Id.*, at 61. Thus, while one might continue to argue that Bingham meant his substitute to do away with congressional power to legislate for the preservation of equal rights of suffrage, one can, with at least equal plausibil-

ity, contend that Bingham sought to do no more than substitute for his earlier specific language more general language which had already appeared elsewhere in the Constitution.[36]

Bingham's proposed amendment to the Constitution, as modified, was next submitted to the House of Representatives, where Republicans joined Democrats in attacking it. Republican Representative Hale of New York, for example, thought the amendment "in effect a provision under which all State legislation, in its codes of civil and criminal jurisprudence and procedure, affecting the individual citizen, may be overridden," Globe 1063, while Representative Davis, also a New York Republican, thought it would give Congress power to establish "perfect political equality between the colored and the white race of the South." *Id.*, at 1085. Meanwhile, the New York Times, edited by conservative Republican Congressman Henry J. Raymond, wondered if the proposed Amendment was "simply a preliminary to the enactment of negro suffrage." Feb. 19, 1866. Even the Amendment's supporters recognized that it would confer extensive power upon the Federal Government; Representative Kelley, a Pennsylvania radical, who supported the Amendment, concluded, after a lengthy discussion of the right of suffrage, that "the proposed amendment . . . [was] intended to secure it." Globe 1063. Its proponents, however, could not secure the necessary support for the Amendment in the House and thus were compelled to postpone the matter until a later date, when they failed to bring it again to the floor. Kendrick 215.

Meanwhile, the Joint Committee had returned to work and had begun to consider the direct antecedent of the Fourteenth Amendment, a proposal by Robert Dale

---

[36] The language appears earlier in Art. IV, § 2.

Owen which Representative Stevens had placed before the committee. Its relevant provisions were as follows:

"Section 1. No discrimination shall be made by any state, nor by the United States, as to the civil rights of persons because of race, color, or previous condition of servitude.

"Sec. 2. From and after the fourth day of July, in the year one thousand eight hundred and seventy-six, no discrimination shall be made by any state, nor by the United States, as to the enjoyment by classes of persons of the right of suffrage, because of race, color, or previous condition of servitude.

"Sec. 3. Until the fourth day of July, one thousand eight hundred and seventy-six, no class of persons, as to the right of any of whom to suffrage discrimination shall be made by any state, because of race, color, or previous condition of servitude, shall be included in the basis of representation.

.    .    .    .    .

"Sec. 5. Congress shall have power to enforce by appropriate legislation, the provisions of this article." *Id.*, at 83–84.

Congressman Bingham had not, however, given up on his own favorite proposal, and he immediately moved to add the following new section to the Amendment:

"Sec. 5. No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws." *Id.*, at 87.

His motion was adopted on a 10-to-2 party-line vote, but its adoption was only the beginning of some intricate and inexplicable maneuvering. Four days later, Senator

Williams, an Oregon radical, moved to delete Bingham's section, and his motion was carried by a vote of 7 to 5, with radicals Howard and Boutwell and Democrats Grider and Johnson voting for the motion and Stevens, Bingham, and Democrat Rogers voting against. Bingham then moved to submit his proposal as a separate amendment, but he was supported by only the three Democrats on the committee. The committee then agreed to submit the Owen proposal to Congress with only slight modifications, but postponed the submission until after one further meeting to be held three days hence. *Id.*, at 98–100.

At this meeting, the proposed Fourteenth Amendment was substantially rewritten. First, the committee, by a vote of 12 to 2, deleted § 2, which had barred States from making racial discriminations in the enjoyment of the right of suffrage after 1876, and conformed § 3, so as to insure that it would remain in effect after 1876. After making numerous other changes, the committee then concluded its deliberations by replacing Owen's ban in § 1 on discrimination "as to civil rights" with Bingham's now familiar language. Here the vote was 10 to 3, with the majority again containing a full spectrum of political views. *Id.,* at 100–106. The reasons for the rewriting are not entirely clear. The only known explanation was given by Owen in 1875, when he wrote an article recalling a contemporary conversation with Stevens. Stevens had reportedly explained that the committee's original decisions had "got noised abroad," and that, as a result, several state delegations had held caucuses which decided that the explicit references to "negro suffrage, in any shape, ought to be excluded from the platform . . . ." Quoted in *id.*, at 302. Thus, the provision for suffrage after 1876 had to be eliminated, but Stevens did not explain why Bingham's version of § 1 was then substituted

for Owen's version. Perhaps the changes in § 1 of the Amendment were thought by the committee to be mere linguistic improvements which did not substantially modify Owen's meaning and which did not extend its coverage to political as distinguished from civil rights. But, at the very least the committee must have realized that it was substituting for Owen's rather specific language Bingham's far more elastic language—language that, as one scholar has noted, is far more "capable of growth" and "receptive to 'latitudinarian' construction." Bickel, The Original Understanding and the Segregation Decision, 69 Harv. L. Rev. 1, 61, 63 (1955). It is, moreover, at least equally plausible that the committee meant to substitute for Owen's narrow provision dealing solely with civil rights a broader provision that had originated and been understood only two months earlier as protecting equality in the right of suffrage as well as equality of civil rights.

The purpose of § 1 in relation to the suffrage emerges out of the debates on the floor of Congress with an equal obscurity. In the search for meaning one must begin, of course, with the statements of leading men in Congress, such as Bingham and Howard. Bingham, for one, stated without apparent equivocation that "[t]he amendment does not give . . . the power to Congress of regulating suffrage in the several States." Globe 2542. Similarly, Senator Howard, after noting that the Amendment would accord to Negroes the same protection in their fundamental rights as the law gave to whites, explicitly cautioned that "the first section of the proposed amendment does not give to either of these classes the right of voting." Globe 2766.[37] But such statements are not

---

[37] As the statements of Bingham and Howard in the text indicate, the framers of the Amendment were not always clear whether they understood it merely as a grant of power to Congress or whether they thought, in addition, that it would confer power upon the

as unambiguous as they initially appear to be.   Thus, Howard, with that "lack of legal precision" typical of the period, stated that the right of suffrage was not one of the privileges and immunities protected by the Constitution, Globe 2766, immediately after he had read into the record an excerpt from the case of *Corfield* v. *Coryell,* 6 F. Cas. 546 (No. 3230) (CCED Pa. 1825), an excerpt which listed the elective franchise as among the privileges and immunities.   Globe 2765.   Bingham was equally ambiguous, for he too thought that the elective franchise was a constitutionally protected privilege and immunity. Globe 2542.   Indeed, at one point in the debates, Bingham made what is for us a completely incongruous statement:

> "To be sure we all agree, and the great body of the people of this country agree, and the committee thus far in reporting measures of reconstruction agree, that the exercise of the elective franchise, though it be one of the privileges of a citizen of the Republic, is exclusively under the control of the States."   Globe 2542.

Bingham seemed to say in one breath first, that the franchise was a constitutionally protected privilege in support of which Congress under § 5 of the Fourteenth Amendment could legislate and then, in the next breath, that the franchise was exclusively under the control of the States.

Bingham's words make little sense to modern ears; yet, when they were uttered, his words must have made some sense, at least to Bingham and probably to many of his listeners.   The search for their meaning probably

---

courts, which the courts would use to achieve equality of rights. Since § 5 is clear in its grant of power to Congress and we have consistently held that the Amendment grants power to the courts, this issue is of academic interest only.

ought to begin with Art. IV, § 2—the Privileges and Immunities Clause of the original Constitution. In the minds of members of the 39th Congress, the leading case to construe that clause was *Corfield* v. *Coryell,* *supra,* which had listed among a citizen's privileges and immunities "the elective franchise, as regulated and established by the laws or constitution of the state in which it is to be exercised." 6 F. Cas., at 552. Here again is the same apparent ambiguity that later occurred in Bingham's thought—that the franchise is a federally protected right, but only to the extent it is regulated and established by state law. The ambiguity was, however, only apparent and not real, for the Privileges and Immunities Clause of the original Constitution served a peculiar function; it did not create absolute rights but only placed a noncitizen of a State "upon a perfect equality with its own citizens" as to those fundamental rights already created by state law. *Scott* v. *Sandford,* 19 How. 393, 407 (1857). Accord, *id.,* at 584 (dissenting opinion). The Privileges and Immunities Clause, that is, was a sort of equal protection clause adopted for the benefit of out-of-state citizens;[38] it required, for example, that if a State gave its own citizens a right to enter into a lawful business, it could not arbitrarily deny the same right to out-of-state citizens solely because they came from out of State. See *Ward* v. *Maryland,* 12 Wall. 418, 430 (1871). Thus, what Bingham may have meant in indicating that the franchise was included within the scope of the Privileges and Immunities Clause of the Fourteenth Amendment while remaining entirely under the control of the States was that, although the States would be free in general to confer the franchise upon whomever they chose, Congress would have power.

---

[38] According to *Paul* v. *Virginia,* 8 Wall. 168, 180 (1869), the Privileges and Immunities Clause in Art. 4, § 2, secured to citizens "in other States the equal protection of their laws."

to bar them from racial or other arbitrary discriminations in making their choices. In short, the Privileges and Immunitres Clause might for Bingham have meant the same as the Equal Protection Clause; as he later explained in a campaign speech, § 1 was nothing but "a simple, strong, plain declaration that equal laws and equal and exact justice shall hereafter be secured within every State of this Union . . . ." Cincinnati Daily Commercial, Aug. 27, 1866, quoted in James 160.

One way, then, to reconcile the seemingly incongruous statements of Bingham is to read him as understanding that, while the Fourteenth Amendment did not take from the States nor grant to Congress plenary power to regulate the suffrage, it did give Congress power to invalidate discriminatory state legislation. In his words, the Amendment took "from no State any right which hitherto pertained to the several States of the Union, but it impose[d] a limitation upon the States to correct their abuses of power." *Ibid.* Others had a similar understanding. Thus, for Charles Sumner, "Equality of *political* rights . . . [did] not involve necessarily what is sometimes called the 'regulation' of the suffrage by the National Government, although this would be best . . . [but] simply require[d] the abolition of any discrimination among citizens, inconsistent with Equal Rights." C. Sumner, Are We a Nation? 34 (1867). Or, as Stevens explained in presenting the Amendment to the House, it merely allowed "Congress to correct the unjust legislation of the States, so far that the law which operates upon one man shall operate *equally* upon all." Globe 2459 (emphasis in original). Clearest of all, perhaps was Thomas M. Cooley in the 1871 edition of his Constitutional Limitations, where he wrote:

> "This amendment of the Constitution does not concentrate power in the general government for

> any purpose of police government within the States; its object is to preclude legislation by any State which shall 'abridge the privileges or immunities of citizens of the United States,' or 'deprive any person of life, liberty, or property without due process of law,' or 'deny to any person within its jurisdiction the equal protection of the laws'; and Congress is empowered to pass all laws necessary to render such unconstitutional State legislation ineffectual." T. Cooley, Constitutional Limitations 294 (2d ed. 1871).

There is also other evidence that at least some members of Congress and of the electorate believed that § 1 of the Fourteenth Amendment gave Congress power to invalidate discriminatory state regulations of the suffrage. Thus, Congressman Rogers, a Democrat who had served on the Joint Committee, agreed with Bingham and Howard that "[t]he right to vote is a privilege," Globe 2538, while Congressman Boyer, another Democrat, feared that § 1 was "intended to secure ultimately, and to some extent indirectly, the political equality of the negro race." Globe 2467. A third Democrat, Congressman Niblack, thought the section sufficiently ambiguous to warn that he might, although in fact he never did, offer the following addition to it:

> "*Provided,* That nothing contained in this article shall be so construed as to authorize Congress to regulate or control the elective franchise within any State, or to abridge or restrict the power of any State to regulate or control the same within its own jurisdiction, except as in the third section hereof prescribed." Globe 2465.

Republicans also alluded on occasion to their belief that the Amendment might give Congress power to prevent discrimination in regard to the suffrage. Radi-

cal Senator Stewart, for example, while unhappy that the Amendment did not directly confer suffrage, nevertheless could "support this plan" because it did "not preclude Congress from adopting other means by a two-thirds vote,[39] when experience shall have demonstrated, as it certainly will, the necessity for a change of policy. In fact it furnishes a conclusive argument in favor of universal amnesty and impartial suffrage." Globe 2964. Likewise, the more conservative Congressman Raymond of New York supported the first section because he thought Congress should have the power to legislate on behalf of equal rights "in courts and elsewhere," Globe 2513, after the radical Congressman Wilson of Iowa had informed him that, "if we give a reasonable construction to the term 'elsewhere,' we may include in that the jury-box and the ballot-box." Globe 2505. Congressman Stevens, meanwhile, was informing Congress that "if this amendment prevails you must legislate to carry out many parts of it," Globe 2544, and was looking forward to "further legislation; in enabling acts or other provisions," Globe 3148, while even the Joint Committee submitted the Amendment to the Nation "in the hope that its imperfections may be cured, and its deficiencies supplied, by legislative wisdom . . . ." Report of the Joint Committee on Reconstruction, H. R. Rep. No. 30, 39th Cong., 1st Sess., xxi (1866). Nor did the radical Republican press disagree; as the Lansing State Republican argued in its editorial columns, even "[i]f impartial suffrage, the real vital question of the whole struggle . . . [was] postponed through the mulish obstinacy of Andrew Johnson," "freedom" would "triumph by the adoption of the pro-

---

[39] Senator Stewart's statement regarding the two-thirds requirement appears to refer to § 3 of the Fourteenth Amendment, which requires such a majority for legislation granting amnesty to former Confederate leaders.

posed amendment," which would be followed by "equal rights to all . . . ." July 11, 1866. And, of course, once the Amendment had been ratified, Republicans in Congress began to make speeches in favor of legislation which would implement the Amendment by guaranteeing equal suffrage. See, *e. g.*, Cong. Globe, 40th Cong., 2d Sess., 1966–1967 (1868) (remarks of Cong. Stevens); 3d Sess., 1008 (1869) (remarks of Sen. Sumner).

Of course, few of the above statements taken from congressional debates, campaign speeches, and the press were made with such clarity and precision that we can know with certainty that its framers intended the Fourteenth Amendment to function as we think they did. But clarity and precision are not to be expected in an age when men are confronting new problems for which old concepts do not provide ready solutions. As we have seen, the 1860's were such an age, and the men who formulated the Fourteenth Amendment were facing an especially perplexing problem—that of creating federal mechanisms to insure the fairness of state action without in the process destroying the reserved powers of the States. It would, indeed, be surprising if the men who first faced this difficult problem were possessed of such foresight that they could debate its solution with complete clarity and consistency and with uniformity of views. There is, in short, every reason to believe that different men reconciled in different and often imprecise ways the Fourteenth Amendment's broad guarantee of equal rights and the statements of some of its framers that it did not give Congress power to legislate upon the suffrage.

Some men, for example, might have reconciled the broad guarantee and the narrow language by concluding that Negroes were not yet ready to exercise the franchise and hence that a State would not act arbitrarily

in denying it to them while granting it to whites. As the debates make clear, proponents of the Amendment did not understand the Equal Protection Clause to forbid States to distinguish among persons where justification for distinctions appeared. See, *e. g.,* Globe 1064 (Congressman Stevens). At the time the Fourteenth Amendment was adopted, the overwhelming majority of Negro residents of the United States were former slaves living in the Southern States. Most of them were illiterate and uneducated. Except for those few who had been kidnaped by slave traders after reaching adulthood, they had no prior experience with the responsibilities of citizenship. Given this state of affairs, it would hardly be surprising if some of the framers of the Fourteenth Amendment felt that the Equal Protection Clause would not forbid the States from classifying Negroes as a group to be denied the right to vote. Equal protection has never been thought to require identical treatment of all persons in all respects. *Metropolitan Cas. Ins. Co.* v. *Brownell,* 294 U. S., at 583–584, and cases cited. It requires only that the State provide adequate justification for treating one group differently from another. *Levy* v. *Louisiana,* 391 U. S. 68 (1968). Entirely aside from any concepts of racial inequality that may have been held by some members of Congress at that time, it seems clear that many members had serious reservations about the ability of the majority of Negroes, after centuries of slavery, to cast an intelligent and responsible vote. See, for example, the debates over a proposal to enfranchise Negroes in the District of Columbia in Cong. Globe, 38th Cong., 1st Sess., 2140–2141, 2239–2243, 2248 (1864). Of course, we would not now hold that even the situation existing in 1866 would justify wholesale exclusion of Negroes from the franchise: our decisions have consistently held that a particular group may not be denied the right to vote merely

because many, or even most, of its members could properly be excluded. *Carrington* v. *Rash,* 380 U. S., at 93–96; *Kramer* v. *Union School District,* 395 U. S., at 632–633; *Evans* v. *Cornman,* 398 U. S., at 424–426; cf. Tussman & TenBroek, The Equal Protection of the Laws, 37 Calif. L. Rev. 341, 351–352 (1949). But mere administrative convenience was once thought to be sufficient justification for an overly broad legislative classification, so long at least as the resultant discrimination could be justified as to a majority of the class affected. *Terrace* v. *Thompson,* 263 U. S. 197, 218–222 (1923); cf. *Kotch* v. *Board of River Port Pilots,* 330 U. S. 552 (1947). Rejection of this approach has been the result of a judicial development that could hardly have been known to the framers of the Amendment. Cf. *Baxstrom* v. *Herold,* 383 U. S. 107, 114–115 (1966).

Of course, many Americans in the 1860's rejected imputations that Negroes were unready for the franchise and thus concluded that distinctions between the races in regard to the franchise would constitute denials of equal protection. Congressman Stevens, for one, had no doubt that to allow a State to deny the franchise to Negroes would be to allow it "to discriminate among the same class." Globe 2460. And Negroes, of course, indignantly rejected such imputations, arguing that "[w]e are not all so illiterate as you suppose" and that "even if we were, our instincts have proved better than that 'educated class,' whose 'little learning' prompted them to attempt the impossible thing of destroying this great Republic . . . ." Letter to the Editor, New York Times, Nov. 4, 1866.

Among the men who refused to regard Negroes as ill prepared for the exercise of the franchise, there may have been some who did not understand the subtle distinctions of constitutional lawyers such as Bingham and who thus

accepted at face value assurances that the Fourteenth Amendment gave Congress no power over the suffrage. As a result, at least three identifiable groups may have existed within the Republican majorities that enacted and ratified the Amendment—those who thought that Congress would have power to insure to Negroes the same right to suffrage as the States gave to whites, those who thought that Congress would not have such power since Negroes and whites constituted distinct and dissimilar classes for voting purposes, and those who thought Congress would possess no power at all over the suffrage. Perhaps all three such groups did not exist in 1866 in Congress and in the Nation at large, but surely the evidence is not clear "beyond any reasonable doubt" that the only existent group was the last one, consisting of men who, despite the broad language of § 1 and the hints by speakers of its applicability to the suffrage, simply assumed without developing any analytical framework in support of their assumption that the section would not be so applied.

The evidence, in sum, plausibly suggests that the men who framed the Fourteenth Amendment possessed differing views as to the limits of its applicability but that they papered over their differences because those differences were not always fully apparent and because they could not foresee with precision how their amendment would operate in the future. Moreover, political considerations militated against clarification of issues and in favor of compromise. Much of the North, as already noted, opposed Negro suffrage, and many Republicans in Congress had to seek re-election from constituencies where racial prejudice remained rampant. Republicans in the forthcoming elections thus found it convenient to speak differently before different constituencies; as the Republican state chairman of Ohio wrote, in northern counties of the State "some of our Speakers have openly

advocated impartial suffrage, while in other places it was thought necessary, not only to repudiate it but to oppose it." Letter from B. R. Cowan to S. P. Chase, Oct. 12, 1866, quoted in James 168. Similarly, Senator Wilson of Massachusetts, when accused shortly after the 1866 elections of misrepresenting the issues of the campaign in Delaware by saying nothing of Negro suffrage, replied that since he had been "in a State where not much progress had been made, I acted somewhat on the scriptural principle of giving 'milk to babes.'" Cong. Globe, 39th Cong., 2d Sess., 42. Apparently Congressman Ashley of Ohio acted upon similar principles, for when he was asked after the House had initially approved the Amendment whether Congress had "power to confer the right of suffrage upon negroes in the States," he responded,

> "Well, sir, I do not intend to put myself on record against the right of Congress to do that. I am not prepared now to argue the point with my colleague; but I will say to him that when the time comes for the American Congress to take action on the question, I will be ready to speak. I will not say now whether I would vote for or against such a proposition." Globe 2882.

Thus, precise legal analysis and clarity of thought were both intellectually difficult and politically unwise. What Republicans needed, in the words of Wendell Phillips, the former abolitionist leader, was "a party trick to tide over the elections and save time," after which they could "float back into Congress, able to pass an act that shall give the ballot to the negro and initiate an amendment to the Constitution which shall secure it to him." Speech of Wendell Phillips, July 4, 1866, quoted in A. Harris, A Review of the Political Conflict in America 437 (1876). Similarly, the New York Times, edited by Congressman Henry J. Raymond, a conservative Republican who

ultimately would support the Amendment, observed that "all the excitement that had been raised about constitutional amendments . . . has been simply dust thrown in the eyes of the public to cover the approach to the grand fundamental, indispensable principle of universal negro suffrage . . . ." April 27, 1866, quoted in Harris, *supra,* at 433.

Not surprisingly, the product of such political needs was an Amendment which contemporaries saw was vague and imprecise. Democratic Senator Hendricks, for example, protested that he had "not heard any Senator accurately define, what are the rights and immunities of citizenship," Globe 3039, while Congressman Boyer, another Democrat, found the first section "objectionable also in its phraseology, being open to ambiguity and admitting of conflicting constructions." Globe 2467. Republicans, too, were aware of the Amendment's vagueness. Thus, when he presented the Amendment to the Senate, Senator Howard noted that "[i]t would be a curious question to solve what are the privileges and immunities of citizens" and proposed not to consider the question at length, since "[i]t would be a somewhat barren discussion." Instead, like the pre-Civil War Supreme Court,[40] he "very modestly declined to go into a definition of them, leaving questions arising under the clause to be discussed and adjudicated when they should happen practically to arise." Globe 2765.

Thus, the historical evidence does not point to a single, clear-cut conclusion that contemporaries viewed the first section of the Fourteenth Amendment as an explicit abandonment of the radical goal of equal suffrage for Negroes. Rather the evidence suggests an alternative hypothesis: that the Amendment was framed by men who possessed differing views on the great question of the

---

[40] This Court had taken such an approach in *Conner* v. *Elliott,* 18 How. 591 (1856).

suffrage and who, partly in order to formulate some program of government and partly out of political expediency, papered over their differences with the broad, elastic language of § 1 and left to future interpreters of their Amendment the task of resolving in accordance with future vision and future needs the issues that they left unresolved. Such a hypothesis strikes us as far more consistent with the turbulent character of the times than one resting upon a belief that the broad language of the Equal Protection Clause contained a hidden limitation upon its operation that would prevent it from applying to state action regulating rights that could be characterized as "political." [41]

Nor is such a hypothesis inconsistent with the subsequent enactment of the Fifteenth, Nineteenth, and Twenty-fourth Amendments. Those who submitted the Fifteenth Amendment to the States for ratification could well have desired that any prohibition against racial discrimination in voting stand upon a firmer foundation than mere legislative action capable of repeal [42] or the vagaries of judicial decision.[43] Or they could merely have concluded that, whatever might be the case with other rights, the right to vote was too important to allow disenfranchisement of any person for no better reason

---

[41] Ironically, the same distinction between "political" and other rights was drawn by this Court in *Plessy* v. *Ferguson,* 163 U. S. 537, 545–546 (1896). But the Court there concluded, directly contrary to our Brother HARLAN's position, that the Fourteenth Amendment applied to "political" rights and to those rights only.

[42] As Thaddeus Stevens had pointed out in urging passage of the Fourteenth Amendment despite the fact that, he felt, some of its guarantees could be enforced by mere legislative enactment, "a law is repealable by a majority." Globe 2459.

[43] Radical disenchantment with decisions of this Court had led, prior to the Fifteenth Amendment, to the Act of March 27, 1868, 15 Stat. 44, withdrawing our appellate jurisdiction over certain habeas corpus cases. See *Ex parte McCardle,* 7 Wall. 506, 508, 514–515 (1869).

than that others of the same race might not be qualified. At least some of the supporters of the Nineteenth Amendment believed that sex discrimination in voting was itself proscribed by the Fourteenth Amendment's guarantee of equal protection. 57 Cong. Rec. 3053 (1919). And finally, the Twenty-fourth Amendment was not proposed to the States until this Court had held, in *Breedlove* v. *Suttles,* 302 U. S. 277 (1937),[44] that state laws requiring payment of a poll tax as a prerequisite to voting did not *ipso facto* violate the Equal Protection Clause. Accordingly, we see no reason that the mere enactment of these amendments can be thought to imply that their proponents believed the Fourteenth Amendment did not apply to state allocations of political power. At a dubious best, these amendments may be read as implying that their proponents felt particular state allocations of power a proper exercise of power under the Equal Protection Clause.

Nor do we find persuasive our Brother HARLAN's argument that § 2 of the Fourteenth Amendment was intended as an exclusive remedy for state restrictions on the franchise, and that therefore any such restrictions are permissible under § 1. As Congressman Bingham emphatically told the House, when the same argument was made by Congressman Bromwell,

> "there has not been such a construction, in my opinion, of a law which imposes only a penalty, for centuries, if ever, in any country where the common law obtains. The construction insisted upon by the gentleman amounts to this, that a law which inflicts a penalty or works a forfeiture for doing an act, by implication authorizes the act to be done for doing which the penalty is inflicted. There

---

[44] *Breedlove* has been overruled by *Harper* v. *Virginia Board of Elections,* 383 U. S. 663, 669 (1966).

cannot be such a construction of the proviso. It is a penalty. It says in terms that if any of the States of the United States shall disobey the Constitution . . . as a penalty such State shall lose political power in this House . . . .

   .      .      .      .      .

"You place upon your statute-book a law punishing the crime of murder with death. You do not thereby, by implication, say that anybody may, of right, commit murder. You but pass a penal law. You do not prohibit murder in the Constitution; you guaranty life in the Constitution. You do not prohibit the abuse of power by the majority in the Constitution in express terms, but you guaranty the equal right of all free male citizens of full age to elect Representatives; and by the proviso you inflict a penalty upon a State which denies or abridges that right on account of race or color. In doing that we are not to be told that we confer a power to override the express guarantees of the Constitution. We propose the penalty in aid of the guarantee, not in avoidance of it." Globe 431–432.

See Van Alstyne, *supra*, at 48–68.

It may be conceivable that § 2 was intended to be the sole remedy available when a State deprived its citizens of their right to vote, but it is at least equally plausible that congressional legislation pursuant to §§ 1 and 5 was thought by the framers of the Amendment to be another potential remedy. Section 2, in such a scheme, is hardly superfluous: it was of critical importance in assuring that, should the Southern States deny the franchise to Negroes, the Congress called upon to remedy that discrimination would not be controlled by the beneficiaries of discrimination themselves. And it could, of course, have been expected to provide at least a limited remedy

in the event that both Congress and the courts took no action under § 1. Neither logic nor historical evidence compellingly suggests that § 2 was intended to be more than a remedy supplementary, and in some conceivable circumstances indispensable, to other congressional and judicial remedies available under §§ 1 and 5. See generally Van Alstyne, *supra*.

The historical record left by the framers of the Fourteenth Amendment, because it is a product of differing and conflicting political pressures and conceptions of federalism, is thus too vague and imprecise to provide us with sure guidance in deciding the pending cases. We must therefore conclude that its framers understood their Amendment to be a broadly worded injunction capable of being interpreted by future generations in accordance with the vision and needs of those generations. We would be remiss in our duty if, in an attempt to find certainty amidst uncertainty, we were to misread the historical record and cease to interpret the Amendment as this Court has always interpreted it.

## D

There remains only the question whether Congress could rationally have concluded that denial of the franchise to citizens between the ages of 18 and 21 was unnecessary to promote any legitimate interests of the States in assuring intelligent and responsible voting. There is no need to set out the legislative history of Title III at any great length here.[45] Proposals to lower the voting age to 18 had been before Congress at several times since 1942.[46] The Senate Subcommittee on Con-

---

[45] For a full collection of the relevant materials, see Note, Legislative History of Title III of the Voting Rights Act of 1970, 8 Harv. J. Legis. 123 (1970).

[46] See 88 Cong. Rec. 8312, 8316 (1942).

stitutional Amendments conducted extensive hearings on the matter in 1968 and again in 1970,[47] and the question was discussed at some length on the floor of both the House and the Senate.

Congress was aware, of course, of the facts and state practices already discussed.[48] It was aware of the opinion of many historians that choice of the age of 21 as the age of maturity was an outgrowth of medieval requirements of time for military training and development of a physique adequate to bear heavy armor.[49] It knew that whereas only six percent of 18-year-olds in 1900 had completed high school, 81 percent have done so today.[50] Congress was aware that 18-year-olds today make up a not insubstantial proportion of the adult work force;[51] and it was entitled to draw upon its experience in supervising the federal establishment to determine the competence and responsibility with which 18-year-olds perform their assigned tasks. As Congress recognized, its judgment that 18-year-olds are capable of voting is consistent with its practice of entrusting them with the heavy responsibilities of military service. See § 301 (a) (1) of the Amendments.[52] Finally, Congress was pre-

---

[47] Hearings on S. J. Res. 8, 14, and 78 before the Subcommittee on Constitutional Amendments of the Senate Committee on the Judiciary, 90th Cong., 2d Sess. (1968); Hearings on S. J. Res. 147 and Others before the Subcommittee on Constitutional Amendments of the Senate Committee on the Judiciary, 91st Cong., 2d Sess. (1970) (hereafter 1970 Hearings).

[48] *Supra*, at 242–246.

[49] See 116 Cong. Rec. 6955; James, The Age of Majority, 4 Am. J. Legal Hist. 22 (1960); Report of the Committee on the Age of Majority Presented to the English Parliament 21 (1967).

[50] 116 Cong. Rec. 6435.

[51] 16 Department of Labor, Bureau of Labor Statistics, Employment and Earnings, table A–3 (June 1970).

[52] See also Senate Hearings 323 (Sen. Kennedy), 116 Cong. Rec. 5950–5951 (Sen. Mansfield); 6433 (Sen. Cook). See generally Note, *supra*, n. 45, at 134–148.

sented with evidence that the age of social and biological maturity in modern society has been consistently decreasing. Dr. Margaret Mead, an anthropologist, testified that in the past century, the "age of physical maturity has been dropping and has dropped over 3 years." [53] Many Senators and Representatives, including several involved in national campaigns, testified from personal experience that 18-year-olds of today appeared at least as mature and intelligent as 21-year-olds in the Congressmen's youth. [54]

Finally, and perhaps most important, Congress had before it information on the experience of two States, Georgia and Kentucky, which have allowed 18-year-olds to vote since 1943 and 1955, respectively. Every elected Representative from those States who spoke to the issue agreed that, as Senator Talmadge stated, "young people [in these States] have made the sophisticated decisions and have assumed the mature responsibilities of voting. Their performance has exceeded the greatest hopes and expectations." [55]

In sum, Congress had ample evidence upon which it could have based the conclusion that exclusion of citizens 18 to 21 years of age from the franchise is wholly unnecessary to promote any legitimate interest the States may have in assuring intelligent and responsible voting. See *Katzenbach* v. *Morgan*, 384 U. S., at 653–656. If discrimination is unnecessary to promote any legitimate state interest, it is plainly unconstitutional

---

[53] 1970 Hearings at 223. Dr. W. Walter Menninger, a psychiatrist, and Dr. S. I. Hayakawa agreed. *Id.*, at 23, 36.

[54] *E. g.*, 116 Cong. Rec. 5950–5951 (Sen. Mansfield); 6433–6434 (Sen. Cook); 6434–6437 (Sen. Goldwater); 6929–6930 (Sen. Talmadge, joined by Sen. Ervin); 6950–6951 (Sen. Tydings).

[55] 116 Cong. Rec. 6929.

under the Equal Protection Clause, and Congress has ample power to forbid it under § 5 of the Fourteenth Amendment. We would uphold § 302 of the 1970 Amendments as a legitimate exercise of congressional power.

MR. JUSTICE STEWART, with whom THE CHIEF JUSTICE and MR. JUSTICE BLACKMUN join, concurring in part and dissenting in part.

In these cases we deal with the constitutional validity of three provisions of the Voting Rights Act Amendments of 1970. Congress undertook in these provisions: (a) to abolish for a five-year period all literacy tests and similar voting eligibility requirements imposed by any State in the Union (§ 201); (b) to remove the restrictions imposed by state durational residency requirements upon voters in presidential elections (§ 202); and (c) to reduce the voting age to a minimum of 18 years for all voters in all elections throughout the Nation (§ 302). The Court today upholds § 201's nationwide literacy test ban and § 202's elimination of state durational residency restrictions in presidential elections. Section 302's extension of the franchise to 18-year-old voters is (by virtue of the opinion of MR. JUSTICE BLACK announcing the judgments of the Court) upheld as applied to federal elections. I agree with the Court in sustaining the congressional ban on state literacy tests, for substantially the same reasons relied upon by MR. JUSTICE BLACK. I also agree that the action of Congress in removing the restrictions of state residency requirements in presidential elections is constitutionally valid, but I base this judgment upon grounds quite different from those relied upon by MR. JUSTICE BLACK. And, finally, I disagree with the Court's conclusion that Congress could constitutionally reduce the voting

age to 18 for federal elections, since I am convinced that Congress was wholly without constitutional power to alter—for the purpose of any elections—the voting age qualifications now determined by the several States.

Before turning to a discussion of my views, it seems appropriate, to state that we are not called upon in these cases to evaluate or appraise the wisdom of abolishing literacy tests, of altering state residency requirements, or of reducing the voting age to 18. Whatever we may think as citizens, our single duty as judges is to determine whether the legislation before us was within the constitutional power of Congress to enact. I find it necessary to state so elementary a proposition only because certain of the separate opinions filed today contain many pages devoted to a demonstration of how beneficent are the goals of this legislation, particularly the extension of the electoral franchise to young men and women of 18. A casual reader could easily get the impression that what we are being asked in these cases is whether or not we think allowing people 18 years old to vote is a good idea. Nothing could be wider of the mark. My Brothers to the contrary, there is no question here as to the "judgment" of Congress; there are questions only of Congress' constitutional power.

## I

I concur in Part II of MR. JUSTICE BLACK's opinion, which holds that the literacy test ban of § 201 of the 1970 Amendments is constitutional under the Enforcement Clause of the Fifteenth Amendment. Our decisions establish that the Fifteenth Amendment "nullifies sophisticated as well as simple-minded modes of discrimination. It hits onerous procedural requirements which effectively handicap exercise of the franchise by the colored race although the abstract right to vote may remain unrestricted as to race." *Lane* v. *Wilson,* 307 U. S. 268, 275;

cf. *Gomillion* v. *Lightfoot,* 364 U. S. 339. Because literacy and illiteracy are seemingly neutral with respect to race, creed, color, and sex, we upheld a literacy requirement against a claim that it was invalid on its face under the Fifteenth Amendment. *Lassiter* v. *Northampton Election Board,* 360 U. S. 45. But in *Gaston County* v. *United States,* 395 U. S. 285, we made it clear that Congress has ample authority under § 2 of the Fifteenth Amendment to determine that literacy requirements work unfairly against Negroes in practice because they handicap those Negroes who have been deprived of the educational opportunities available to white citizens. We construed the 1965 Voting Rights Act in light of the report of the Senate Judiciary Committee which said, "[T]he educational differences between whites and Negroes in the areas to be covered by the prohibitions— differences which are reflected in the record before the committee—would mean that equal application of the tests would abridge 15th amendment rights." S. Rep. No. 162, pt. 3, 89th Cong., 1st Sess., 16. See also *South Carolina* v. *Katzenbach,* 383 U. S. 301, 308–315.

Congress has now undertaken to extend the ban on literacy tests to the whole Nation. I see no constitutional impediment to its doing so. Nationwide application reduces the danger that federal intervention will be perceived as unreasonable discrimination against particular States or particular regions of the country. This in turn increases the likelihood of voluntary compliance with the letter and spirit of federal law. Nationwide application facilitates the free movement of citizens from one State to another, since it eliminates the prospect that a change in residence will mean the loss of a federally protected right. Nationwide application avoids the often difficult task of drawing a line between those States where a problem is pressing enough to warrant federal intervention and those where it is not. Such a

284

line may well appear discriminatory to those who think themselves on the wrong side of it. Moreover the appli-. cation of the line to particular States can entail a substantial burden on administrative and judicial machinery and a diversion of enforcement resources. Finally, nationwide application may be reasonably thought appropriate when Congress acts against an evil such as racial discrimination which in varying degrees manifests itself in every part of the country. A remedy for racial discrimination which applies in all the States underlines an awareness that the problem is a national one and reflects a national commitment to its solution.

Because the justification for extending the ban on literacy tests to the entire Nation need not turn on whether literacy tests unfairly discriminate against Negroes in every State in the Union, Congress was not required to make state-by-state findings concerning either the equality of educational opportunity or actual impact of literacy requirements on the Negro citizen's access to the ballot box. In the interests of uniformity, Congress may paint with a much broader brush than may this Court, which must confine itself to the judicial function of deciding individual cases and controversies upon individual records. Cf. *Lassiter* v. *Northampton Election Board, supra.* The findings that Congress made when it enacted the Voting Rights Act of 1965 would have supported a nationwide ban on literacy tests. Instead, at that time "Congress chose to limit its attention to the geographic areas where immediate action seemed necessary." *South Carolina* v. *Katzenbach,* 383 U. S., at 328. Experience gained under the 1965 Act has now led Congress to conclude that it should go the whole distance. This approach to the problem is a rational one; consequently it is within the constitutional power of Congress under § 2 of the Fifteenth Amendment.

## II

Section 202 added by the Voting Rights Act Amendments of 1970 is a comprehensive provision aimed at insuring that a citizen will not be deprived of the opportunity to vote for the offices of President and Vice President because of a change of residence. Those who take up a new residence more than 30 days before a presidential election are guaranteed the right to register and vote in the State to which they have moved notwithstanding any durational residency requirement imposed by state law, provided, of course, that they are otherwise qualified to vote. Those who take up a new residence less than 30 days before a presidential election are guaranteed the right to vote, either in person or by absentee ballot, in the State from which they have moved, provided that they satisfied, as of the date of their change of residence, the requirements to vote in that State.

## A

Congress, in my view, has the power under the Constitution to eradicate political and civil disabilities that arise by operation of state law following a change in residence from one State to another. Freedom to travel from State to State—freedom to enter and abide in any State in the Union—is a privilege of United States citizenship. *Shapiro* v. *Thompson,* 394 U. S. 618; *United States* v. *Guest,* 383 U. S. 745, 757–760; *Truax* v. *Raich,* 239 U. S. 33, 39; *Twining* v. *New Jersey,* 211 U. S. 78, 97; *Crandall* v. *Nevada,* 6 Wall. 35. Section 1 of the Fourteenth Amendment provides: "All persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or

immunities of citizens of the United States . . . .". In discussing the privileges of citizens of the United States within the meaning of § 1, Mr. Justice Miller wrote for the Court in the *Slaughter-House Cases:*

> "One of these privileges is conferred by the very article under consideration. It is that a citizen of the United States can, of his own volition, become a citizen of any State of the Union by a *bona fide* residence therein, with the same rights as other citizens of that State." 16 Wall. 36, 80.

Although § 5 of the Fourteenth Amendment confers on Congress the "power to enforce, by appropriate legislation, the provisions of this article," this Court has sustained the power of Congress to protect and facilitate the exercise of privileges of United States citizenship without reference to § 5. *United States* v. *Guest,* 383 U. S., at 757–760; *United States* v. *Classic,* 313 U. S. 299; *Burroughs* v. *United States,* 290 U. S. 534. These cases and others establish that Congress brings to the protection and facilitation of the exercise of privileges of United States citizenship all of its power under the Necessary and Proper Clause. Consequently, as against the reserved power of the States, it is enough that the end to which Congress has acted be one legitimately within its power and that there be a rational basis for the measures chosen to achieve that end. *McCulloch* v. *Maryland,* 4 Wheat. 316, 421.

In the light of these considerations, § 202 presents no difficulty. Congress could rationally conclude that the imposition of durational residency requirements unreasonably burdens and sanctions the privilege of taking up residence in another State. The objective of § 202 is clearly a legitimate one. Federal action is required if the privilege to change residence is not to be undercut by parochial local sanctions. No State could undertake

to guarantee this privilege to its citizens. At most a single State could take steps to resolve that its own laws would not unreasonably discriminate against the newly arrived resident. Even this resolve might not remain firm in the face of discriminations perceived as unfair against those of its own citizens who moved to other States. Thus, the problem could not be wholly solved by a single State, or even by several States, since every State of new residence and every State of prior residence would have a necessary role to play. In the absence of a unanimous interstate compact, the problem could only be solved by Congress. Quite clearly, then, Congress has acted to protect a constitutional privilege that finds its protection in the Federal Government and is national in character. *Slaughter-House Cases,* 16 Wall., at 79.

## B

But even though general constitutional power clearly exists, Congress may not overstep the letter or spirit of any constitutional restriction in the exercise of that power. For example, Congress clearly has power to regulate interstate commerce, but it may not, in the exercise of that power, impinge upon the guarantees of the Bill of Rights. I have concluded that, while § 202 applies only to presidential elections, nothing in the Constitution prevents Congress from protecting those who have moved from one State to another from disenfranchisement in any federal election, whether congressional or presidential.

The Constitution withholds from Congress any general authority to change by legislation the qualifications for voters in federal elections. The meaning of the applicable constitutional provisions is perfectly plain. Article I, § 2, and the Seventeenth Amendment prescribe the qualifications for voters in elections to choose Senators and Representatives: they "shall have the Qualifications

requisite for Electors of the most numerous Branch of the State Legislature." The Constitution thus adopts as the federal standard the standard which each State has chosen for itself. *Ex parte Yarbrough,* 110 U. S. 651, 663; *Wiley* v. *Sinkler,* 179 U. S. 58, 64. Accordingly, a state law that purported to establish distinct qualifications for congressional elections would be invalid as repugnant to Art. I, § 2, and the Seventeenth Amendment. By the same token, it cannot be gainsaid that federal legislation that had no objective other than to alter the qualifications to vote in congressional elections would be invalid for the same reasons. What the Constitution has fixed may not be changed except by constitutional amendment.

Contrary to the submission of my Brother BLACK, Art. I, § 4, does not create in the Federal Legislature the power to alter the constitutionally established qualifications to vote in congressional elections. That section provides that the legislatures in each State shall prescribe the "Times, Places and Manner of holding Elections for Senators and Representatives," but reserves in Congress the power to "make or alter such Regulations, except as to the Places of chusing Senators." The "manner" of holding elections can hardly be read to mean the *qualifications* for voters, when it is remembered that § 2 of the same Art. I explicitly speaks of the "qualifications" for voters in elections to choose Representatives. It is plain, in short, that when the Framers meant qualifications they said "qualifications." That word does not appear in Art. I, § 4. Moreover, § 4 does not give Congress the power to do anything that a State might not have done, and, as pointed out above, no State may establish distinct qualifications for congressional elections. The States, of course, are free to pass such laws as are necessary to assure fair elections. Congressional power under § 4 is equally broad with respect to con-

gressional elections. *United States* v. *Classic,* 313 U. S. 299. But the States are not free to prescribe qualifications for voters in federal elections which differ from those prescribed for the most numerous branch of the state legislature. And the power of Congress to do so cannot, therefore, be found in Art. I, §·4;

This view is confirmed by extrinsic evidence of the intent of the Framers of the Constitution. An early draft of the Constitution provided that the States should fix the qualifications of voters in congressional elections subject to the proviso that these qualifications might "at any Time be altered and superseded by the Legislature of the United States." [1] The records of the Committee on Detail show that it was decided to strike the provision granting to Congress the authority to set voting qualifications and to add in its stead a clause making the qualifications "the same from Time to Time as those of the Electors, in the several States, of the most numerous Branch of their own Legislatures." [2] The proposed draft reported by the Committee on Detail to the Convention included the following:

> "The qualifications of the electors shall be the same, from time to time, as those of the electors in the several States, of the most numerous branch of their own legislatures." Art. IV, § 1.
>
> "The times and places and manner of holding the elections of the members of each House shall be prescribed by the Legislature of each State; but their provisions concerning them may, at any time, be altered by the Legislature of the United States." [3] Art. VI, § 1.

---

[1] 2 M. Farrand, Records of the Federal Convention of 1787, p. 153 (1911).

[2] *Id.,* at 164.

[3] *Id.,* at 178–179.

On August 7, Gouverneur Morris moved to strike the last clause of the proposed Art. IV, § 1, and either to provide a freehold limitation on suffrage or to add a clause permitting Congress to alter the electoral qualifications.[4] This motion was opposed by Oliver Ellsworth, George Mason, James Madison, and Benjamin Franklin. Ellsworth protested that the proposal favored aristocracy. If the legislature could alter qualifications, it could disqualify a great proportion of the electorate.[5] Mason voiced a similar objection. "A power to alter the qualifications would be a dangerous power in the hands of the Legislature."[6] To the same effect Madison said:

> "The right of suffrage is certainly one of the fundamental articles of republican Government, and ought not to be left to be regulated by the Legislature."[7]

The proposed motion was defeated by a seven-to-one vote,[8] and no substantive change in Art. I, § 2, was proposed or made thereafter.

Thus, Alexander Hamilton accurately reported the intent of the Convention when he wrote in The Federalist No. 60 that the authority of the national government "would be expressly restricted to the regulation of the *times*, the *places*, and the *manner* of elections. The qualifications of the persons who may choose or be chosen, as has been remarked upon other occasions, are defined and fixed in the Constitution, and are unalterable by the legislature [*i. e.*, Congress]." (Emphasis in original.)

Different provisions of the Constitution govern the selection of the President and the Vice President. Arti-

---

[4] *Id.*, at 201, 207.

[5] *Id.*, at 201.

[6] *Id.*, at 202.

[7] *Id.*, at 203.

[8] *Id.*, at 206.

cle II and the Twelfth Amendment provide for election by electors. Article II specifies that each State shall appoint electors "in such Manner as the Legislature thereof may direct." Because the Constitution does not require the popular election of members of the electoral college, it does not specify the qualifications that voters must have when the selection of electors is by popular election. This is left to the States in the exercise of their power to "direct" the manner of choosing presidential electors. *Williams* v. *Rhodes,* 393 U. S. 23, 29. When electors are chosen by popular election, the Federal Government has the power to assure that such elections are orderly and free from corruption. *Burroughs* v. *United States,* 290 U. S. 534. But in *Burroughs* the Court noted of the Act under review: "Neither in purpose nor in effect does it interfere with the power of a state to appoint electors or the manner in which their appointment shall be made." 290 U. S., at 544. The Court quoted with approval the following passage from *Ex parte Yarbrough,* 110 U. S. 651: "[T]he importance to the general government of having the actual election—the voting for those members—free from force and fraud is not diminished by the circumstance that the qualification of the voter is determined by the law of the State where he votes." 290 U. S., at 546. And in *United States* v. *Classic,* 313 U. S. 299, the Court was careful to point out that it is the "right of *qualified* voters within a state to cast their ballots and have them counted" which is a privilege of United States citizenship amenable to congressional protection. *Id.,* at 315 (emphasis added). See also *Corfield* v. *Coryell,* 6 F. Cas. 546, 552 (No. 3230) (CCED Pa.).

The issue, then, is whether, despite the intentional withholding from the Federal Government of a general authority to establish qualifications to vote in either congressional or presidential elections, there exists con-

gressional power to do so when Congress acts with the objective of protecting a citizen's privilege to move his residence from one State to another. Although the matter is not entirely free from doubt, I am persuaded that the constitutional provisions discussed above are not sufficient to prevent Congress from protecting a person who exercises his constitutional right to enter and abide in any State in the Union from losing his opportunity to vote, when Congress may protect the right of interstate travel from other less fundamental disabilities. The power of the States with regard to the franchise is subject to the power of the Federal Government to vindicate the unconditional personal rights secured to the citizen by the Federal Constitution. *Williams* v. *Rhodes, supra;* cf. *Shapiro* v. *Thompson, supra.* The power that Congress has exercised in enacting § 202 is not a general power to prescribe qualifications for voters in either federal or state elections. It is confined to federal action against a particular problem clearly within the purview of congressional authority. Finally, the power to facilitate the citizen's exercise of his constitutional privilege to change residence is one that cannot be left for exercise by the individual States without seriously diminishing the level of protection available. As I have sought to show above, federal action is required if this privilege is to be effectively maintained. We should strive to avoid an interpretation of the Constitution that would withhold from Congress the power to legislate for the protection of those constitutional rights that the States are unable effectively to secure. For all these reasons, I conclude that it was within the power of Congress to enact § 202.[9]

[9] Whether a particular State's durational residency requirement for voters may violate the Equal Protection Clause of the Fourteenth Amendment presents questions that are for me quite different from those attending the constitutionality of § 202. See *Howe* v. *Brown,*

## III

Section 302 added by the Voting Rights Act Amendments of 1970 undertakes to enfranchise in all federal, state, and local elections those citizens 18 years of age or older who are now denied the right to vote by state law because they have not reached the age of 21. Although it was found necessary to amend the Constitution in order to confer a federal right to vote upon Negroes [10] and upon females,[11] the Government asserts that a federal right to vote can be conferred upon people between 18 and 21 years of age simply by this Act of Congress. Our decision in *Katzenbach* v. *Morgan*, 384 U. S. 641, it is said, established the power of Congress, under § 5 of the Fourteenth Amendment, to nullify state laws requiring voters to be 21 years of age or older if Congress could rationally have concluded that such laws are not supported by a "compelling state interest."

In my view, neither the *Morgan* case, nor any other case upon which the Government relies, establishes such congressional power, even assuming that all those cases [12] were rightly decided. MR. JUSTICE BLACK is surely

---

319 F. Supp. 862 (ND Ohio 1970); *Cocanower* v. *Marston*, 318 F. Supp. 402 (Ariz. 1970); *Burg* v. *Canniffe*, 315 F. Supp. 380 (Mass. 1970); *Blumstein* v. *Ellington*, —— F. Supp. —— (MD Tenn. 1970); *Hadnott* v. *Amos*, 320 F. Supp. 107 (MD Ala. 1970); *Bufford* v. *Holton*, 319 F. Supp. 843 (ED Va. 1970); *Lester* v. *Board of Elections*, 319 F. Supp. 505 (DC 1970).

[10] U. S. Const., Amdt. XV.

[11] U. S. Const., Amdt. XIX; see also *Minor* v. *Happersett*, 21 Wall. 162.

[12] *Carrington* v. *Rash*, 380 U. S. 89 (1965); *Louisiana* v. *United States*, 380 U. S. 145 (1965); *Harper* v. *Virginia Board of Elections*, 383 U. S. 663 (1966); *Katzenbach* v. *Morgan*, 384 U. S. 641 (1966); *Kramer* v. *Union School District*, 395 U. S. 621 (1969); *Cipriano* v. *City of Houma*, 395 U. S. 701 (1969); *Evans* v. *Cornman*, 398 U. S. 419 (1970); *Phoenix* v. *Kolodziejski*, 399 U. S. 204 (1970).

correct when he writes, "It is a plain fact of history that the Framers never imagined that the national Congress would set the qualifications for voters in every election from President to local constable or village alderman. It is obvious that the whole Constitution reserves to the States the power to set voter qualifications in state and local elections, except to the limited extent that the people through constitutional amendments have specifically narrowed the powers of the States." *Ante,* at 125. For the reasons that I have set out in Part II of this opinion, it is equally plain to me that the Constitution just as completely withholds from Congress the power to alter by legislation qualifications for voters in federal elections, in view of the explicit provisions of Article I, Article II, and the Seventeenth Amendment.

To be sure, recent decisions have established that state action regulating suffrage is not immune from the impact of the Equal Protection Clause.[13] But we have been careful in those decisions to note the undoubted power of a State to establish a qualification for voting based on age. See, *e. g., Kramer* v. *Union School District,* 395 U. S. 621, 625; *Lassiter* v. *Northampton Election Board,* 360 U. S., at 51. Indeed, none of the opinions filed today suggest that the States have anything but a constitutionally unimpeachable interest in establishing some age qualification as such. Yet to test the power to establish an age qualification by the "compelling interest" standard is really to deny a State any choice at all, because no State could demonstrate a "compelling interest" in drawing the line with respect to age at one point rather than another. Obviously, the power to establish an age qualification must carry with it the power to choose

---

[13] See, *e. g.,* cases cited *supra,* n. 12.

21 as a reasonable voting age, as the vast majority of the States have done.[14]

 Katzenbach v. Morgan, supra, does not hold that Congress has the power to determine what are and what are not "compelling state interests" for equal protection purposes.  In Morgan the Court considered the power of Congress to enact a statute whose principal effect was to enfranchise Puerto Ricans who had moved to New York after receiving their education in Spanish-language Puerto Rican schools and who were denied the right to vote in New York because they were unable to read or write English.  The Court upheld the statute on two grounds: that Congress could conclude that enhancing the political power of the Puerto Rican community by conferring the right to vote was an appropriate means of remedying discriminatory treatment in public services; and that Congress could conclude that the New York statute was tainted by the impermissible purpose of denying the right to vote to Puerto Ricans,

---

[14] If the Government is correct in its submission that a particular age requirement must meet the "compelling interest" standard, then, of course, a substantial question would exist whether a 21-year-old voter qualification is constitutional even in the absence of congressional action, as my Brothers point out.  Ante, at 241–246. Yet it is inconceivable to me that this Court would ever hold that the denial of the vote to those between the ages of 18 and 21 constitutes such an invidious discrimination as to be a denial of the equal protection of the laws.  The establishment of an age qualification is not state action aimed at any discrete and insular minority.  Cf. United States v. Carolene Products Co., 304 U. S. 144, 152 n. 4.  Moreover, so long as a State does not set the voting age higher than 21, the reasonableness of its choice is confirmed by the very Fourteenth Amendment upon which the Government relies. Section 2 of that Amendment provides for sanctions when the right to vote "is denied to any of the male inhabitants of such State, being twenty-one years of age, and citizens of the United States . . . ." (Emphasis added.)

an undoubted invidious discrimination under the Equal Protection Clause. Both of these decisional grounds were farreaching. The Court's opinion made clear that Congress could impose on the States a remedy for the denial of equal protection that elaborated upon the direct command of the Constitution, and that it could override state laws on the ground that they were in fact used as instruments of invidious discrimination even though a court in an individual lawsuit might not have reached that factual conclusion. Cf. *Swain* v. *Alabama,* 380 U. S. 202.

But it is necessary to go much further to sustain § 302. The state laws that it invalidates do not invidiously discriminate against any discrete and insular minority. Unlike the statute considered in *Morgan,* § 302 is valid only if Congress has the power not only to provide the means of eradicating situations that amount to a violation of the Equal Protection Clause, but also to determine as a matter of substantive constitutional law what situations fall within the ambit of the clause, and what state interests are "compelling." I concurred in MR. JUSTICE HARLAN's dissent in *Morgan.* That case, as I now read it, gave congressional power under § 5 the furthest possible legitimate reach. Yet to sustain the constitutionality of § 302 would require an enormous extension of that decision's rationale. I cannot but conclude that § 302 was beyond the constitutional power of Congress to enact.